IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF ARIZONA; STATE OF MINNESOTA; STATE OF CONNECTICUT; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; LAURA KELLY, in her official capacity as Governor of the State of Kansas; OFFICE OF THE GOVERNOR ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; and STATE OF WISCONSIN,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as U.S. Secretary of Agriculture; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in his official capacity as Director of the U.S. Office of Management and Budget; and UNITED STATES OF AMERICA,

Defendants.

Case No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.     For decades, low-income Americans have relied on the Supplemental Nutrition Assistance Program (SNAP) to put food on the table.

2.     Across various previous federal government shutdowns, SNAP benefits have never been interrupted by a lapse in appropriations.

3.      Until now:  earlier this month, Defendant U.S. Department of Agriculture (USDA) suspended SNAP benefits for November.

4.      Because of USDA's actions, SNAP benefits will be delayed for the first time since the program's inception.

5.      Worse still, USDA suspended SNAP benefits even though, on information and belief, it has funds available to it that are sufficient to fund all, or at least a substantial portion, of November SNAP benefits.

6.      Suspending SNAP benefits in these circumstances is both contrary to law and arbitrary and capricious under the Administrative Procedure Act.

7.      USDA's suspension of SNAP benefits is irreparably harming Plaintiff States—a harm that increases every day SNAP benefits are delayed.

8.      Plaintiff States are therefore forced to seek this Court's intervention to forestall further irreparable harm from USDA's illegal action.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 2201(a).

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The Commonwealth of Massachusetts is a resident of this judicial district and a substantial part of the events or omissions giving rise to this Complaint occurred within the District of Massachusetts.

## PARTIES

I.    **Plaintiffs**

11.    Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

12.    Plaintiff the State of California, by and through its Attorney General Rob Bonta, is a sovereign state of the United States of America. Attorney General Bonta is the chief law officer of the State of California and head of the California Department of Justice. He has the authority to file civil actions to protect California's rights and interests and the resources of this State. Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510-11; *see Pierce v. Superior Court*, 1 Cal. 2d 759, 761–62 (1934) (the Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state").

13.    Plaintiff the State of Arizona is a sovereign state of the United States of America and joins this action by and through Attorney General Kristin Mayes, who is the chief law enforcement officer of the State and authorized to "[r]epresent this state in any action in a federal court." Ariz. Rev. Stat. § 41-193(A)(3); see Ariz. Const. Art. V, § 1(A).

14.    Plaintiff the State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

15.     Plaintiff the State of Colorado is a sovereign state of the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

16.     Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

17.     Plaintiff the State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

18.     Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

19.     Plaintiff the State of Hawaiʻi, represented by and through its Attorney General Anne E. Lopez, is a sovereign state of the United States of America. The Attorney General is Hawaiʻi's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

20.    Plaintiff the State of Illinois is a sovereign state of the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, section 15. *See* Ill. Comp. State. 205/4.

21.    Plaintiff Laura Kelly brings this suit in her official capacity as Governor of the State of Kansas. The Kansas Constitution vests "[t]he supreme executive power" in the Governor, "who shall be responsible for the enforcement of the laws of" Kansas. Kan. Const. art. I, § 3. The Governor oversees all executive agencies in Kansas and has the power to bring a suit and be sued in her official capacity in fulfilling her constitutional duty.

22.    Plaintiff Office of the Governor, *ex rel.* Andy Beshear, brings this suit in his official capacity as Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," Ky Const. § 81. In taking office, Governor Beshear swears an oath that he will support the Constitution of the United States and the Kentucky Constitution. Ky. Const. § 228.

23.    Plaintiff the State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

24.    Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

25.     The State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

26.     Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State of the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

27.     Plaintiff the State of New Jersey is a sovereign state of the United States of America, and by and through Attorney General Matthew Platkin, brings this action. The Attorney General of New Jersey is the New Jersey's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern. N.J. Stat. Ann. § 52:17A-4.

28.     Plaintiff the State of New Mexico, represented by and through its Attorney General Raúl Torrez, is a sovereign state of the United States of America. As the State's chief law enforcement officer, the Attorney General is authorized to act on behalf of the State of New Mexico in this matter.

29.     Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign state of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

30.     Plaintiff the State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson who is the chief law enforcement officer of North Carolina.

31.     Plaintiff the State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

32.     Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6), 732-303.

33.     Plaintiff the State of Rhode Island, by and through its Attorney General Peter F. Neronha, is a sovereign state of the United States of America. Attorney General Neronha is the chief law enforcement officer of Rhode Island and authorized to pursue this action on behalf of the State of Rhode Island. R.I. Gen. Laws § 42-9-6.

34.     Plaintiff the State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity R. Clark, who is Vermont's chief legal officer and is authorized to pursue this action on behalf of the State. Vt. Stat. Ann. tit. 3, § 159.

35.     Plaintiff the State of Washington, represented by and through Attorney General Nicholas W. Brown, is a sovereign state of the United States of America. The Attorney General is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action.

36.     Plaintiff the State of Wisconsin is a sovereign state of the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

## II.    Defendants

37.    Defendant United States Department of Agriculture (USDA) is a department of the executive branch of the United States government, which, through its sub-agency the Food and Nutrition Service (FNS), is responsible for overseeing the States' administration of SNAP.

38.    Defendant Brooke Rollins is the Secretary of Agriculture and the head of USDA. She is sued in her official capacity.

39.    Defendant Office of Management and Budget (OMB) is a cabinet agency within the executive branch of the United States government. OMB is responsible for oversight of federal agencies' performance and the administration of the federal budget as negotiated and passed by Congress. 31 U.S.C. §§ 501–507.

40.    Defendant Russell Vought is the Director of OMB and that agency's highest ranking official. In that capacity, he oversees OMB and provides direction to the executive branch on financial and budgetary matters. He is sued in his official capacity. 31 U.S.C. §§ 501, 503.

41.    The United States of America is responsible for the exercise of executive actions by the named Defendants. The United States of America is included as a Defendant under 5 U.S.C. § 702 to ensure that Plaintiff States obtain adequate relief if this Court orders an injunction.

## BACKGROUND

## I.    PLAINTIFF STATES SERVE MILLIONS OF FOOD-INSECURE RESIDENTS THROUGH SNAP.

42.    First authorized in 1964 as the "Food Stamp Program," the Supplemental Nutrition Assistance Program (SNAP) has long been the country's primary weapon against hunger and an essential safety net for low-income Americans. The goal of SNAP is "to 'alleviate

. . . hunger and malnutrition' by 'increasing [the] food purchasing power' of low-income households." *Hall v. USDA*, 984 F.3d 825, 831 (9th Cir. 2020) (quoting 7 U.S.C. § 2011); *see* 7 U.S.C. § 2011 ("It is declared to be the policy of Congress, in order to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households"). To achieve this end, SNAP provides monthly benefits to eligible households that can be used to buy food. *See Hall*, 984 F.3d at 831.

43.     Through SNAP, eligible recipients—whose net income cannot exceed the federal poverty line, or around $31,000 per year for a family of four in 2025[1]—receive Electronic Benefit Transfer (EBT) cards that are loaded with benefits each month that recipients can use to purchase food at participating retailers. 7 U.S.C. § 2016; 7 C.F.R. §§ 274.2, 274.7.

44.     In 2024, SNAP helped more than 41 million people avoid hunger or malnutrition.[2] More than 62 percent of SNAP participants are in families with children, and more than 37 percent are in families with members who are elderly or have disabilities.[3] Collectively, in a month, Plaintiff States provide nearly 25 million individuals, in nearly 14 million households, with food assistance through SNAP.[4] Nationwide, for Federal Fiscal Year 2024, SNAP benefits averaged about $8.3 billion per month.[5]

---

[1] *Supplemental Nutrition Assistance Program (SNAP) Fiscal Year (FY) 2025 Income Eligibility Standards*, USDA (updated Oct. 1, 2024), https://fns-prod.azureedge.us/sites/default/files/media/file/FY2025-Income-Eligibility-Standards.pdf.
[2] Center on Budget and Policy Priorities, *Policy Basics: The Supplemental Nutrition Assistance Program (SNAP)* (updated Nov. 25, 2024), https://www.cbpp.org/research/food-assistance/the-supplemental-nutrition-assistance-program-snap.
[3] *Id.*
[4] *SNAP Data Tables*, USDA (last updated July 14, 2025), https://www.fns.usda.gov/pd/supplemental-nutrition-assistance-program-snap.
[5] *The Food and Nutrition Assistance Landscape: Fiscal Year 2024 Annual Report*, USDA (July 2025), at 9, https://ers.usda.gov/sites/default/files/_laserfiche/publications/112884/EIB-291.pdf?v=45626.

