IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF ARIZONA;  STATE OF MINNESOTA; STATE OF CONNECTICUT; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA;  STATE OF HAWAII; STATE OF ILLINOIS; LAURA KELLY, in her official capacity as Governor of the State of Kansas; OFFICE OF THE GOVERNOR ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; and STATE OF WISCONSIN,<br><br>                                        Plaintiffs,<br><br>                    v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as U.S. Secretary of Agriculture; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in his official capacity as Director of the U.S. Office of Management and Budget; UNITED STATES OF AMERICA,<br><br>                                        Defendants. | Case No. 1:25-cv-13165<br><br>**EMERGENCY HEARING REQUESTED** |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 2

I.  SNAP is a state-administered federal mandatory spending program that
    serves millions of food-insecure Americans every month. ................................... 2

II. Despite Congress's appropriation of contingency funds to prevent an
    interruption in SNAP, USDA has suspended SNAP benefits for millions
    of Americans. ...................................................................................................... 4

    A.  USDA has access to funds to cover SNAP benefits, including
    roughly $6 billion that Congress appropriated for SNAP
    contingency funding. ................................................................................ 4

    B.  For years, USDA and OMB have agreed that the SNAP
    contingency reserve can fund SNAP benefits during a government
    shutdown. ................................................................................................. 5

    C.  At the beginning of the current government shutdown, USDA
    announced it would continue to fund SNAP using contingency
    reserves. ................................................................................................... 6

    D.  In October, USDA suspended SNAP benefits and refused to use
    available funds to cover November benefits. ............................................ 7

ARGUMENT .................................................................................................................... 8

I.  Plaintiffs have standing to challenge the suspension of SNAP benefits. ............... 8

II. Plaintiffs are likely to succeed on the merits of their APA claims. ....................... 9

    A.  The suspension of SNAP benefits is final agency action. ......................... 9

    B.  The suspension of SNAP benefits is contrary to law, because the
    SNAP Act requires continued benefits where appropriated funds
    are available to pay these entitlements. .................................................. 11

    C.  The suspension of SNAP benefits is arbitrary and capricious. ................ 13

III. Plaintiffs will be irreparably harmed by the suspension of benefits. ................... 15

IV. The balance of the equities and public interest favor a temporary
    restraining order .................................................................................................. 18

CONCLUSION ............................................................................................................... 19

## <u>INTRODUCTION</u>

Tens of millions of Plaintiffs' residents are on the cusp of crisis: their life-sustaining benefits under the Supplemental Nutrition Assistance Program (SNAP) for November 2025—a month of benefits that begins four days from today—have been abruptly suspended by the federal government. Plaintiffs, whose state agencies administer this program and whose institutions rely on SNAP as part of their essential governmental functions, need immediate relief. Every day that this suspension of SNAP benefits is not enjoined is another day that critical food assistance does not go out to families who need it.

Since the inception of SNAP and through past lapses in funding, Congress and U.S. Department of Agriculture (USDA) have provided a consistent message: the continued issuance of SNAP benefits is mandatory. USDA's decision to suspend SNAP benefits is inconsistent with USDA guidance circulated just last month and removed from its website last week. USDA provides no reasoned explanation for refusing to use available resources to fund SNAP, including a contingency fund replenished by Congress as well as general funds available under 7 U.S.C. § 2257's specific authority to shift spending within a particular USDA division. The only explanation provided for USDA's decision is a two-page memorandum sent by USDA on the evening of October 24, 2025, claiming—without citation—that these funds cannot be used. This memorandum contradicts years of USDA guidance and is simply incorrect.

The suspension of these benefits is contrary to law and arbitrary and capricious under the Administrative Procedure Act (APA). The suspension will cause cascading and irreparable harms across the Plaintiffs, including by burdening the state agencies that administer SNAP and the state and local programs that will need to compensate for the lack of SNAP benefits. The balance of the equities and the public interest clearly weigh in favor of the Court entering the Plaintiffs' Proposed Order to ensure these essential benefits continue. A TRO is necessary to

preserve the issuance of SNAP on November 1, or as close in time to November 1 as circumstances allow.

## BACKGROUND

### I.    SNAP is a state-administered federal mandatory spending program that serves millions of food-insecure Americans every month.

SNAP benefits "'alleviate . . . hunger and malnutrition' by 'increasing [the] food purchasing power' of low-income households." *Hall v. USDA*, 984 F.3d 825, 831 (9th Cir. 2020) (quoting 7 U.S.C. § 2011). These benefits helped over 41 million people avoid food insecurity last year and collectively serve over twenty million individuals every month. *See*, *e.g.*, Ex. 27 (López Decl.) ¶ 7; Ex. 29 (Moore Decl.) ¶ 5; Ex. 20 (Reagan Decl.) ¶ 10; Ex. 35 (Hoffman Decl.) ¶ 6; Ex. 34 (DeMarco Decl.) ¶ 6. A version of the program has been in effect since 1964. In SNAP's 60 years, no government shutdown has ever prevented states from distributing SNAP benefits to those in need. Declaration of Jack Smalligan ("Smalligan Decl.") ¶¶ 20-23.[1]

While SNAP is overseen at the federal level by the Food and Nutrition Service (FNS), a component of USDA, 7 C.F.R. § 271.3(a), state agencies administer SNAP on the ground, processing applications and issuing SNAP benefits to eligible recipients. *Id.* § 271.4(a); *see* 7 U.S.C. § 2020(a)(1)-(2). Each month, state agencies prepare benefit issuance files containing the benefit amount for each recipient. *See*, *e.g.*, Ex. 27 (López Decl.) ¶ 14; Ex. 29 (Moore Decl.) ¶ 12; Ex. 20 (Reagan Decl.) ¶¶ 12, 16; Ex. 35 (Hoffman Decl.) ¶ 12; Ex. 34 (DeMarco Decl.) ¶ 12. The agencies then send those files to third-party vendors by a pre-set deadline prior to the first day benefits are to be issued. The vendors use the files to load the correct amount of benefits onto recipients' Electronic Benefit Transfer (EBT) cards. Those EBT cards function like debit