**A.    How SNAP operates.**

45.    At the federal level, SNAP is overseen by FNS, a component of USDA. 7 C.F.R. § 271.3(a).

46.    It is state agencies, however, that are "responsible for the administration of the [SNAP] program." 7 C.F.R. § 271.4(a); *see* 7 U.S.C. § 2020(a)(1). States are responsible for creating and processing applications for benefits, making eligibility determinations, issuing benefits, and ensuring program integrity. *See* 7 U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4.

47.    The administrative costs of operating SNAP are paid by both the state and federal governments. Currently, "the Secretary is authorized to pay each State agency, through fiscal year 2026, 50 percent . . . of all administrative costs involved in each State agency's operation of" SNAP. 7 U.S.C. § 2025(a).

48.    Plaintiff States each administer their own SNAP program. For example, in the Commonwealth of Massachusetts, the SNAP program is administered by the Massachusetts Department of Transitional Assistance (DTA), which has a statutory mission to assist and empower low-income individuals and families to meet their basic needs, improve their quality of life, and achieve long-term economic self-sufficiency. SNAP, Massachusetts's largest anti-hunger program, is a key part of the Commonwealth's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food. Thus far in 2025, an average of 1.1 million people received SNAP benefits in Massachusetts each month, including approximately 665,000 families, 342,000 children, and 261,500 elderly individuals. Households in Massachusetts receive on average $323 per month in SNAP benefits to meet their basic subsistence and nutritional needs.

49.     California's SNAP program is called CalFresh. Cal. Welf. & Inst. Code § 18900.2(a). CalFresh is overseen by the California Department of Social Services (CDSS), but the certification of applicant households and the issuance of EBT cards is managed by California's 58 counties, as authorized by federal law. *See* 7 U.S.C. §§ 2012(s)(1), 2020(a)(2); *see also* Cal. Welf. & Inst. Code § 18902. CalFresh is the second largest social services program in California after Medi-Cal, California's Medicaid program, and it provides an essential hunger safety net to an average of 5.5 million Californians per month. Since the beginning of Federal Fiscal Year 2025, approximately $1.07 billion in CalFresh benefits have been issued each month. Annually, California and the federal government each covers over a billion dollars in administrative costs. Each month, approximately 1.9 million SNAP recipients in California are children.

50.     In the State of Arizona, the SNAP program is administered by the Arizona Department of Economic Security, which carries out its mission through work with individuals, families, community and advocacy organizations, and state and federal partners to facilitate the safety and economic security of persons who qualify for benefits and services in the State. In federal fiscal year 2024, an average of 950,978 people received SNAP benefits in Arizona each month, including 401,455 children and 135,677 elderly individuals. More than $2,029,794,041 in SNAP benefits were issued over the course of state fiscal year 2024.

51.     In Minnesota, the SNAP program is administered by the Department of Children, Youth, and Families, which administers programs that keep children safe and provides families with supports to care for their children. In federal fiscal year 2024, an average of 440,000 people received SNAP benefits in Minnesota each month, including 181,980 children and 67,000 elderly individuals.

52. In the State of Colorado, its 64 counties determine SNAP eligibility and authorize benefits while the state oversees the SNAP program. Colo. Rev. Stat. § 26-2-301(1), (2). The Colorado Department of Human Services's (CDHS) Office of Economic Security fulfills the State of Colorado's responsibilities. Consistent with federal law, CDHS is responsible for issuance, control, and accountability of SNAP benefits and EBT cards; ensuring program integrity; and supervising counties' day-to-day administration of SNAP, including processing applications for SNAP benefits and certifying eligible applicant households. 7 U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4; 7 C.F.R. § 274.2. SNAP is a key part of Colorado's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food. In 2025, an average of 612,931 people received SNAP benefits in Colorado each month, including over 306,000 children and about 114,000 elderly individuals. More than $1.4 billion in SNAP benefits were issued during 2024 in Colorado.

53. In the State of Connecticut, SNAP is administered by the Department of Social Services. SNAP is a key part of Connecticut's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food. Thus far in 2025, an average of approximately 366,000 people received SNAP benefits in Connecticut each month, including approximately 215,000 families and 120,000 children. Households in Connecticut receive on average $324 per month in SNAP benefits to meet their basic subsistence and nutritional needs. During the federal fiscal year between October 1, 2024, and September 30, 2025, DSS issued approximately $72,000,000 per month in SNAP benefits in Connecticut.

54. In the District of Columbia, SNAP is administered by the District of Columbia Department of Human Services. In fiscal year 2025 (FY25), an average of 141,000 people

received SNAP benefits in the District each month, including 47,000 children and 24,000 elderly individuals. More than $320 million in SNAP benefits were issued in FY25.

55.    In the state of Illinois, the SNAP program is administered by the Illinois Department of Human Services (IDHS). IDHS administers the SNAP program in Illinois pursuant to the Illinois Public Aid Code. 305 ILCS 5/1-1 *et seq.* It is nearly impossible to overstate the crucial role SNAP plays in the lives of Illinoisans who most need help accessing food. SNAP is a cornerstone public health program with long term success at fighting hunger and helping low-income people and families in Illinois buy the food they need. Thus far in State Fiscal Year 2025, an average of 1,033,970 households received SNAP benefits in Illinois each month, which included an average of 1,873,090 individuals. Households in Illinois receive on average $350 per month in SNAP benefits to meet their basic subsistence and nutritional needs. During the federal fiscal year between October 1, 2024 and September 30, 2025, IDHS issued an average of $378 million per month in SNAP benefits in Illinois. More than $4.9 billion in SNAP benefits were issued in Illinois through State Fiscal Year 2025.

56.    In Kansas, the SNAP program is administered by the Kansas Department for Children and Families to serve as the first line of defense against hunger. It provides crucial support to, on average, 93,000 Kansas households—over 188,000 Kansans each month. This includes more than 85,000 Kansas children and 38,000 elderly and disabled individuals.

57.    In Kentucky, the SNAP program is administered by the Kentucky Department for Community Based Services, within the Kentucky Cabinet for Health and Family Services. SNAP feeds an average of 593,000 Kentuckians each month, including around 230,000 children under age 18 and about 280,000 families. Kentucky households receive on average $368 per month in

SNAP benefits and during federal fiscal year 2025 the Commonwealth issued approximately $104 million per month in SNAP benefits to Kentuckians.

58.     In Maine, the SNAP program is administered by the Department of Health and Human Services, Office for Family Independence, which connects Maine families to services and programs that foster health, safety, resilience, and opportunity and helps Maine families to obtain necessities. In calendar year 2025, an average of 174,147 people received SNAP benefits in Maine each month, including approximately 59,209 children and 40,235 elderly individuals. Approximately 12.5 percent of Maine's population receive SNAP benefits. During the most recent federal fiscal year the average monthly SNAP benefit for a household in Maine was $296.

59.     In Maryland, the SNAP program is administered by the Maryland Department of Human Services. SNAP feeds more than 680,000 Marylanders monthly, including nearly 270,000 children, with an average monthly benefit of just $180 per customer.

60.     Michigan's SNAP program is operated by the Michigan Department of Health and Human Services (MDHHS). Michigan's program provides approximately $254 million in SNAP benefits per month on average, with an average of approximately 1,418,000 recipients.

61.     In New Jersey, the SNAP program is administered through New Jersey's largest agency, the New Jersey Division of Human Services, Division of Family Development. As of August 2025, there were approximately 812,966 persons receiving NJ SNAP, representing 436,452 households; 340,425 children; and 176,706 elderly individuals. NJ SNAP plays a critical role, through federal funding, to support NJ families in need of food assistance.

62.     SNAP is a key part of New Mexico's efforts to address hunger by supplementing the budget of low-income households to enable them to purchase healthy food. Throughout 2025, an average of 466,407 individuals—about 20.8% of the state's population—have received

14

SNAP benefits each month, which includes approximately 253,274 families and 171,534 children.

63.    In New York, the SNAP program is a central component of state-wide efforts to eradicate hunger and to help vulnerable New Yorkers meet their essential needs and advance economically by providing opportunities for stable employment, housing, and nutrition. The SNAP program serves over 2.9 million New Yorkers each month, including over 920,000 children and over 600,000 older adults. Approximately 7% of the New Yorkers benefiting from SNAP are disabled.

64.    In North Carolina, the SNAP program is administered through the North Carolina Department of Health and Human Services, Division of Child and Family Well-Being. As of September 2025, there were approximately 1,343,381 persons receiving SNAP benefits in North Carolina totaling $234,431,225, including 581,412 children and 151,793 elderly adults over the age of 65. In Federal Fiscal Year 2025, North Carolina budgeted approximately $196 million in state and county funds to pay for SNAP administration.

65.    In Pennsylvania, an average of 1,971,749 people have received SNAP benefits in Pennsylvania each month of 2025, including approximately 1,081,862 families and 694,055 children. Households in Pennsylvania receive on average $329 per month in SNAP benefits to meet their basic subsistence and nutritional needs.