---

[1] The Declaration of Jack Smalligan is filed separately, rather than attached to the Declaration of Michelle Pascucci.  All exhibits attached to the Declaration of Mr. Smalligan are identified by letters, and all exhibits attached to the Declaration of Attorney Pascucci are identified by numbers.

cards and can be used at licensed SNAP retailers to purchase food. *See*, *e.g.*, Ex. 29 (Moore Decl. ¶ 14); Ex. 34 (DeMarco Decl.) ¶ 14. The federal government reimburses retailers for SNAP benefits spent at their stores. *See*, *e.g.*, Ex. 29 (Moore Decl.) ¶ 16; Ex. 34 DeMarco Decl.) ¶ 16.

States and the federal government share the cost of administering the program,[2] but SNAP benefits are funded entirely by the federal government. The Act that created SNAP (the "SNAP Act") requires the federal government to cover the cost of SNAP benefits for all eligible applicants. *See* 7 U.S.C. § 2014(a) ("Assistance under this program shall be furnished to all eligible households . . . ."). In other words, SNAP is an "appropriated entitlement, meaning the government is required to make payments to those who meet the program requirements." USDA, B-336036, 2025 WL 506899, at *5 (Comp. Gen. Feb. 12, 2025); *see also* 2 U.S.C. §§ 622(9)(B), 900(c)(8)(C); 7 U.S.C. § 2024(d); Smalligan Decl. ¶¶ 14-15 (SNAP is an appropriated entitlement, like Medicaid).[3]

If USDA's funds cannot meet the full cost of SNAP benefits, USDA must reduce the amount of benefits. 7 U.S.C. § 2027(b); 7 C.F.R. § 271.7(c). USDA's regulations allow for canceling or suspending benefits only if necessary to ensure that benefits do not exceed available appropriations. *See* 7 C.F.R. § 271.7(a) ("This section sets forth the procedures to be followed if the monthly SNAP allotments . . . *must* be reduced, suspended, or cancelled to comply with [7 U.S.C. § 2027]." (emphasis added)). In determining whether to take this step, USDA must consider "[t]he best available data pertaining to the number of people participating in the program and the amounts of benefits being issued" and "whether such action is *necessary*." *Id.* (emphasis added). If a reduction, cancellation, or suspension of benefits results in a surplus of

---

[2] States are currently responsible for 50% of SNAP administrative costs and will be responsible for 75% beginning in Federal Fiscal Year 2027. 7 U.S.C. § 2025(a).

[3] *Cf.* 42 U.S.C. § 1396a(8) (Medicaid statute requiring that "all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals").

funds, USDA generally must redistribute those funds as benefits to SNAP recipients. *Id.*

§ 271.7(d)(5).

## II. Despite Congress's appropriation of contingency funds to prevent an interruption in SNAP, USDA has suspended SNAP benefits for millions of Americans.

### A. USDA has access to funds to cover SNAP benefits, including roughly $6 billion that Congress appropriated for SNAP contingency funding.

Congress funds SNAP through regular appropriations. In the last regular appropriations

bill, Congress fully funded the program through the end of Federal Fiscal Year (FFY) 2025,

which ended on September 30, 2025.[4] In two prior appropriations bills, Congress also provided

for a total of $6 billion in contingency reserve for SNAP that remains available through

September 30, 2026, to be used "in such amounts and at such times as may become necessary to

carry out program operations." *See* Pub. L. No. 118-42, § 6, 138 Stat. 25, 93-94 (2024); Pub. L.

No. 119-4, § 1109(a), 139 Stat. 9, 13 (2025). OMB has apportioned this $6 billion to USDA to

spend during FFY 2026. Smalligan Decl. ¶ 19.

A lapse in regular appropriations does not mean the agency lacks funds that could be

used to continue issuing SNAP benefits during the shutdown. To the extent additional funding is

necessary to fund mandatory SNAP benefits, USDA has access to other appropriated funds in

certain circumstances. *See* 7 U.S.C. § 2257; Smalligan Decl. ¶¶ 27-32. For example, the 2008

Farm Bill automatically transfers a portion of annual customs duties to USDA each year for child

nutrition programs. 7 U.S.C. § 612c-6. USDA had over $23 billion in available child nutrition

funds as of October 8, 2025.[5] USDA has invoked its § 2257 authority to use a portion of those

---

[4] Because SNAP benefits are obligated in the month prior to their issuance, October benefits were funded by FFY 2025 appropriations. *See* Smalligan Decl. ¶ 33.

[5] *State Child Nutrition Programs*, OpenOMB, https://openomb.org/file/11478695 (Oct. 8, 2025).

funds to cover the Women, Infants, and Children (WIC) program in September and could do the same to cover SNAP benefits. Smalligan Decl. ¶¶ 27-32.

### B.    For years, USDA and OMB have agreed that the SNAP contingency reserve can fund SNAP benefits during a government shutdown.

USDA has consistently maintained that SNAP contingency funds are available to fund SNAP benefits in the event of an appropriations lapse. Smalligan Decl. ¶¶ 21-24. For example, during the 2018-2019 government shutdown, USDA repeatedly issued guidance confirming contingency funds would be used to fund SNAP benefits if necessary.[6] Smalligan Decl. Ex. I (2019 Q&A #1) at 1-3 ("[l]imited funding with the SNAP contingency reserve [was] available" to fund February 2019 benefits); Smalligan Decl. Ex. J (2019 Q&A #2) at 1-2 ("FNS can confirm that limited funding is available from the contingency . . . to provide benefits for February."); Ex. 5 (2018 FNS Contingency Plan) at 4 (joint determination by USDA and OMB of "Congressional intent" that SNAP "shall continue operations during a lapse in appropriations."); Ex. 7 (2021 Contingency Plan) at 1 (describing SNAP as "essential Federal activit[y]"). In 2018, USDA and OMB both agreed that USDA's "[b]udget authority" to continue SNAP operations included "contingency reserves." Ex. 5 (2018 FNS Contingency Plan) at 4.