66.    In Rhode Island, the SNAP program is administered by the Rhode Island Department of Human Services. In 2024, 144,200 Rhode Island residents received SNAP benefits (13% of the state population—1 in 8). In FY24, Rhode Island received in federal funds and paid out $343,459,430.25 in SNAP benefits.

67.     The Vermont Agency of Human Services, Department for Children and Families, Economic Services Division (Vermont DCF/ESD) is the state agency in Vermont that administers the SNAP program. The Vermont DCF/ESD administers benefits programs that help Vermonters meet their basic needs. SNAP is a key part of Vermont's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food. Thus far in State fiscal year 2025, an average of 65,109 people received SNAP benefits in Vermont each month. Individuals in Vermont receive on average $194 per month in SNAP benefits to meet their basic subsistence and nutritional needs. During the state fiscal year between July 1, 2024 and June 30, 2025, Vermont DCF/ESD issued approximately $12.6 million per month in SNAP benefits in Vermont, for a total of $151 million.

68.     In Washington, about 11 percent of Washington's population receive SNAP benefits at any given time, or about 900,000 people, including approximately 300,000 children. Households in Washington receive on average and in the aggregate more than $150 million each month of food benefits. Washington receives about $130 million annually to pay for the administrative costs of the program from the federal government and provides about $130 million in state funds. Washinton does not have the resources available to administer the program with solely state funds.

69.     Wisconsin's SNAP program, called FoodShare, is administered by the Wisconsin Department of Health Services (DHS). So far in 2025, an average of 688,942 people received SNAP benefits in Wisconsin each month, including 270,000 children, and 110,000 individuals over the age of 60. On average, SNAP benefits in Wisconsin are $136 per person per month and $161 per household per month. During the federal fiscal year 2025, Wisconsin DHS issued approximately $114,000,000 per month in SNAP benefits in Wisconsin.

**B.    SNAP benefits are appropriated entitlements.**

70.    Congress has provided that "[a]ssistance under this program shall be furnished to all eligible households who make application for such participation." 7 U.S.C. § 2014(a).

71.    Additionally, Congress requires that participating States implement plans of operation requiring States to "promptly determine eligibility of each applicant . . . so as to complete certification of and provide an allotment retroactive to the period of application to any eligible household not later than thirty days" after applying. 7 U.S.C. § 2020(e)(3). And where an applicant is especially impoverished, the state plan of operation must provide "that the State agency shall . . . provide benefits no later than 7 days" after applying." *Id.* § 2020(e)(9).

72.    Congress also declared it to be its policy that SNAP would "increas[e] food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011.

73.    Further, Congress has provided that SNAP benefits are "obligations of the United States within the meaning of section 8 of Title 18." 7 U.S.C. § 2024(d).

74.    Congress has also elsewhere treated SNAP as a form of "direct spending" distinct from "discretionary appropriations," the latter of which are "budgetary resources (except to fund direct spending programs) provided in appropriation Acts." 2 U.S.C. § 900(c)(7), (8).

75.    In sum, it is well-understood that, as the Government Accountability Office explained earlier this year, "SNAP is considered an appropriated entitlement, meaning that the government is legally required to make payments to those who meet the program requirements" and that "USDA's liability [extends to] the availability of appropriations for these payments."[6]

---

[6] Decision B-336036, U.S. Department of Agriculture–Application of Recording Statute, Bona Fide Needs Statute, and Antideficiency Act to Supplemental Nutrition Assistance Program Benefits at 7, GAO (Feb. 12, 2025), https://www.gao.gov/assets/880/875390.pdf.

### C.     How SNAP benefits are funded.

76.     These mandatory SNAP benefits are generally funded through appropriations

bills. *See, e.g.*, Consolidated Appropriations Act of 2024, Pub. L. 118-42, § 6, 138 Stat. 25, 93

(2024) ("For necessary expenses to carry out the Food and Nutrition Act of 2008 (7 U.S.C. 2011

et seq.), $122,382,521,000 . . . .").

77.     Congress has also provided that, when Congress appropriates a particular amount

for the SNAP program, USDA must monitor allotments over the year to ensure that they do not

exceed the appropriation and, if necessary, reduce allotments to no more than the appropriated

amount. *See* 7 U.S.C. § 2027(b) ("In any fiscal year, the Secretary shall limit the value of those

allotments issued to an amount not in excess of the appropriation for such fiscal year.").

78.     Under 7 U.S.C. § 2027(b), "if in any fiscal year [USDA] finds that the

requirements of participating States will exceed the appropriation, [USDA] shall direct State

agencies to reduce the value of such allotments to be issued to households certified as eligible to

participate in the supplemental nutrition assistance program to the extent necessary to" ensure

that allotments do not exceed appropriations. 7 U.S.C. § 2027(b).

79.     USDA has promulgated detailed regulations to implement section 2027, providing

that USDA may when necessary effect "a suspension or cancellation of allotments for one or

more months, a reduction in allotment levels for one or more months or a combination of these

three actions." 7 C.F.R. § 271.7(b).

80.     If USDA decides to suspend or cancel benefits, it must "notify State agencies of

the date the suspension or cancellation is to take effect." *Id.* § 271.7(d)(2)(i). States must then

"take immediate action to effect the suspension or cancellation," including "making necessary

computer adjustments, and notifying issuance agents and personnel." *Id.*

81.     Similarly, when USDA decides to reduce allotments, USDA "shall notify State agencies of the date the reduction is to take effect and by what percentage maximum SNAP allotments amounts are to be reduced" and "State agencies shall act immediately to implement the reduction." *Id.*

82.     A reduction or cancellation of benefits may result in a surplus of funds, in which case USDA "shall direct State agencies to provide affected households with restored benefits unless the Secretary determines that the amount of surplus funds is too small to make this practicable." *Id.* § 271.7(d)(5).

83.     By regulation, if a state agency "fails to comply with a directive to reduce, suspend or cancel allotments in a particular month" and fails to respond adequately to a warning from USDA, USDA may cancel all of the federal administrative funding the state agency receives by law, bill the State for the overissuance, or seek an injunction compelling compliance in court. *Id.* § 271.7(h).

### D.    How SNAP benefits work.

84.     As noted, the federal government funds SNAP benefits. 7 U.S.C. §§ 2013, 2017(a); 7 C.F.R. § 273.10.

85.     It is state agencies, however, that are "responsible for the administration of the [SNAP] program." 7 C.F.R. § 271.4(a).

86.     As part of administering the SNAP program, state agencies are responsible for issuing EBT cards. *See* 7 C.F.R. § 271.4(a)(2). An EBT card is a plastic, reusable card similar to a prepaid debit or gift card. EBT cards are the exclusive means by which program participants may redeem their benefits in exchange for food at qualifying retail stores. *See* 7 U.S.C. § 2016(f)(3)(B).

87.     Once benefit information is loaded onto EBT cards, SNAP recipients can use their EBT card like a debit card at any licensed SNAP retailer.

88.     Retailers are then reimbursed by the federal government through bank intermediaries.

**E.     How benefits reach EBT cards.**

89.     Plaintiff States have contracted with one of two main vendors, Fidelity Information Services, LLC or Conduent Inc., to provide EBT processing services, including managing the EBT system for their SNAP programs.

90.     In order for SNAP benefits to reach beneficiaries, each month state agencies calculate the benefit amount to which each household is entitled and send that information—called "benefit issuance files"—to their EBT vendors. The EBT vendors then use that information to load SNAP benefits onto SNAP recipients' EBT cards.

91.     If any State fails to send benefits data to its vendor by the vendor's submission deadline, delivery of benefits to SNAP recipients will be delayed.

92.     Generally, Plaintiff States submit benefits data in the form of "benefits issuance files" to their vendors by the 15th of the month prior to the month in which the benefits will be issued (e.g., by March 15 for April benefits). If necessary, a vendor can push back the date for these states to submit their benefits data. However, in order for benefits to be transmitted to beneficiaries on schedule, Plaintiff States each have a specific date by which they must submit this data. This date varies among Plaintiff States but is anywhere between a week before the start of the month and the first day of the new month.

93.     Any tardiness sending benefit issuance files to Plaintiffs' vendors will result in a delay in November benefits being issued to SNAP recipients. For California, for example, the

final date by which it can send these files to its vendor is one week prior to the first of the month.

So, in order to ensure recipients received their November 2025 benefits on time, California

would have had to send its issuance files to its vendor by October 23, 2025. Each day after

October 23 that California does not send its issuance files to its vendor will result in November

benefits being delayed another day.

94.      Relatedly, on information and belief, the complexity of the vendors' processes

means that the vendors may be unable to immediately process benefit issuance files received

from all of their client-states at essentially the same time. Therefore, in a scenario where many

states send benefit issuance files at the same time for immediate processing, there may be a delay

between receipt of the files and benefits being loaded on EBT cards.