USDA confirmed "the legal availability of the contingency fund" during the Government Accountability Office (GAO) review of the legality of USDA's early payments of February 2019 SNAP benefits. *See* USDA, B-331094, 2019 WL 4241055, at *5 (Comp. Gen. Sept. 5, 2019). Although disapproving of USDA's method for funding those early payments (which were not made from contingency funds), GAO confirmed that USDA would have had "available budget authority" to pay "early issuance of February benefits" with "remaining funds in the SNAP

---

[6] Nationwide November SNAP benefits would cost approximately $8 billion. *See* Jordan W. Jones, *Supplemental Nutrition Assistance Program (SNAP)—Key Statistics and Research*, Economic Research Service (July 24, 2025), https://www.ers.usda.gov/topics/food-nutrition-assistance/supplemental-nutrition-assistance-program-snap/key-statistics-and-research.

contingency fund." *Id.* In sum, USDA and the federal government have long expressed a clear policy that SNAP operations, including the payment of benefits, should continue during a lapse in annual appropriations, and that USDA has authority to fund those operations from several sources, including contingency reserves.

### C.    At the beginning of the current government shutdown, USDA announced it would continue to fund SNAP using contingency reserves.

Congress did not pass a regular appropriations bill for FFY 2026 and still has not done so at the time of this filing. As a result, funding lapsed on October 1, 2025. On September 30, 2025, USDA published a "Lapse of Funding Plan" (Smalligan Decl. Ex. L) reaffirming its position from 2018 and 2019 that SNAP operations should continue during a shutdown and that contingency funds could be used to fund SNAP benefits if needed:

> Congressional intent is evident that SNAP's operations should continue since the program has been provided with multi-year contingency funds that can be used for State Administrative Expenses to ensure that the State can also continue operations during a Federal Government shutdown. These multi-year contingency funds are also available to fund participant benefits in the event that a lapse occurs in the middle of the fiscal year.

Smalligan Decl. Ex. L (Lapse of Funding Plan). On October 1, USDA sent a letter (the Oct. 1 Letter) reassuring states that USDA would continue to fund October SNAP benefits and directing states to "continue to administer the program in accordance with Federal statute and regulations." Ex. 1 (Oct. 1 Letter). Plaintiffs continued to administer SNAP, including by taking the necessary steps to issue November benefits, such as preparing November's benefit issuance files. *See*, *e.g.*, Ex. 27 (López Decl.) ¶ 34; Ex. 29 (Moore Decl.) ¶ 41; Ex. 20 (Reagan Decl.) ¶ 41; Ex. 35 (Hoffman Decl.) ¶¶ 9, 40; Ex. 34 (DeMarco Decl.) ¶ 37. On or about October 25, 2025, the Lapse of Funding Plan was removed from USDA's website with no explanation.[7]

---

[7] *Compare Wayback Machin*e, INTERNET ARCHIVE (Oct. 10, 2025, 10:05 PM), Wayback Machine, https://perma.cc/UKP4-WBWU; *with* USDA, Lapse of Funding Plan, https://perma.cc/92YT-GQS9 (Oct. 27, 2025, 10:59 AM).

**D.    In October, USDA suspended SNAP benefits and refused to use available funds to cover November benefits.**

Despite assurances that SNAP would continue to operate through the shutdown—as it has through prior shutdowns—on October 10, USDA sent state SNAP administrators a letter (the Oct.10 Letter) stating that "if the current lapse in appropriations continues, there will be insufficient funds to pay full November SNAP benefits for approximately 42 million individuals across the Nation." Ex. 2 (Oct. 10 Letter). USDA asserted it had only just "begun the process of fact finding and information gathering to be prepared in case a contingency plan must be implemented." The Oct. 10 Letter "direct[ed] States to hold their November issuance files and delay transmission to State EBT vendors until further notice." *Id.*

As a result, states would miss their deadlines to submit November benefit issuance files to their EBT vendors, delaying the issuance of November SNAP benefits and effectively suspending benefits until states are permitted to send issuance files. Massachusetts's deadline is October 28, 2025, and, without court-ordered relief, SNAP benefits will be delayed. Ex. 24 (Cole Decl.) ¶¶ 19, 28. By contrast, California's deadline was October 24, 2025; bound by USDA's guidance, California's state agency was forced to miss this deadline, making it virtually impossible for November benefits to issue on time. Ex. 11 (Gilette Decl.) ¶¶ 21, 27.

On October 24, 2025, 23 states sent Secretary of Agriculture Brooke Rollins a letter seeking further guidance as to whether SNAP benefits would be funded for November and how state agencies should proceed. Ex. 6 (State Letter to USDA). That same day, USDA sent states another letter (the Oct. 24 Letter) announcing that it was "suspending all November 2025 benefit allotments until such time as sufficient federal funding is provided, or until FNS directs State agencies otherwise" and directing states to "take immediate action to implement this suspension." Ex. 3 (Oct. 24 Letter). The Oct. 24 Letter further "encourages" states to "limit

7

administrative expenses only to the activities necessary to support the eligibility and issuance processes, integrity/oversight, and system maintenance." *Id.*

Later in the day on October 24, USDA circulated an unsigned, two-page memorandum to states (the Oct. 24 Memorandum). The memorandum asserted that USDA will not use SNAP contingency funds to cover November benefits because those funds "are only available to supplement regular monthly benefits when amounts have been appropriated for, but are insufficient to cover, benefits." Ex. 4 (Oct. 24 Memo). Because "the appropriation for regular benefits no longer exists," USDA concluded, "[t]he contingency fund is not available to support FY 2026 regular benefits." *Id.* The Oct. 24 Memorandum further stated that "the contingency fund is a source of funds for contingencies," such as disasters—not government shutdowns. *Id.* USDA also claimed that transferring other funds to SNAP would "jeopardize" their use for child nutrition and WIC programs. *Id.* at 2. USDA provided no support, factual or legal, for these conclusions.