## II.    USDA SUSPENDS SNAP BENEFITS FOR MILLIONS OF AMERICANS DESPITE THE AVAILABILITY OF CONTINGENCY FUNDS.

### A.    Congress appropriates $6 billion to USDA for use as a SNAP-specific contingency fund.

95.      In March 2025, Congress passed the Full-Year Continuing Appropriations and

Extensions Act, 2025 (139 Stat. 9, P.L. 119-4), which extended funding of most facets of the

U.S. government, including SNAP benefits, through the end of Federal Fiscal Year (FFY)

2025—September 30, 2025.

96.      These regular appropriations lapsed on September 30 and, as of the date of this

filing, Congress has not passed an annual appropriations bill funding SNAP benefits for the

current fiscal year.

97.      On information and belief, USDA funded normal SNAP benefits for issuance in

the month of October 2025 with the appropriations that expired on September 30 on the basis

that, because States sent the October issuance files in September, those benefits were obligated in

FFY 2025 and were therefore funded by FFY 2025 appropriations.

98.     While Congress has not yet provided a regular annual appropriation for SNAP benefits in FFY 2026, in 2024 it enacted an appropriations law funding $3 billion in a contingency reserve to remain available through the end of FFY 2026 (September 30, 2026). The appropriation law stated that the $3 billion "shall be placed in reserve for use only in such amounts and at such times as may become necessary to carry out program operations." *See* Pub. L. No. 118-42, § 6, 138 Stat. 25, 93–94 (2024).

99.     A continuing resolution in 2025 funded another $3 billion in a contingency reserve for these same purposes, also to remain available at least through September 30, 2026. *See* Pub. L. No. 119-4, § 1109(a), 139 Stat. 9, 13 (2025).

100.     On information and belief, the first $3 billion and the second $3 billion were available for expenditure as of October 1, 2025.

101.     On October 2, 2025, OMB apportioned $750 million of the $3 billion appropriation from March 9, 2024 (Pub. L. 118-42).[7] On information and belief, OMB has not apportioned any additional funds from the contingency reserve funds.

102.     Less than a month ago, on September 30, USDA itself acknowledged in its own shutdown contingency plan that SNAP "has been provided with multi-year contingency funds that can be used for State Administrative Expenses to ensure that the State can also continue operations during a Federal Government shutdown" and that "[t]hese multi-year contingency funds are also available to fund participant benefits in the event that a lapse occurs in the middle of the fiscal year."

103.     On information and belief, much of these contingency funds—if not all—remains available to fund SNAP benefits and State administrative costs.

---

[7] *Supplemental Nutrition Assistance Program*, OMB (last visited Oct. 27, 2025), https://openomb.org/file/11478265.

104.    Additionally, at least one other appropriated fund available to USDA has enough money to fully cover November SNAP benefits. This fund, often referred to as "Section 32" because it comes from Section 32 of the Agricultural Adjustment Act of 1935, *see* 7 U.S.C. § 612c *et seq.*, has over $23 billion in it as of October 8.[8] Earlier this month, USDA invoked its authority under 7 U.S.C. § 2257 to use a portion of this money to fund the Women, Infants, & Children (WIC) program during this government shutdown.[9]

**B.    USDA directs States to withhold benefit issuance files, effectively suspending benefits nationwide.**

105.    On October 1, 2025, the new federal fiscal year began without an appropriation by Congress to fund the federal government, creating a lapse in appropriations, or government "shutdown."

106.    In the lead-up to this shutdown, USDA issued a Lapse of Funding Plan on September 30, 2025, setting out its plan of operations should regular appropriations lapse. USDA announced in that plan:

> In addition, Congressional intent is evident that SNAP's operations should continue since the program has been provided with multi-year contingency funds that can be used for State Administrative Expenses to ensure that the State can also continue operations during a Federal Government shutdown. These multi-year contingency funds are also available to fund participant benefits in the event that a lapse occurs in the middle of the fiscal year. To fulfill this Congressional intent, it is necessary that a limited number of FNS employees be excepted from furlough to support program operations. These activities include, but are not limited to, program policy and operations, financial management, and stakeholder communications.

---

[8] *State Child Nutrition Programs*, OMB (last visited Oct. 27, 2025), https://openomb.org/file/11478695
[9] Marcia Brown, *USDA tells lawmakers WIC will be funded through October*, Politico (Oct. 10, 2025), https://www.politico.com/live-updates/2025/10/10/congress-usda-wic-tariff-revenue-nutrition-benefits-trump-00600666.

Sept. 30, 2025 Lapse of Funding Plan, at 15.

107.    On October 1, 2025, once the current government shutdown began, USDA sent state SNAP agencies a letter regarding the lapse in regular appropriations. In the letter, USDA said that "SNAP eligible households will receive monthly benefits for October" and that "funding is available for State administrative expenses (SAE) for October."

108.    The letter further directed state agencies to "continue to administer the program in accordance with Federal statute and regulations."

109.    Relying on this direction, Plaintiff States continued their normal operations, including processing new applications and preparing benefit issuance files for November benefits.

110.    On October 10, however—despite having acknowledged congressional intent to continue SNAP operations and the apparent availability of sufficient appropriations to fund November benefits—USDA sent a letter to state SNAP agencies saying that "if the current lapse in appropriations continues, there will be insufficient funds to pay full November SNAP benefits for approximately 42 million individuals across the Nation" ("October 10 Letter").

111.    The October 10 Letter further stated that, "[c]onsidering the operational issues and constraints that exist in automated systems, and in the interest of preserving maximum flexibility," USDA was "forced to direct States to hold their November issuance files and delay transmission to State EBT vendors until further notice."

112.    USDA further stated that it had only "begun the process of fact finding and information gathering to be prepared in case a contingency plan must be implemented."

113.    The October 10 Letter did not provide any further guidance regarding the availability of administrative funds for November or subsequent months should the shutdown continue.

114.    USDA did not follow up with States to provide any more detail about the result of this "process of fact finding and information gathering," nor any further "contingency plan," despite a request for such information in a letter from many of Plaintiff States' attorneys general to the agency on October 24.

115.    However, in other contexts, USDA has used available appropriations to fund certain activities during the shutdown.

116.    For example, on information and belief, USDA is repurposing certain appropriations in order to "distribute billions in aid for farmers and reopen some activities of the U.S. Department of Agriculture amid the ongoing federal shutdown."[10] That involves opening around 2,100 USDA Farm Service Agency offices across the country.[11]

117.    Separately, days before sending its October 10 Letter, USDA used Section 32 funds to temporarily fund WIC, a program providing infants and pregnant people with nutritional benefits during the shutdown.[12]

118.    In making this latter move, Defendants invoked USDA's authority under 7 U.S.C. § 2257 to draw on other available funds. Yet, inexplicably and arbitrarily, Defendants have not

---

[10] Leah Douglas, *Trump administration plans to distribute farmer aid amid shutdown*, Reuters (Oct. 21, 2025), https://www.reuters.com/world/us/trump-administration-plans-distribute-farmer-aid-amid-shutdown-2025-10-21/.

[11] Josh Funk, *USDA is reopening some 2,100 offices to help farmers access $3B in aid despite the ongoing shutdown*, AP (Oct. 22, 2025), https://apnews.com/article/usda-farm-service-agency-shutdown-rollins-trump-d0a2412aa91f9a599c46a03e5cf177a9.

[12] Moriah Balingit, *WIC food program receives $300M to keep running during government shutdown*, AP (Oct. 10, 2025), https://apnews.com/article/government-shutdown-wic-food-a6d66fa0ce3d02257b5b43a79355b1bf; Marcia Brown, *USDA tells lawmakers WIC will be funded through October,* Politico (Oct. 10, 2025), https://www.politico.com/live-updates/2025/10/10/congress-usda-wic-tariff-revenue-nutrition-benefits-trump-00600666

invoked that same authority to fund SNAP benefits for millions of Americans, including

veterans, hard-working low-income families, and some of our most vulnerable populations like

seniors and children.

**C.    USDA formally suspends November SNAP benefits.**

119.    The attorneys general of many Plaintiff States sent USDA a letter on October 24,

2025 asking for further details about what contingency funds remain available and why USDA is

not funding SNAP with these reserves and, to the extent that they are available, Section 32 funds.

USDA has not responded.

120.    The same day, however, USDA sent all state SNAP agencies a letter "as a follow-

up to [its] prior guidance issued on October 10, 2025" ("October 24 Letter").

121.    The letter stated that USDA "is suspending all November 2025 benefit allotments

until such time as sufficient federal funding is provided, or until FNS directs State agencies

otherwise." *Id.* "This suspension," it continued, "is effective November 1, 2025."