## ARGUMENT

In assessing whether to issue a TRO, the Court must consider the same four factors used in the preliminary injunction analysis: "(1) substantial likelihood of success on the merits; (2) a high likelihood of irreparable harm if injunctive relief is not granted; (3) a balance of equities tips in the movant's favor; and (4) the injunctive relief is in the public interest." *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 295 (D. Mass. 2025). The last two factors "merge when the Government is the party opposing" the motion. *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## I.    Plaintiffs have standing to challenge the suspension of SNAP benefits.

Plaintiffs have standing to challenge the impediments to and suspension of SNAP benefits because they will suffer an "injury in fact" that is "fairly traceable" to the action and "may be redressed by" a judicial order enjoining its implementation. *McBreairty v. Miller*, 93

F.4th 513, 518 (1st Cir. 2024). Plaintiffs can show standing based on a "substantial risk" that they will suffer proprietary harms, including fiscal injuries through the operational costs that will derive from the unprecedented delay of benefits and, in some instances, state coverage of benefits. *Massachusetts v. HHS*, 923 F.3d 209, 222 (1st Cir. 2019); *In re FOMB*, 110 F.4th 295, 308 (1st Cir. 2024); *Gustavsen v. Alcon Labs, Inc.*, 903 F.3d 1, 7 (1st Cir. 2018). As detailed herein and in the accompanying declarations, Plaintiffs have demonstrated that the suspension of benefits will impose a host of injuries, financial and otherwise, including the expenditure of state funds to provide SNAP benefits or other nutrition assistance programs; major operational disruptions and administrative burdens across agencies and facilities; and fiscal and operational harm to state programs that will be overwhelmed by residents lacking essential SNAP benefits. *See supra* § III. Each injury flows from the suspension of benefits and would thus be redressed by immediate injunctive relief.

## II.     Plaintiffs are likely to succeed on the merits of their APA claims.

Plaintiffs are likely to succeed on the merits because the suspension of benefits is contrary to law and arbitrary and capricious under 5 U.S.C. § 706(2)(A) and (C).

### A.     The suspension of SNAP benefits is final agency action.

The APA provides for judicial review of "final agency action." *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting 5 U.S.C. § 704). USDA's decision to suspend SNAP benefits, embodied in both the Oct. 10 Letter and the Oct. 24 Letter, is a final agency action subject to judicial review. Defendants instituted a suspension of SNAP benefits by directing Plaintiffs in the Oct. 10 Letter to refrain from transmitting their November 2025 benefit issuance files. Defendants then confirmed the suspension and directed Plaintiffs to take further steps to implement it in the Oct. 24 Letter.

"[T]wo conditions . . . generally must be satisfied for agency action to be 'final.'" *U.S. Army Corps of Engin'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). First, the action "must mark

9

the consummation of the agency's decisionmaking process." *Id.* (citation omitted). Second, "it must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citation omitted). Both conditions are easily met here. First, Defendants' suspension of benefits marks the consummation of their decision-making process, particularly given that USDA expressly confirmed its decision in its Oct. 24 Letter. *See* Ex. 3 (Oct. 24 Letter) at 1 (confirming "prior guidance issued on October 10, 2025"). Second, Defendants' suspension of benefits has immediate legal consequences for Plaintiffs, because they are required by law to "take immediate action to effect the suspension," 7 C.F.R. §271.7(d)(2)(i), such as withholding their November 2025 benefit issuance files, *see* Ex. 2 (Oct. 10 Letter), and notifying beneficiaries of the suspension, *see* Ex. 3 (Oct. 24 Letter) at 1 (citing 7 C.F.R. § 271.7(d)(4)).

Moreover, if any Plaintiffs were to violate Defendants' directive to withhold benefit issuance files, that state could face severe penalties, such as being forced to pay for "issuances [of SNAP benefits] that result," 7 C.F.R. § 271.7(h)(3), and the full costs of administering the SNAP program for the affected month, *id.* § 271.7(h)(1). Therefore, Defendants' suspension of benefits constitutes a final agency action subject to judicial review. *See New York v. Trump*, 133 F.4th 51, 67-69 (1st Cir. 2025) (agencies' "decisions . . . to implement" funding freezes constituted final agency actions); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (action is final when an agency has given "the States their 'marching orders'" and "expects [them] to fall in line" (citation omitted)).[8]

---

[8] Defendants cannot evade judicial review by arguing that the suspension is not final insofar as it will end after the federal shutdown. The "mere possibility that an agency might reconsider" its position "does not suffice to make an otherwise final agency action nonfinal," *Sackett v. EPA*, 566 U.S. 120, 127 (2012), nor does the fact that an action is temporary in nature, *see Massachusetts v. Trump*, 2025 WL 1836592 at *11 (D. Mass. July 3, 2025) ("indefinite pause" constituted final agency action).