122.    The letter then directed States to "take immediate action to implement this

suspension," including "notify[ing] households of the suspension." It continued, "[u]pon the

availability of federal funding, FNS will notify State agencies of when the suspension is lifted to

allow for immediate action to resume issuing November and subsequent monthly benefits to

eligible households."

123.    It then cited a regulation requiring States to continue adjudicating SNAP

applications and "encourages State agencies to limit administrative expenses only to the

activities necessary to support the eligibility and issuance processes, integrity/oversight, and

system maintenance."

124.    Finally, it asserted that "[h]ouseholds shall receive retroactive benefits once the suspension is lifted upon the availability of federal funding" and noted that households with remaining benefits from prior months can continue to redeem those benefits.

125.    Also on October 24, USDA issued a memorandum stating the agency's view that it could not legally use the SNAP contingency reserve to fund SNAP benefits and that it would not use Section 32 funds for that purpose.[13]

126.    In that memorandum, USDA first claimed the contingency funds cannot be used because they "are only available to supplement regular monthly benefits when" there has been an appropriation that proves insufficient; because "the appropriation for regular benefits no longer exists," USDA concludes, "[t]he contingency fund is not available to support FY 2026 regular benefits." The USDA memorandum provided no citation for this legal claim.

127.    The USDA memorandum further claimed that the contingency fund may not be used for SNAP benefits because "it is a source of funds for contingencies." The memorandum does not define "contingencies," but provides as an example the Disaster SNAP program, which provides "food purchasing benefits" for people affected by disasters. And, USDA mused, "Hurricane Melissa is currently swirling in the Caribbean and could reach Florida."

128.    USDA's claim that the SNAP contingency funds cannot be used to fund SNAP benefits during an appropriation lapse is contrary to the plain text of the congressional appropriations law, which states that the reserves are for use "in such amounts and at such times as may become necessary to carry out program operations" under the Food and Nutrition Act of 2008. Pub. L. No. 118-42, § 6, 138 Stat. 25, 93–94 (2024).

---

[13] Leah Douglas, *USDA memo says it will not use emergency funds for November food benefits*, Reuters (Oct. 24, 2025), https://www.reuters.com/world/us/usda-memo-says-it-will-not-use-emergency-funds-november-food-benefits-2025-10-24/.

129.    USDA's claim that the SNAP contingency funds cannot be used to fund SNAP benefits during an appropriations lapse is also a dramatic change in USDA's policy. Less than a month ago, USDA's stated policy, in its Lapse of Funding Plan, was that the contingency funds are "available to fund participant benefits in the event that a lapse occurs in the middle of the fiscal year."

130.    Similarly, USDA's 2021 contingency plan stated that "USDA and OMB have jointly determined that there is Congressional intent that core programs of the nutrition safety net, including [SNAP] . . . shall continue operations during a lapse in appropriations." The plan stated further that "[b]udget authority" including "contingency reserves" were apportioned by OMB for this purpose.

131.    And in guidance USDA issued in January 2019, during another government shutdown, USDA stated its policy that "limited funding is available from the contingency that can be used to provide benefits for February. This reserve is being used to fund recertifications and new applications through February."

132.    USDA's view that contingency reserve funds may be used to pay SNAP benefits has further been reflected in other government reports. In a September 2019 report published by the U.S. Government Accountability Office (GAO), the GAO reaffirmed USDA's position that USDA could have used the contingency fund to cover SNAP benefits during that shutdown. *See* GAO, B-331094, U.S. Department of Agriculture—Early Payment of SNAP Benefits (Sept. 5, 2019)[14] The report stated that "[d]uring the funding gap, USDA may have had some or all of a $3 billion contingency fund available to pay for SNAP benefits." *Id.* at 3. It further stated that "USDA could properly incur obligations for the early issuance of February benefits only if it had

---

[14] Available at https://www.gao.gov/assets/b-331094-d20753.pdf.

available budget authority to make the payments, such as remaining funds in the SNAP contingency fund." *Id.* at 6.

133.    OMB has also stated its view that SNAP benefits shall continue during a lapse in appropriations. In January 2018, another USDA shutdown contingency plan reported that "USDA and OMB [had] jointly determined that there [was] Congressional intent that . . . [SNAP] . . . shall continue operations during a lapse in appropriations.").USDA and OMB both agreed that USDA's "[b]udget authority" to continue SNAP operations included "contingency reserves."

134.    As to Section 32 funds, USDA's October 24 memorandum did not claim that they are legally unavailable. Instead, it claimed that using these funds for SNAP benefits would "jeopardize" their use for child nutrition programs and the WIC program, but provided no figures to substantiate this claim. As noted above, that fund has $23 billion in it as of October 8, 2025.

135.    Finally, the USDA memorandum claimed that the suspension it effected through its October 10 Letter "provided USDA additional time to work with States on how the program will operate until further decisions are made."

136.    As of October 28, 2025, USDA's website banner included the following account of its action:

> Senate Democrats have now voted 12 times to not fund the food stamp program, also known as the Supplemental Nutrition Assistance Program (SNAP). Bottom line, the well has run dry. At this time, there will be no benefits issued November 01. We are approaching an inflection point for Senate Democrats. They can continue to hold out for healthcare for illegal aliens and gender mutilation procedures or reopen the government so mothers, babies, and the most vulnerable among us can receive critical nutrition assistance.

*See* USDA, www.usda.gov, captured at https://perma.cc/W2FU-ZUNY.

### III.  PLAINTIFF STATES WILL BE IRREPARABLY HARMED BY ANY DELAY IN SNAP BENEFIT ISSUANCE.

#### A.  Operating a program that provides no benefits

137.    Again, it is state agencies that are "responsible for the administration of the [SNAP] program," including "[c]ertification of applicant households" and "[i]ssuance, control, and accountability of SNAP benefits and EBT cards." 7 C.F.R. § 271.4(a)(1), (2); *see also* 7 U.S.C. §§ 2020(a)(1), 2025(a); 7 C.F.R. § 277.4.

138.    Administering a complex benefit program like SNAP to its 42 million participants is costly. Currently, 50% of the cost of the administration of SNAP is borne by States while the federal government covers the other 50%. 7 U.S.C. § 2025(a); 7 C.F.R. § 277.4(b). Under recently enacted legislation (known as H.R. 1 or the "One Big Beautiful Bill Act"), States' share of these administrative costs will rise to 75% for FFY 2027. *See* 7 U.S.C. § 2025(a).

139.    States are required by law to continue operating their state SNAP programs even when benefits are suspended or reduced. They must, for example, continue promptly accepting and processing SNAP applications even though "no benefits shall be issued to the applicant until issuance is again authorized by" USDA. 7 C.F.R. § 271.7(e)(1). They must also continue recertifying beneficiaries during a benefit suspension or reduction. 7 C.F.R. § 271.7(e)(3). Indeed, USDA underscored this in its letter to States on October 1, 2025, which directed that "States should continue to administer the program in accordance with Federal statute and regulations."

140.    In Wisconsin, for example, Wisconsin DHS has and will continue to expend resources to suspend SNAP benefits for November. This includes updating and maintaining DHS's case management system, managing communications and inquiries from SNAP recipients, and planning for multiple contingencies for an uncertain period. Wisconsin DHS will

be forced to dedicate numerous information technology professionals, communications and operational resources, and administrative staff to these tasks.

141.    Plaintiff States are thus being forced to spend their limited resources to operate a benefits program while USDA fails to provide the underlying benefits. Indeed, Plaintiff States have already spent millions in October to administer SNAP benefits, a significant portion of which is dedicated to developing accurate benefit issuance files to ensure November benefits are issued promptly and accurately. When those benefits do not go out on time (or at all), that investment will have been for naught.

142.    USDA has given no indication that States could recoup their share of these forced wasted expenditures.

143.    Further, on its own, the October 10 Letter has instigated significant uncertainty, confusion, and questions among State agencies, imposing an additional administrative burden on already-strained resources and staff trying to operate a complex program. For some Plaintiff States, this includes preparation for laying off a significant portion of their staffs in the event that the federal share of administrative expenses is not provided.

144.    The October 24 Letter compounds the uncertainty, as it holds out the possibility that USDA will change course even before the shutdown ends. It states that "[USDA] is suspending all November 2025 benefit allotments until such time as sufficient federal funding is provided, *or until* [*USDA*] *directs State agencies otherwise*." (emphasis added).

**B.    State resources to mitigate harms caused by the suspension of SNAP benefits.**

145.    The USDA's change in statutory interpretation and policy regarding the availability of funds for November 2025 benefits has already caused harms to the Plaintiff States as they grapple with the impacts of this abrupt and unexplained change.