B. **The suspension of SNAP benefits is contrary to law, because the SNAP Act requires continued benefits where appropriated funds are available to pay these entitlements.**

By suspending November SNAP benefits, USDA acts contrary to the SNAP Act and its implementing regulations, which only allow USDA to suspend benefits where funding is unavailable. USDA lacks the discretion to stop funding benefits for eligible individuals absent a complete lack of funding to do so. The SNAP Act contains mandatory language that "[a]ssistance under this program shall be furnished to all eligible households." 7 U.S.C. § 2014(a); *see* 7 U.S.C. § 2024(d) (SNAP benefits are "obligations of the United States within the meaning of section 8 of Title 18"). Therefore, "the government is required to provide SNAP benefits in specific amounts under a formula prescribed by law," because "SNAP is an appropriated entitlement, meaning that the government is legally required to make payments to those who meet the program requirements." B-336036, 2025 WL 506899, at *3, 5.

The requirement to furnish SNAP benefits applies so long as Congress has appropriated funds that are permitted for those disbursements. *See* 31 U.S.C. § 1341(a)(1)(A). When there are insufficient appropriated funds, the SNAP Act requires the reduction of SNAP benefits, 7 U.S.C. § 2027(b), but does not contain a provision that permits USDA to suspend benefits altogether when there are available appropriated funds. This is reflected in USDA's implementing regulation, which provides that the agency can reduce or suspend benefits—or a combination of the two—only if "necessary" to comply with 7 U.S.C. § 2027. *See* 7 C.F.R. § 271.7(c) (setting forth procedure for reduction of benefits "[i]f a reduction in allotments is deemed necessary"); *id.* § 271.7(a) (query to reduce, suspend, or cancel funds is "whether such action is necessary").

A suspension of benefits is not "necessary" here because Congress has appropriated funds to cover at least a portion of the SNAP benefits during a lapse in funding. Specifically, Congress has appropriated $6 billion in funds as a contingency reserve "in such amounts and at such times as may become necessary to carry out [SNAP] operations." *See* Pub. L. No. 118-42,

§ 6, 138 Stat. 25, 93-94; Pub. L. No. 119-4, § 1109(a), 139 Stat. 9, 13. Because Congress has not passed a regular appropriations bill, this contingency fund is "necessary to carry out [SNAP] operations" and must therefore be used to fund SNAP benefits. *Id.* And, to the extent November SNAP benefits exceed USDA's contingency fund, USDA has other sources of funds it can use to make up the difference. *See* Smalligan Decl. ¶¶ 27-31. For example, USDA recently invoked its authority to transfer surplus funds for other nutrition programs, *see* 7 U.S.C. § 2257, to cover the WIC program last month, and could do the same for SNAP without jeopardizing WIC. *See* Smalligan Decl. ¶¶ 27-31. Accordingly, a suspension of benefits is not "necessary" to ensure that November benefits do not exceed available appropriations under 7 U.S.C. § 2027. *See* 7 C.F.R. § 271.7(c); *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 424 (2024) ("[A]n appropriation is simply a law that authorizes expenditures from a specified source of public money for designated purposes."). USDA's decision to do so violates Congress's mandate that benefits "must be furnished to all eligible households." 7 U.S.C. § 2014(a).

USDA's position that contingency funds are "not available to support FY 2026 regular benefits" (Ex. 4 (Oct. 24 Memorandum) at 1) contradicts statutory language authorizing use of contingency reserves as "necessary to carry out program operations." It is up to the Court to apply that statutory language, and USDA's view is not entitled to deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). USDA's interpretation is especially suspect given that it conflicts with USDA's historical view on allowable use of the contingency reserve. *See, e.g.*, *id.* at 399 (criticizing the former *Chevron* doctrine because it called for deference to agency interpretations even when they were "inconsistent over time").

**C.    The suspension of SNAP benefits is arbitrary and capricious.**

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Defendants' actions fail that test in at least four ways.

*First*, USDA's suspension of benefits represents an abrupt about-face from its years-long recognition that SNAP benefits should continue during lapses in appropriations and that contingency funds are available to cover benefits if necessary. *See supra* § III. Agencies "may not . . . depart from a prior policy sub silentio." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Yet USDA has not even acknowledged its changed position, much less justified that change. *See NIH*, 770 F. Supp. 3d at 307 ("When an agency rescinds a prior policy, its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." (citation modified)).

*Second*, in disregarding its existing policy and suspending benefits, USDA failed to consider the consequences of the suspension and was not "cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020); *see also Housatonic River Initiative v. EPA*, 75 F.4th 248, 270 (1st Cir. 2023) (a "more detailed justification" for a change in policy may be required when an agency's prior policy has "engendered serious reliance interests"). USDA failed to consider a host of factors in its abrupt delay of these essential benefits, including wide-ranging costs, disruptions, administrative burdens, and other harms to Plaintiffs. *See supra* § III; *Rhode Island v. Trump*, 781 F. Supp. 3d 25, 47 (D.R.I. 2025) (failure to consider states' reliance interests on funding prior to grant terminations and layoffs was arbitrary and capricious). "Because [USDA] was not writing on a blank slate . . . it was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests

13

against competing policy concerns." *DHS*, 591 U.S. at 33 (citation modified). Plaintiffs have weighty reliance interests in the continuation of SNAP benefits, and their suspension will have stunning and far-reaching consequences across Plaintiffs. USDA has identified no "competing policy concerns" on the other side of the ledger, nor weighed them against the interests and imminent harms discussed here. *See id.* at 33.