146.    Even before USDA's formal suspension of SNAP benefits on October 24, in light of the October 10 effective suspension of benefits many Plaintiff States have had to expend state resources on messaging campaigns and efforts to try to ease the pain that will be felt by families that rely on SNAP come November 1. California, for example, has deployed its National Guard to assist food banks that will be facing a dramatic increase in needy families seeking assistance in the absence of SNAP benefits. California is also fast-tracking $80 million in state funds for food banks that would normally be used to fund food bank operations throughout the rest of the year. Similarly, Colorado's Governor, Jared Polis, is seeking $10 million in funds from the Colorado legislature to support food banks as they fill increased demand due to suspension of SNAP benefits. The funding would be available starting November 2025 but would only last through mid-December 2025. Minnesota Governor Tim Walz announced that Minnesota would provide $4 million in emergency funding to the state's food shelves to support Minnesotans affected by the suspension of SNAP benefits.

147.    The Connecticut SNAP agency will be required to increase its capacity to serve beneficiaries who are in search of solutions to this unprecedented break in SNAP benefits.

148.    Washington State does not have sufficient state only resources to maintain its current administrative staffing levels in the absence of the federal share of administrative expenses. In light of USDA's communications outlined above, Washington has been forced to assume that the federal share of administrative expenses will not be forthcoming, and is preparing to layoff 633 staff, approximately half of its workforce dedicated to the administration of Washington's SNAP program. Similarly, Arizona depends on administrative funds from the federal government to administer SNAP. In light of USDA's order on October 24 to "limit" administrative costs, it is not clear when federal administrative funds will come, and Arizona

does not have sufficient state-only funds to maintain current staffing levels for program administration.

###    C.    Loss of trust with SNAP recipients.

149.    Communities that need SNAP benefits the most are often reluctant to enroll in SNAP. For example, USDA found that in FFY 2020, only 78% of eligible people received SNAP benefits.[15]

150.    Accordingly, over the span of many years, Plaintiff States have spent an immense amount of resources to build trust in these communities to encourage SNAP participation.

151.    However, USDA's action to suspend benefits where there are federal funds that Congress has appropriated and that are available for these benefits threatens to fundamentally undermine this trust.

152.    This risk is heightened because it is States that operate SNAP on the ground and are forced into the position of trying to explain to needy, hungry people—who include hard-working individuals, families with children, seniors, and veterans—why they will not be receiving the benefits they have been promised, despite the availability of funds and the federal government's decisions to fund other programs during this shutdown.

###    D.    Safety net programs.

153.    Suspending benefits will ultimately transfer costs to state and local governments and community organizations, as families increasingly rely on emergency services and public safety net programs, such as local food pantries.

---

[15] *Reaching Those in Need: Estimates of State Supplemental Nutrition Assistance Program Participation Rates in 2020*, USDA (Aug. 2023) at 1, https://fns-prod.azureedge.us/sites/default/files/resource-files/snap-participation-2020-final-report.pdf

154.    Food banks, for example, are already struggling to fill a growing nutrition gap in the face of other cutbacks in nutrition assistance from the federal government.

155.    USDA's action suspending benefits will worsen the burden on food banks. In California alone, those food banks already provide for 4.6 million Californians (including 1.7 million children) facing food insecurity. In fact, California has already been forced to take steps to advance $80 million in additional funding to food banks to help needy families get access to food, when their SNAP benefits are not issued in the first week of November as expected. This investment will help ease, but not come close to eliminating, the pain that will be felt by these families.

156.    These food banks are already under strain after USDA cut $500 million in food deliveries earlier this year.[16]

### E.    Deterioration of public health and welfare.

157.    Shutting off SNAP benefits will cause deterioration of public health and well-being. Ultimately, the States will bear costs associated with many of these harms.

158.    The loss of SNAP benefits leads to food insecurity, hunger, and malnutrition, which are associated with numerous negative health outcomes in children, such as poor concentration, decreased cognitive function, fatigue, depression, and behavioral problems.

159.    These negative health outcomes in turn result in harm to Plaintiff States' educational systems. Low-income children who go without nutritious food will struggle to learn in classrooms, impacting their educational performance and advancement.[17]

---

[16] Tami Luhy, *Food banks scramble after USDA halts $500 million in deliveries*, CNN (March 22, 2025), https://www.cnn.com/2025/03/22/politics/food-banks-usda-delivery-halt.
[17] Sehrish Naveed et al., *An Overview on the Associations between Health Behaviors and Brain Health in Children and Adolescents with Special Reference to Diet Quality*, 17(3) Int'l J. Env't Res. Pub. Health. (Feb. 4, 2020), https://doi.org/10.3390/ijerph17030953.

160.    For instance, in Massachusetts, the Department of Elementary and Secondary Education (DESE) has relied on the provision of SNAP benefits as a crucial component of DESE's overall mission to keep kids learning and help them thrive in their school communities. The timely and regular provision of SNAP benefits is woven into existing DESE efforts to combat the harmful health- and education-related impacts of food insecurity among students. Furthermore, the food access crisis that will result for families who face losing SNAP benefits during the current federal government shutdown is likely to have devastating effects on DESE's ability to administer programs across local education agencies (or districts) statewide.

161.    Conversely, access to nutritious food among children is associated with better educational outcomes, including improved attendance, behavior, grades, and test scores.[18]

162.    With the suspension of SNAP benefits, the nutritional needs of millions of school-aged children in Plaintiff States will not be met. Hungry children have a harder time paying attention, behaving, and learning in school. States will have to devote additional state resources, including healthcare expenditures and additional educational resources, to address these challenges.

163.    Adults who have adequate access to nutritious food are also healthier. Low-income adults participating in SNAP incur about $1,400 less in medical care costs in a year than low-income non-participants. When state residents are refused SNAP benefits, these benefits will be lost.

164.    Food insecurity can also have a significant effect on health and, in turn, healthcare costs. Generally, food insecurity is associated with higher healthcare use and costs, including

---

[18] *See, e.g.,* Naveed et al., *supra* note 17; *Amid Cuts, We Must Protect Programs That Reduce Child Hunger*, Project Bread, https://projectbread.org/news/child-nutrition-food-insecurity.

emergency room visits, hospitalizations, and related costs. [19] A sudden and complete loss of SNAP benefits for this population would only further exacerbate these costs on state healthcare systems and the programs that partially depend on state funds, like state Medicaid, that fund these healthcare costs. The State of Connecticut, for example, anticipates that the sudden loss of SNAP benefits will also have downstream effects on other safety net programs, negatively impacting operations for other state programs such as Medicaid.

165.    Defendants' actions thus interfere with Plaintiff States' interests in protecting the health, safety, and well-being of all residents. *See, e.g.*, Cal. Welf. & Inst. Code § 18700(a)(1) (declaring state policy that "every human being has the right to access sufficient affordable and healthy food"); *id.* § 18919.1 (stating "intent of the Legislature to maximize food access for all CalFresh recipients"); 106 Mass. Code Regs. § 360.010 (stating the "purpose of the Supplemental Nutrition Assistance Program (SNAP) is to raise the nutritional level among low income households whose limited food purchasing power contributes to hunger and malnutrition among these households"); N.J. Admin. Code § 10:87-13.1 (establishing a minimum benefit amount "to reduce hunger and improve nutrition among NJ SNAP recipients by increasing their ability to purchase food and meet their nutritional needs"); Colo. Rev. Stat. § 26-2-102 ("It is the purpose of this article to promote the public health and welfare of the people of Colorado by providing, in cooperation with the federal government or independently, public assistance for needy individuals and families who are residents of the state and whose income and property are insufficient to meet the costs of necessary maintenance and services as determined by the state

---

[19] *Mass General Brigham, Greater Boston Food Bank Release Food Access Study, Revealing 2 Million Food-Insecure Adults in Massachusetts*, Mass General Brigham (Jun. 17, 2025), available at https://www.massgeneralbrigham.org/en/about/newsroom/press-releases/2025-greater-boston-food-bank-annual-food-access-report ("[U]p to an estimated $1.3 billion in emergency room and inpatient hospitalization costs in MA may be related to food insecurity[,]" with "hospitalizations that could be attributed to food insecurity among Medicaid recipients total[ling] up to $878 million annually for adults and $373 million for children.").

department and to assist such individuals and families to attain or retain their capabilities for independence, self-care, and self-support . . . .").

166.    Suspending SNAP benefits also has economic consequences beyond hunger and public health.

167.    For example, failing to provide SNAP benefits will harm the merchants that accept SNAP benefits for food purchases—approximately 26,600 grocers, farmers' markets, and other merchants in California; 17,000 merchants in New York; 10,600 in Pennsylvania; 9,600 in Illinois; 9,200 in North Carolina; 5,700 in New Jersey; 5,500 in Massachusetts; 5,000 in Washington; 4,500 in Kentucky; 4,500 in Wisconsin; 3,800 in Maryland; 3,500 in Oregon; 3,200 in Colorado; over 1,400 in Maine; and over 900 in Rhode Island. With the upcoming Thanksgiving holiday, on information and belief, many of these retailers will have purchased a greater amount of food and inventory to match the holiday demand. Without SNAP funds, SNAP recipients will not be able to frequent retailers, causing a significant loss in revenue, increased food waste, and a negative impact on Plaintiff States' economies overall.