*Third*, any reasoning that USDA has offered is conclusory and underscores the unexplained inconsistencies in its actions. Only after USDA decided to suspend benefits did it send the Oct. 24 Memorandum, which asserts that contingency reserve funds are unavailable for SNAP benefits during the shutdown. Ex. 4 at 1. But the memorandum cites no legal authority in support, and such "conclusory statements hardly rise to the level of 'reasoned decisionmaking' required by the APA." *NIH*, 770 F. Supp. 3d at 306 (citation omitted); *see Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("Conclusory statements will not do; an agency's statement must be one of reasoning." (citation modified)). More fundamentally, it is simply wrong. The plain language of the SNAP contingency appropriations contradicts the position set forth in the Oct. 24 Memorandum, and the memorandum fails to acknowledge USDA's departure from its longstanding interpretation to the contrary. *See Southwest Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019) (agency may not "gloss over or swerve from prior precedents without discussion." (citation modified)). As the Oct. 24 Memorandum acknowledges, USDA has accessed alternative funds to cover other programs during the shutdown. USDA claims that "[t]ransfers from other sources would pull away funding for school meals and infant formula," Ex. 4 (Oct. 24 Memo) at 1, but provides no information to substantiate that claim. See ANR Storage Co. v. FERC, 904 F.3d 1020, 1024-26 (D.C. Cir. 2018) (failure to "give a reasoned analysis to justify the disparate treatment of regulated parties that seem similarly situated" was arbitrary and capricious (citation modified)); Smalligan Decl.

¶¶ 27-32 (availability of funds to support WIC and SNAP).

**Fourth**, to the extent USDA's decision to suspend benefits rather than use available appropriations is a matter of discretion, it abused that discretion under the circumstances, including because its own policy and practice has engendered significant reliance interests and it has accessed available appropriations to continue other crucial nutrition programs. At minimum, USDA has abused its discretion by not exhausting contingency reserves before suspending benefits.[9]

### III.    Plaintiffs will be irreparably harmed by the suspension of benefits.

To establish irreparable harm, plaintiffs need only demonstrate that their "substantial injury . . . is not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996). Plaintiffs have demonstrated such an injury through harm to state agencies that administer SNAP and harm to state services as a whole.

**First,** Defendants' action will cause irreparable harm to Plaintiffs in the administration and provision of food safety net programs. USDA's actions have delayed, and will continue to delay, critical benefits to households that rely on SNAP funding to feed themselves and their families. Ex. 16 (Hadler Decl.) ¶ 26. The delay will devastate Plaintiffs' ability to administer their programs, irreparably corrode public confidence in these programs, and impose severe operational challenges on state agencies. The affected state agencies operate a host of federal and state programs beyond SNAP. The confusion resulting from millions of state residents simultaneously losing essential benefits will divert critical resources from these other programs

---

[9] At some point on or before October 26, 2025, USDA placed a banner on its website blaming "Senate Democrats" for the cessation of SNAP benefits, suggesting that USDA may be abusing its discretion for partisan goals that have no lawful place in the administration of this critical program. *See supra* n.7; 5 U.S.C. § 7321 *et seq.* (Hatch Act barring federal employees from using their office for partisan political purposes).

to addressing the many SNAP recipients who will seek recourse and answers from state agencies. *See*, *e.g.*, Ex. 24 (Cole Decl.) ¶¶ 40-42; Ex. 29 (Moore Decl.) ¶ 44; *California v. Trump*, 786 F. Supp. 3d 359, 391 (D. Mass. 2025) (finding that states' diversion of resources "from other key projects" constitutes irreparable harm). Despite the indefinite withholding of benefits, however, Plaintiffs will still need to administer the program, *see* 7 C.F.R. § 271.7(e)(1) (states must accept and process SNAP applications even though "no benefits shall be issued to the applicant until issuance is again authorized by" USDA); 7 C.F.R. § 271.7(e)(3) (states must recertify beneficiaries during a suspension or reduction), and bear a substantial portion of program costs, 7 U.S.C. § 2025(a).

Moreover, to cover the deficiency caused by the delay in SNAP benefits, some Plaintiffs have diverted state money from other sources to temporarily provide benefits or other food assistance to residents. Ex. 29 (Moore Decl.) ¶ 32; Ex. 9 (Fernández Garcia Decl.) ¶ 21; Ex. 34 (DeMarco Decl.) ¶¶ 39-41. Forcing Plaintiffs to divert funds from other critical functions to feed their residents is an "economic harm" that cannot be remedied by monetary damages. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).

State agencies also risk damage to their reputations from the delay in SNAP benefits. *See Ross-Simons of Warwick, Inc.*, 102 F.3d at 20 (describing damage to reputation as "not easily measured or fully compensable in damages" and therefore "often held to be irreparable"); *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1264 (10th Cir. 2016) (governor's directive to withhold funding to health services provider would irreparably harm provider's reputation). To properly effectuate its programs, Plaintiffs' agencies must work to overcome stigma, misinformation, and other barriers to access. Ex. 29 (Moore Decl.) ¶ 37; Ex. 20 (Reagan Decl.) ¶ 37; Ex. 34 (DeMarco Decl.) ¶ 33; Ex. 35 (Hoffman Decl.) ¶ 36. State agencies are the public face of SNAP (and often other safety net programs), and an abrupt cessation of SNAP

16

benefits will generate the public perception that state agencies have failed or engaged in wrongdoing, thereby damaging their reputation.

   ***Second***, food insecurity for Plaintiffs' residents will irreparably harm the provision of other state services. Millions of households rely on SNAP benefits to meet their daily food needs and to prevent "hunger and malnutrition." 7 U.S.C. § 2011; Ex. 27 (López Decl.) ¶ 7; Ex. 29 (Moore Decl.) ¶ 5; Ex. 20 (Reagan Decl.) ¶ 10; Ex. 34 (DeMarco Decl.) ¶ 6. The loss of SNAP benefits leads to food insecurity, which is associated with numerous negative health outcomes in children.[10] The harms stemming from food insecurity will have ripple effects on Plaintiffs' administration of state services. For example, food insecurity is associated with higher healthcare use and costs, including emergency room visits and hospitalizations.[11] In Massachusetts, "up to an estimated $1.3 billion in emergency room and inpatient hospitalization costs . . . may be related to food insecurity[,]" with "hospitalizations that could be attributed to food insecurity among Medicaid recipients total[ling] up to $878 million annually for adults and $373 million for children."[12] A sudden and complete loss of SNAP benefits for this population would further toll the state healthcare systems that fund these healthcare costs.