168.    In Illinois, SNAP is also an economic driver for local businesses. If millions of Illinois residents are forced to cut back on food spending at once, this will immediately and drastically affect the economic well-being of vendors, farmers, and stores across Illinois. According to the National Grocers' Association, SNAP spending drives economic output of $1.3 billion across grocery and other retailing industries in Illinois and supports approximately 11,584 jobs in grocery stores and 6,670 jobs in supporting industries. Additionally, they report that SNAP sales and administration at the grocery store level were responsible for $110.2 million in State and local tax revenues, and $122.6 million in federal tax receipts.

169. Further, more than 4,500 merchants in Kentucky accept SNAP benefits for food purchases, and each month, approximately $100–$110 million in SNAP benefits are redeemed across the state, equating to an estimated $1.2 billion annually injected into Kentucky's economy. This funding supports thousands of local businesses and contributes substantially to food sales, particularly in rural and low-income areas; a suspension of SNAP benefits would therefore have significant adverse economic effects on retailers and communities statewide.

170. SNAP benefits generate secondary economic effects that increase overall spending and production. Defendant USDA has estimated that in a slowing economy, every $1 in SNAP benefits generates $1.54 in economic activity.[20] Thus, suspending SNAP benefits will also result in loss of economic activity in Plaintiff States.

## COUNT 1
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)
### Contrary to Law
### Against All Defendants

171. Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

172. The Administrative Procedure Act (APA) authorizes judicial review of final agency action. 5 U.S.C. §§ 704, 706.

173. The APA directs courts to hold unlawful and set aside agency actions that are found to be "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

---

[20] Patrick Canning & Brian Stacy, *The Supplemental Nutrition Assistance Program (SNAP) and the Economy: New Estimates of the SNAP Multiplier*, USDA, at iii (Jul. 19, 2019), https://ers.usda.gov/sites/default/files/_laserfiche/publications/93529/ERR-265.pdf?v=43851.

174.    USDA's suspension of November SNAP benefits is a "final agency action for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704.

175.    USDA's suspension of November SNAP benefits is contrary to the SNAP Act and its implementing regulations, specifically: 7 U.S.C. § 2014, 7 U.S.C. § 2027, and 7 C.F.R. § 271.7.

176.    7 U.S.C. § 2014(a) provides that "[a]ssistance under this program **must** be furnished to all eligible households who" apply. (Emphasis added).

177.    7 U.S.C. § 2027(b) dictates that "[i]n any fiscal year, the Secretary shall limit the value of those allotments issued to an amount not in excess of the appropriation for such fiscal year." If USDA "finds that the requirements of participating States will exceed the appropriation," USDA must "direct State agencies to reduce the value of such allotments to be issued to households certified as eligible to participate in [SNAP] to the extent necessary to comply with the provisions of this subsection." 7 U.S.C. § 2027(b).

178.    USDA thus has a statutory obligation to both "furnish" SNAP benefits "to all eligible households" who apply and, *only* where an appropriation exists but USDA expects benefits to exceed that appropriation, to reduce benefits to ensure the cost of benefits does not exceed that appropriation for the fiscal year. Together, this means that USDA can only reduce benefits to the extent necessary to ensure that benefits do not exceed available appropriations.

179.    In other words, the agency cannot simply suspend all benefits indefinitely, while refusing to spend funds from available appropriations for SNAP benefits for eligible households.

180.    Here, Congress has appropriated $6 billion for contingency reserves specifically assigned to the SNAP program. Additionally, as USDA raised in its October 24 memorandum,

Congress has also appropriated funds through Section 32 that, as explained *supra* at ¶¶ 104, 117, 125, 134, are designated by Congress for USDA nutrition-assistance programs and would be sufficient for November SNAP benefits.

181.    By suspending all SNAP benefits nationwide rather than allowing them to be funded through USDA's available appropriations, Defendants have acted contrary to their statutory obligation under 7 U.S.C. § 2014 and 7 U.S.C. § 2027 to provide SNAP benefits using appropriated funds.

182.    By suspending all SNAP benefits nationwide rather than allowing them to be funded through USDA's available appropriations, Defendants have also acted contrary to 7 C.F.R. § 271.7, which limits the reduction of SNAP benefits to those reductions made necessary by the amount of available appropriations.

183.    In the alternative, USDA, on information and belief, has access to sufficient appropriations to fund at least a significant portion of November SNAP benefits based just on the $6 billion in SNAP-specific contingency funds.

184.    By suspending all November SNAP benefits nationwide rather than utilizing the statutory procedure for providing a reduced amount of benefits for November, Secretary Rollins and USDA have acted contrary to their statutory obligation to provide SNAP benefits.

### COUNT 2
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious and Abuse of Discretion
### Against All Defendants

185.    Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

186.    The APA authorizes judicial review of final agency action. 5 U.S.C. §§ 704, 706.

187.    The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

188.    USDA's suspension of November SNAP benefits is a "final agency action for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704.

189.    USDA's suspension of November SNAP benefits is arbitrary and capricious within the meaning of the APA.

190.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

191.    USDA has historically funded SNAP benefits during prior lapses in appropriations. USDA has also previously—in prior years and as recently as last month—taken the position that contingency funds are available to fund benefits during shortfalls. *See supra* ¶¶ 129–33. OMB has shared that position. In its September 30, 2025 Funding Lapse Plan, USDA assured States that "Congressional intent is evident that SNAP's operations should continue since the program has been provided with multi-year contingency funds" that are "available to fund participant benefits in the event that a lapse occurs in the middle of the fiscal year."

192.    And in its October 1 letter to States, USDA promised that "funding is available for State administrative expenses (SAE) for October" and that "States should continue to administer the program in accordance with Federal statute[s] and regulations."

193.    Defendants failed to engage in reasoned decision-making as required by the APA. Among other deficiencies, Defendants have failed to consider the impact their actions will have on USDA's and States' ability to fulfill the SNAP program's purpose of providing food benefits to low-income families. Defendants have also failed to consider the dire public health consequences that will result from a suspension of SNAP benefits, or the other irreparable harms the decision will inflict.

194.    Defendants additionally ignored substantial reliance interests that Plaintiff States have in USDA's funding SNAP benefits through a lapse in appropriations. At least in part due to USDA's assurances and direction on October 1 received by many Plaintiff States, Plaintiff States have expended time and resources to ensure that November benefit issuance files are prepared on time as usual, to enable state agencies to send those files to vendors on time, and therefore ensure timely issuance of benefits to state SNAP recipients. Plaintiff States have fostered trust with their residents by delivering benefits on time for decades. That trust will be destroyed by USDA's direction to effectively suspend benefits, which will cause residents to blame state agencies for the delay.

195.    Although Defendants may change their policies within statutory limits, the agency must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Defendants have not even provided clear notice of their departure from their longstanding and statutorily mandated policy, much less the necessary "satisfactory

explanation" for their decision not to use all available funds to furnish SNAP benefits to participant households. *State Farm*, 463 U.S. at 43.

196.     Moreover, the reasons offered by Defendants for their actions in USDA's October 24 memorandum are pretextual, in that they offer no evidence that contingency funds are not available or that funding November SNAP benefits through Section 32 funds will threaten funding for child nutrition programs and WIC.

197.     Defendants' actions are therefore arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A) of the APA.

198.     To the extent Defendants purport to have the discretion to determine whether to fund SNAP benefits using alternative appropriations, including the SNAP contingency reserve, the October 10 Letter and October 24 Letter constitute an abuse of discretion in violation of 5 U.S.C. § 706(2)(A). It is an abuse of discretion for Defendants to decline to use available appropriations, including the SNAP contingency reserve, to fund benefits for the mandatory SNAP entitlement program.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States respectfully request that this Court enter judgment in their favor and grant the following relief:

1.     A declaration that USDA's directive to State SNAP administrators to withhold SNAP benefit issuance files in its October 10, 2025 letter is contrary to law, arbitrary and capricious, and an abuse of discretion.

2.     A declaration that USDA's suspension of November 2025 SNAP benefits in its October 24, 2025 letter is contrary to law, arbitrary and capricious, and an abuse of discretion.

3.    A declaration that USDA is required to furnish the SNAP benefits that have already been calculated and determined by Plaintiffs' state agencies for November 2025, unless the Secretary reduces those benefits in accordance with 7 U.S.C. § 2027 and 7 C.F.R. § 271.7 only to the extent necessary to ensure SNAP benefits do not exceed USDA's appropriations, where such appropriations include all funds available for SNAP benefits, including in the contingency reserve.