   Food insecurity also disrupts Plaintiffs' provision of educational services. Children who go without food will struggle to learn in classrooms, impacting their educational performance and advancement.[13] For instance, Massachusetts relies on SNAP benefits as a crucial component

---

   [10] Jessica Lyons, *Loss of SNAP Benefits Linked to Economic Hardship, Poor Health*, HealthCity (May 6, 2019), https://healthcity.bmc.org/loss-snap-benefits-linked-economic-hardship-poor-health/.

   [11] Seth A. Berkowitz et al., *Food Insecurity, Healthcare Utilization, and High Cost: A Longitudinal Cohort Study*, American Journal of Managing Care (Sept. 2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6426124/.

   [12] *Mass General Brigham, Greater Boston Food Bank Release Food Access Study, Revealing 2 Million Food-Insecure Adults in Massachusetts*, Mass General Brigham (June 17, 2025), https://www.massgeneralbrigham.org/en/about/newsroom/press-releases/2025-greater-boston-food-bank-annual-food-access-report.

   [13] *Too Hungry to Learn: Food Insecurity and School Readiness*, Children's HealthWatch, (continued…)

of its mission to keep children learning and help them thrive in school. The timely and regular provision of SNAP benefits is woven into Massachusetts' efforts to combat the harmful health- and education-related impacts of food insecurity among students. Ex. 25 (Ortega Decl.) ¶ 7; Ex. 23 (Bell Decl.) ¶ 10. The food access crisis that will result from withholding SNAP benefits is likely to have devastating effects on Massachusetts' ability to administer programs across local education agencies statewide.

Further, the loss of SNAP benefits will harm the tens of thousands of merchants that accept SNAP benefits for food purchases. *See, e.g.*, Ex. 9 (Fernández Decl.) ¶ 19. While merchants may see fewer customers, safety net programs will see the opposite effect. Already strained by other federal cutbacks, state and local governments and community organizations will face further pressure to provide for residents in lieu of the SNAP program. *Id.* ¶¶ 20-21. These imminent and pervasive harms, which will impact state agencies, healthcare systems, and residents, are "sufficient to ground a finding of imminent, irreparable harm." *California*, 786 F. Supp. 3d at 394.

## IV.    The balance of the equities and public interest favor a temporary restraining order.

"The crux of the balance of equities inquiry is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Grant v. Trial Court*, 784 F. Supp. 3d 475, 490 (D. Mass. 2025) (citation modified). At this juncture, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" with "particular regard for the public consequences." *Winter v. NRDC*, 555 U.S. 7, 24 (2008).

---

https://www.childrenshealthwatch.org/wp-content/uploads/toohungrytolearn_report.pdf (last visited Oct. 28, 2025).

Here, the public consequences stemming from this action cannot be overstated. Millions of Plaintiffs' residents will suffer without essential SNAP benefits to pay for food, with ramifications across state healthcare systems, the agencies that administer these (and other) benefits, and other state benefits programs that will become overburdened through the abrupt cessation of SNAP payments. *See Maine v. USDA*, 778 F. Supp. 3d 200, 235-36 (D. Me. 2025) ("[T]he balance of the equities weighs heavily in favor of granting the Plaintiff's TRO" where action by the federal government resulted in "no way to get funds from the USDA to the schools and other facilities, and children will not be fed" (citation omitted)).

Defendants' assertion that such funds will not and cannot be made available does not demonstrate a comparable harm. The Oct. 24 Memorandum is silent on why a lengthy government shutdown resulting in a nationwide delay of essential benefits is not a contingency that the contingency fund was created to address. Defendants also assert that "[t]ransfers from other sources would pull away funding for school meals and infant formula." Ex. 4 (Oct. 24 Memo). This assertion asks the Plaintiffs to accept, with no facts, that any use of any funds for SNAP will deprive these important programs of any and all support. This conclusory assertion, without more, cannot change the inevitable conclusion that the equities and public interest weigh in favor of ensuring that Plaintiffs can continue to administer a program that ensure millions of Americans have access to a critical resource: food.

## CONCLUSION

For these reasons, the Court should enter a temporary restraining order as set forth in the Proposed Order attached hereto.

Dated:  October 28, 2025

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Michelle Pascucci*
MICHELLE PASCUCCI (BBO #690889)
State Trial Counsel
LIZA HIRCH (BBO #683273)
Chief, Children's Justice Unit
CASSANDRA THOMSON (BBO #XX)
Assistant Attorney General
Office of the Massachusetts Attorney
General
1 Ashburton Place Boston, MA 02108
(617) 963-2255
michelle.pascucci@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of
Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

*/s/ Joseph R. Richie*
JOSEPH R. RICHIE*
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

Respectfully submitted,

ROB BONTA
Attorney General of California
PAUL STEIN*
Supervising Deputy Attorney General

*/s/ Maria F. Buxton*
MARIA F. BUXTON*
CHRISTOPHER KISSEL*
LIAM O'CONNOR*
RYAN EASON*
SEBASTIAN BRADY*
WILLIAM BELLAMY*
DEPUTY ATTORNEYS GENERAL
maria.buxton@doj.ca.gov
*Attorneys for Plaintiff State of California*

KRISTIN MAYES
Attorney General of Arizona

*/s/ Luci D. Davis*
JOSHUA D. BENDOR (AZ NO. 031908)*
Solicitor General
HAYLEIGH S. CRAWFORD (AZ NO.
032326)*
Deputy Solicitor General
LUCI D. DAVIS (AZ NO. 035347)*
Senior Litigation Counsel
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Hayleigh.Crawford@azag.gov
Luci.Davis@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