4.    An order vacating USDA's directive to Plaintiff States to withhold SNAP benefit issuance files in its October 10, 2025 Letter ("Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025") and vacating USDA's suspension of November 2025 SNAP benefits in its October 24, 2025 Letter ("Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025").

5.    A preliminary and permanent injunction enjoining Defendants: (a) from implementing, giving effect to, maintaining, or reinstating under a different name the directives in the October 10 Letter or the October 24 Letter as to Plaintiff States or as to the SNAP benefits administered by the Plaintiffs; (b) from enforcing the directives in the October 10 or October 24 Letters against Plaintiffs, including by seeking penalties under 7 C.F.R. § 271.7(h) or initiating noncompliance proceedings under 7 U.S.C. § 2020(g); (c) from seeking to hold Plaintiff States liable for the issuance of these benefits in any manner; and (d) from failing to reimburse Plaintiff States for their expenses incurred in administering SNAP as set forth in 7 U.S.C. § 2024 and 7 C.F.R. § 277.1 *et seq*.

6.    A temporary restraining order enjoining Defendants: (a) from implementing, giving effect to, maintaining, or reinstating under a different name the directives in the October

10 Letter or the October 24 Letter as to Plaintiff States or as to the SNAP benefits administered by the Plaintiffs; and (b) from enforcing the directives in the October 10 or October 24 Letters against Plaintiffs, including by seeking penalties under 7 C.F.R. § 271.7(h) or initiating noncompliance proceedings under 7 U.S.C. § 2020(g).

7.    Plaintiff States' costs, expenses, and reasonable attorneys' fees; and

8.    Such other relief as the Court deems just and proper.

Dated: October 28, 2025

Respectfully submitted,

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

ROB BONTA
Attorney General of California
PAUL STEIN*
Supervising Deputy Attorney General

*/s/ Michelle Pascucci*
MICHELLE PASCUCCI (BBO #690889)
State Trial Counsel
LIZA HIRSCH (BBO #683273)
Chief, Children's Justice Unit
CASSANDRA THOMSON (BBO #705942)
Assistant Attorney General
Office of the Massachusetts Attorney
General
1 Ashburton Place Boston, MA 02108
(617) 963-2255
michelle.pascucci@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of
Massachusetts*

*/s/ Maria F. Buxton*
MARIA F. BUXTON*
CHRISTOPHER KISSEL*
LIAM O'CONNOR*
RYAN EASON*
SEBASTIAN BRADY*
WILLIAM BELLAMY
DEPUTY ATTORNEYS GENERAL
*Attorneys for Plaintiff State of California*

KEITH ELLISON
Attorney General of Minnesota

KRISTIN MAYES
Attorney General of Arizona

*/s/ Joseph R. Richie*
JOSEPH R. RICHIE*
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

*/s/ Luci D. Davis*
JOSHUA D. BENDOR (AZ NO. 031908)*
Solicitor General
HAYLEIGH S. CRAWFORD (AZ NO.
032326)*
Deputy Solicitor General
LUCI D. DAVIS (AZ NO. 035347)*
Senior Litigation Counsel
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Hayleigh.Crawford@azag.gov
Luci.Davis@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Tanja E. Wheeler*
TANJA E. WHEELER*
Associate Chief Deputy Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
Tanja.wheeler@coag.gov
*Attorneys for Plaintiff State of Colorado*

WILLIAM TONG
Attorney General of Connecticut

*/s/ Patricia E. McCooey*
PATRICIA E. MCCOOEY*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Patricia.McCooey@ct.gov
*Attorneys for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Ian R. Liston*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
ROSE E. GIBSON*
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@delaware.gov
*Attorneys for Plaintiff State of Delaware*

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

*/s/ Nicole S. Hill*
NICOLE S. HILL*
Assistant Attorney General
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
Nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

ANNE E. LOPEZ
Attorney General of Hawaiʻi

*/s/ Kalikoʻonālani D. Fernandes*
DAVID D. DAY*
Special Assistant to the Attorney General
KALIKOʻONĀLANI D. FERNANDES*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawaiʻi*

KWAME RAOUL
Attorney General of Illinois

*/s/ Harpreet K. Khera*
HARPREET K. KHERA*
Bureau Chief, Special Litigation
ALICE L. RIECHERS*
Assistant Attorney General
115 S. LaSalle St., 35th Flr.
Chicago, Illinois 60603
(773) 590-7127
Harpreet.Khera@ilag.gov
*Attorneys for Plaintiff State of Illinois*

LAURA KELLY, in her official capacity as
Governor of the State of Kansas

*/s/ Justin Whitten*
JUSTIN WHITTEN*
General Counsel
ASHLEY STITES-HUBBARD*
Deputy Chief Counsel
Office of the Kansas Governor
300 SW 10th Ave, Room 541-E
Topeka, KS 66612
(785) 296-3930
Justin.h.whitten@ks.gov
Ashley.stiteshubbard@ks.gov
*Counsel for Governor Laura Kelly*

OFFICE OF THE GOVERNOR *ex rel*. Andy
Beshear, in his official capacity as
Governor of the Commonwealth of
Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO*
General Counsel
TAYLOR PAYNE
Chief Deputy General Counsel
LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors'
Office*

AARON M. FREY
Attorney General of Maine

*/s/ Brendan Kreckel*
BRENDAN KRECKEL*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.:  207-626-8800
Fax:  207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

DANA NESSEL
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
DANIEL PING*
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
PingD@michigan.gov
*Attorneys for Plaintiff State of Michigan*

AARON D. FORD
Attorney General of Nevada

*/s/ K. Brunetti Ireland*
K. BRUNETTI IRELAND*
Chief of Special Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov
*Attorneys for Plaintiff State of Nevada*

MATTHEW J. PLATKIN
Attorney General of New Jersey

/s/ *Kashif T. Chand*
KASHIF T. CHAND (NJ BAR NO.
016752008)*
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of the State of New
Mexico

*/s/ Anjana Samant*
ANJANA SAMANT*
Deputy Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
505-270-4332
asamant@nmdoj.gov
*Attorneys for the State of New Mexico*

LETITIA JAMES
Attorney General of New York

*/s/ Molly Thomas-Jensen*
MOLLY THOMAS-JENSEN*
Special Counsel
MARK LADOV*
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8240
molly.thomas-jensen@ag.ny.gov
Mark.ladov@ag.ny.gov
*Attorneys for Plaintiff State of New York*

JEFF JACKSON
Attorney General of North Carolina

LAURA HOWARD
Chief Deputy Attorney General

*/s/ Adrian Dellinger*
ADRIAN DELLINGER*
Assistant Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6813
ADellinger@ncdoj.gov
*Counsel for State of North Carolina*

DAN RAYFIELD
Attorney General of Oregon

By: */s/ Leanne Hartmann*
    LEANNE HARTMANN, Mass. BBO
    #667852
    Senior Assistant Attorney General
    Oregon Department of Justice
    100 SW Market Street
    Portland, OR 97201
    Tel (971) 673-1880
    Fax (971) 673-5000
    Email:
    Leanne.Hartmann@doj.oregon.gov
*Attorneys for Plaintiff Oregon*

JOSH SHAPIRO, in his official capacity as
Governor of the Commonwealth of
Pennsylvania

JENNIFER SELBER
General Counsel

*/s/ Jacob B. Boyer*
JACOB B. BOYER
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov
*Counsel for Governor Josh Shapiro*

PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Madeline R. Becker*
MADELINE R. BECKER (RI BAR NO.
10034)*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
*Attorneys for Plaintiff State of Rhode
Island*

NICHOLAS W. BROWN
Attorney General of Washington

*/s/ William McGinty*
WILLIAM MCGINTY, WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
william.mcginty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Faye B. Hipsman*
FAYE B. HIPSMAN*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

*\* pro hac vice forthcoming*

CHARITY R. CLARK
Attorney General for the State of Vermont

*/s/ Ryan P. Kane*
RYAN P. KANE
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov
*Attorneys for Plaintiff State of Vermont*

## <u>CERTIFICATE OF SERVICE</u>

I, Michelle Pascucci, certify that on October 28, 2025, I provided a copy of the foregoing document to the following attorneys at the U.S. Department of Justice by electronic mail:

Brad Rosenberg
Special Counsel
Federal Programs Branch
U.S. Department of Justice
brad.rosenberg@usdoj.gov

Abraham George
Chief, Civil Division
U.S. Attorney's Office for the District of Massachusetts
abraham.george@usdoj.gov

Rayford Farquhar
Chief, Defensive Litigation, Civil Division
U.S. Attorney's Office for the District of Massachusetts
rayford.farquhar@usdoj.gov

<u>/s/ Michelle Pascucci</u>
Michelle Pascucci (BBO #690889)