20

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Tanja E. Wheeler*
TANJA E. WHEELER*
Associate Chief Deputy Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
Tanja.wheeler@coag.gov
*Attorneys for Plaintiff State of Colorado*


KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Ian R. Liston*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
ROSE E. GIBSON*
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@delaware.gov
*Attorneys for Plaintiff State of Delaware*


ANNE E. LOPEZ
Attorney General of Hawai'i

*/s/ Kaliko'onālani D. Fernandes*
DAVID D. DAY*
Special Assistant to the Attorney General
KALIKO'ONĀLANI D. FERNANDES*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawai'i*

WILLIAM TONG
Attorney General of Connecticut

*/s/ Patricia E. McCooey*
PATRICIA E. MCCOOEY*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Patricia.McCooey@ct.gov
*Attorneys for Plaintiff State of Connecticut*


BRIAN L. SCHWALB
Attorney General for the District of
Columbia

*/s/ Nicole S. Hill*
NICOLE S. HILL*
Assistant Attorney General
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
Nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*


KWAME RAOUL
Attorney General of Illinois

*/s/ Harpreet K. Khera*
HARPREET K. KHERA*
Bureau Chief, Special Litigation
ALICE L. RIECHERS*
Assistant Attorney General
115 S. LaSalle St., 35th Flr.
Chicago, Illinois 60603
(773) 590-7127
Harpreet.Khera@ilag.gov
*Attorneys for Plaintiff State of Illinois*

LAURA KELLY, in her official capacity as
Governor of the State of Kansas

*/s/ Justin Whitten*
JUSTIN WHITTEN*
General Counsel
ASHLEY STITES-HUBBARD*
Deputy Chief Counsel
Office of the Kansas Governor
300 SW 10th Ave, Room 541-E
Topeka, KS 66612
(785) 296-3930
Justin.h.whitten@ks.gov
Ashley.stiteshubbard@ks.gov
*Counsel for Governor Laura Kelly*

OFFICE OF THE GOVERNOR *ex rel.* Andy
Beshear, in his official capacity as
Governor of the Commonwealth of
Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO*
General Counsel
TAYLOR PAYNE
Chief Deputy General Counsel
LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors'
Office*

AARON M. FREY
Attorney General of Maine

*/s/ Brendan Kreckel*
BRENDAN KRECKEL*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.: 207-626-8800
Fax: 207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

DANA NESSEL
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
DANIEL PING*
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
PingD@michigan.gov
*Attorneys for Plaintiff State of Michigan*

AARON D. FORD
Attorney General of Nevada

*/s/ K. Brunetti Ireland*
K. BRUNETTI IRELAND*
Chief of Special Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov
*Attorneys for Plaintiff State of Nevada*

MATTHEW J. PLATKIN
Attorney General of New Jersey

/s/ *Kashif T. Chand*
KASHIF T. CHAND (NJ BAR NO.
016752008)*
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of the State of New
Mexico

*/s/ Anjana Samant*
ANJANA SAMANT*
Deputy Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
505-270-4332
asamant@nmdoj.gov
*Attorneys for the State of New Mexico*

LETITIA JAMES
Attorney General of New York

*/s/ Molly Thomas-Jensen*
MOLLY THOMAS-JENSEN*
Special Counsel
MARK LADOV*
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8240
molly.thomas-jensen@ag.ny.gov
Mark.ladov@ag.ny.gov
*Attorneys for Plaintiff State of New York*

JEFF JACKSON
Attorney General of North Carolina

LAURA HOWARD
Chief Deputy Attorney General

*/s/ Adrian Dellinger*
ADRIAN DELLINGER*
Assistant Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6813
ADellinger@ncdoj.gov
*Counsel for State of North Carolina*

DAN RAYFIELD
Attorney General of Oregon

By: */s/ Leanne Hartmann*
    LEANNE HARTMANN, Mass. BBO
    #667852
    Senior Assistant Attorney General
    Oregon Department of Justice
    100 SW Market Street
    Portland, OR 97201
    Tel (971) 673-1880
    Fax (971) 673-5000
    Email:
    Leanne.Hartmann@doj.oregon.gov
    *Attorneys for Plaintiff Oregon*


PETER F. NERONHA
Attorney General of Rhode Island

/S/ *Madeline R. Becker*
MADELINE R. BECKER (RI BAR NO.
10034)*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
*Attorneys for Plaintiff State of Rhode
Island*


JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Faye B. Hipsman*
FAYE B. HIPSMAN*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*


*\* pro hac vice forthcoming*


JOSH SHAPIRO, in his official capacity as
Governor of the Commonwealth of
Pennsylvania

JENNIFER SELBER
General Counsel

*/s/ Jacob B. Boyer*
JACOB B. BOYER
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov
*Counsel for Governor Josh Shapiro*


NICHOLAS W. BROWN
Attorney General of Washington

*/s/ William McGinty*
WILLIAM MCGINTY, WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
william.mcginty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*


CHARITY R. CLARK
Attorney General for the State of Vermont

*/s/ Ryan P. Kane*
RYAN P. KANE
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov
*Attorneys for Plaintiff State of Vermont*

## **CERTIFICATE OF SERVICE**

I, Michelle Pascucci, certify that on October 28, 2025, I provided a copy of the foregoing document to the following attorneys at the U.S. Department of Justice by electronic mail:

Jason Altabet
Trial Attorney
Federal Programs Branch
U.S. Department of Justice
jason.k.altabet2@usdoj.gov

Abraham George
Chief, Civil Division
U.S. Attorney's Office for the District of Massachusetts
abraham.george@usdoj.gov

Rayford Farquhar
Chief, Defensive Litigation, Civil Division
U.S. Attorney's Office for the District of Massachusetts
rayford.farquhar@usdoj.gov

/s/ Michelle Pascucci
Michelle Pascucci (BBO #690889)