# EXHIBIT 16

## DECLARATION OF PETER HADLER

I, Peter Hadler, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a resident of the State of Connecticut. I am over the age of 18 and understand the obligations of an oath.

2. I am the Deputy Commissioner for the Connecticut Department of Social Services ("DSS" or "Department"). I have been employed in this position since April 2023 and have been employed by DSS since January 2012. I am responsible for executive level program and policy oversight and administration of eligibility policy and enrollment determinations for the Medicaid program and the Children's Health Insurance Program (CHIP), among other healthcare programs. In my capacity as Deputy Commissioner, I also oversee the state's program and policy administration for the Supplemental Nutrition Assistance Program (SNAP), the Temporary Assistance for Needy Families block grant, the Low-Income Home Energy Assistance block grant, the Community Services Block Grant (CSBG), and numerous other public assistance programs.

3. I make this declaration based on personal knowledge or have knowledge of the matters herein based on my review of information and records gathered by agency staff.

4. DSS is statutorily designated in Connecticut General Statutes section 17b-2 as the state agency responsible for "the administration of (1) the Connecticut energy assistance program pursuant to the Low Income Home Energy Assistance Act of 1981; (2) the state plan for vocational rehabilitation services for the fiscal year ending June 30, 1994; (3) the refugee assistance program pursuant to the Refugee Act of 1980; (4) the legalization impact assistance grant program pursuant to the Immigration Reform and Control Act of 1986; (5) the temporary

assistance for needy families program pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996; (6) the Medicaid program pursuant to Title XIX of the Social Security Act; (7) the supplemental nutrition assistance program pursuant to the Food and Nutrition Act of 2008; (8) the state supplement to the Supplemental Security Income Program pursuant to the Social Security Act; (9) the state child support enforcement plan pursuant to Title IV-D of the Social Security Act; (10) the state social services plan for the implementation of the social services block grants and community services block grants pursuant to the Social Security Act; and (11) services for persons with autism spectrum disorder."

     5.     Among other statutory duties, pursuant to section 17b-3 of the Connecticut General Statutes, the Department has the power and duty to "(1) Administer, coordinate and direct the operation of the department; . . . (4) establish and develop programs and administer services to achieve the purposes of the department as established by statute; . . . (9) promote economic self-sufficiency where appropriate in the department's programs, policies, practices and staff interactions with recipients; (10) act as advocate for the need of more comprehensive and coordinated programs for persons served by the department; (11) plan services and programs for persons served by the department; . . . (15) encourage and facilitate effective communication and coordination among federal, state, municipal and private agencies; (16) inquire into the utilization of state and federal government resources which offer solutions to problems of the delivery of social services; (17) conduct, encourage and maintain research and studies relating to social services development; (18) prepare, review and encourage model comprehensive social service programs; (19) maintain an inventory of data and information and act as a clearing house and referral agency for information on state and federal programs and services; . . . The Commissioner of Social Services is authorized to do all things necessary to apply for, qualify for

and accept any federal funds made available or allotted under any federal act for social service development, or any other projects, programs or activities which may be established by federal law, for any of the purposes or activities related thereto, and said commissioner shall administer any such funds allotted to the department in accordance with federal law."

6. SNAP, one of the programs administered by DSS, involves the issuance of monthly electronic benefits that can be used to purchase food at authorized retail stores.

### *SNAP in Connecticut*

7. SNAP is a key part of Connecticut's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food. Thus far in 2025, an average of approximately 366,000 people received SNAP benefits in Connecticut each month, including approximately 215,000 families and 120,000 children. Households in Connecticut receive on average $324 per month in SNAP benefits to meet their basic subsistence and nutritional needs. During the federal fiscal year between October 1, 2024, and September 30, 2025, DSS issued approximately $72,000,000 per month in SNAP benefits in Connecticut.

8. DSS administers the SNAP program in Connecticut pursuant Section 17b-2 of the Connecticut General Statutes. Pursuant to federal law, DSS administers SNAP on behalf of the United States Department of Agriculture (USDA) and is responsible for the issuance, control, and accountability of SNAP benefits and Electronic Benefit Transaction (EBT) cards; ensuring program integrity; and day-to-day administration of SNAP, including processing applications for SNAP benefits and certifying eligible applicant households. 7 U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4; 7 C.F.R. § 274.2. USDA funds the entirety of SNAP benefits in Connecticut, though Connecticut and the federal government split administrative costs. 7 U.S.C. § 2025(a).

3

9. For Federal Fiscal Year 2025, DSS will pay approximately $155,000,000 in state funds to administer the SNAP program. This spending is expected to generate approximately $77,500,000 in SNAP federal financial participation, to cover half of anticipated administration costs.

10. By the end of October 2025, DSS estimates that it will have spent approximately $6.3 million in state funds to pay for SNAP administration during the month of October and in anticipation of issuing November benefits as per the typical issuance schedule. DSS did so with the expectation that SNAP would continue to provide benefits to low-income individuals in Connecticut.

***USDA's Lapse of Appropriation Funding and Demand to Withhold Benefit Data***

11. DSS has a contract with a financial services vendor, Conduent ("Conduent", or "Vendor"), to provide EBT processing services for SNAP and other state-funded DSS programs. These services include processing benefit authorizations provided by DSS; managing the accounts through which those benefits are made available to recipients; and processing the financial transactions that transmit payments to retailers that accept payments from those accounts.

12. The Vendor's invoices for its services rendered under its contract with DSS are paid by Connecticut. Each month, Conduent, on behalf of Connecticut and USDA, loads the full value of each household's monthly SNAP benefit allotment into the household's account. The household members access their account by using their EBT card to purchase food in a similar manner to the way one uses a debit card.

13. As part of the SNAP administration process, DSS is required to regularly transmit various types of electronic benefit issuance data files ("benefit files") to its Vendor. These benefit

4

files contain information related to individuals who have been determined eligible for SNAP benefits, and the benefit level for that individual, alongside other information. DSS sends multiple benefit files to the Vendor, including monthly files for active SNAP recipients. Further, DSS sends benefit files for SNAP recipients newly approved that month, a subset of which are individuals who have been approved for expedited SNAP benefits.

14. DSS uses an in-house case management system called ImpaCT to generate benefit files, among many other functions.

15. Once the Vendor receives the benefit files from DSS, the Vendor uses that information to authorize benefits for SNAP recipients and to subsequently load the approved monthly SNAP benefit allotment on recipients' individual EBT cards. Recipients can then use their individual EBT cards to purchase food, as of the benefit availability date, at authorized SNAP retailers.

16. U.S. Department of Agriculture's Food and Nutrition Service (USDA-FNS) manages the process of certifying retailers for participation in the SNAP program. SNAP recipients can only use their EBT card at approved retailers.

17. When SNAP recipients use their EBT card at a retailer's point of sale machine, an electronic message goes from the retailer's cash register to the Vendor to verify a variety of conditions including the availability of funds, and whether sufficient funds are available. If the purchase is approved, the customer's EBT account is immediately debited, and the retailer's account gets credited. Neither DSS nor any other state agency in Connecticut ever receives SNAP benefit funds as part of this process.

18. In accordance with this process, DSS transmits hundreds of benefit files a month to its Vendor pursuant to a preset, contractual transmission schedule.

19. DSS staggers the issuance of benefits over the first 3 days of a month by last name. More specifically, those households whose last name begins in 'A-F' receive their benefits on the first of the month, 'G-N' on the second of the month, and 'O-Z' on the third of the month. DSS requires lead time to process SNAP benefits prior to the month in which the benefits will be issued. For example, for SNAP benefits to be issued in November 2025, DSS is scheduled to start transmission of relevant benefits files to the Vendor on the evening of October 30, 2025, for all households. This schedule ensures that files are received and processed correctly and allows time to correct any errors or discrepancies in the files before the availability date of benefits.

20. In addition to the cyclical monthly benefit issuance process outlined above, DSS also follows a schedule for submitting other benefit files related to SNAP, including daily benefit files, which contain benefits issued for expedited applications, recently approved applications, and other ancillary benefit types. In addition, when an agency approves a household for expedited SNAP benefits after the 15th day of a month, DSS has discretion to approve not only the prorated amount of benefits for the month of eligibility but also benefits for the following month. When processing benefit allotments at the end of a calendar month, DSS thus issues, in part, benefits that are allotted for both the month in which the benefit files are submitted *and* the subsequent month.

21. If DSS fails to send benefit files to the Vendor timely by the agreed upon schedule, delivery of benefits to individual households will be delayed.

22. Per guidance issued by USDA-FNS on the evening of Friday, October 24, USDA has asserted that if Connecticut proceeds with SNAP issuances using state funds, USDA will not provide any federal reimbursement. USDA stated that "Despite their willingness, States cannot

cover the cost of benefits and be reimbursed. . . . There is no provision or allowance under current law for States to cover the cost of benefits and be reimbursed."

23.     On September 30, 2025, USDA released a "Lapse of Funding Plan[,]" stating that such a plan was required by the Office of Management and Budget to outline the approach to follow "for agency operations in the absence of appropriations." U.S. Dep't of Agric., Lapse of Funding Plan (2025), at 4, previously available at https://www.usda.gov/sites/default/files/documents/fy2026-usda-lapse-plan.pdf. The plan stated that "there is a bona fide need to obligate benefits for October . . . thereby guaranteeing that benefit funds are available for program operations even in the event of a government shutdown at the beginning of a fiscal year." *Id.* at 15. The plan further stated that "Congressional intent is evident that SNAP's operations should continue since the program has been provided with multi-year contingency funds" that are "available to fund participant benefits in the event that a lapse occurs in the middle of the fiscal year." *Id.*

24.     On or about October 10, 2025, less than two weeks after the USDA Lapse of Funding Plan was released, the USDA-FNS Acting Associate Administrator Ronald Ward sent DSS a letter addressed to all SNAP State Agency Directors of all State Agencies as well as Regional SNAP Directors of all regions. The October 10th letter stated that "if the current lapse in appropriations continues, there will be insufficient funds to pay full November SNAP benefits for approximately 42 million individuals across the Nation." The letter further stated that the USDA "has begun the process of fact finding and information gathering to be prepared in case a contingency plan must be implemented." USDA also indicated that it "[understood] that several States would normally begin sending November benefit issuance files to their [EBT] vendors soon." Noting "the operational issues and constraints that exist in automated systems, and in the

interest of preserving maximum flexibility," the letter indicated that USDA was "forced to direct States to hold their November issuance files and delay transmission to State EBT vendors until further notice." The letter further demanded that the States also hold "on-going SNAP benefits and daily files."

25. On October 24, 2025, DSS received a letter from USDA purporting to formally suspend November SNAP benefits.

26. Due to the Vendor's data submission schedule for Connecticut, DSS faces the threat of benefit interruption as early as November 1, 2025. Each day in which DSS is delayed from submitting benefit files results in continued benefit interruption and statewide food insecurity for some of the most vulnerable residents of Connecticut.

27. Failure to issue SNAP benefits to qualified recipients in Connecticut will lead to immediate food insecurity for approximately 360,000 people in Connecticut and unprecedented reliance on already overwhelmed food banks that will simply not be able to meet the significant surge in demand. SNAP is the largest anti-hunger program in Connecticut. As a result, the sudden lack of benefits for otherwise eligible individuals and families in SNAP will have devastating consequences on the public health of Connecticut and downstream effects on the safety net programs that currently fill needs that SNAP does not cover.

28. The uncertainty of whether SNAP benefits will continue during this shutdown creates food insecurity for SNAP beneficiaries by threatening their reliable access to food and forcing them to start rationing what are already subsistence-level benefits. Any disruption in SNAP benefits will force families to scramble for alternatives, including possibly going into debt or skipping meals entirely.

29. SNAP is also an economic driver for Connecticut local businesses. Approximately 2,500 merchants in Connecticut accept SNAP benefits for food purchases. If hundreds of thousands of Connecticut residents are forced to cut back on food spending at once, this will immediately and drastically affect the economic well-being of vendors, farmers, and stores across Connecticut. With a reach of approximately 1 out of every 10 Connecticut state residents, the sudden loss of SNAP beneficiaries and their corresponding food purchases from the food economy will be extremely disruptive. It is DSS's understanding that Connecticut's grocers routinely increase their inventory in anticipation of the availability of SNAP benefits on a regular scheduled cadence. Grocers must order food in advance and may be left with significant stocks of perishable goods that will no longer be purchased by Connecticut residents due to the absence of SNAP funds.

30. Federal research authorized and approved by the USDA FNS explicitly identifies the economic impact of SNAP benefits, both on GDP and jobs. USDA's Economic Research Service states: "USDA, ERS research has estimated a multiplier of SNAP benefits on U.S. Gross Domestic Product (GDP) of 1.54 during a slowing economy. This means an increase of $1 billion in SNAP benefits increases the GDP by $1.54 billion. Additionally, the same increase supports 13,560 additional jobs."[1] Correspondingly, a loss of SNAP benefits means a negative impact on GDP and the risk of hundreds or thousands of jobs supported by such funding.

*Fiscal Impacts on the State from the Unavailability of SNAP Benefits*

31. The loss of SNAP benefits funding would have a significant fiscal impact on Connecticut.

---

[1] https://www.ers.usda.gov/topics/food-nutrition-assistance/supplemental-nutrition-assistance-program-snap/key-statistics-and-research

9

32. The loss of SNAP benefits will result in greater need and requests for state-funded assistance programs, including, for example, state-funded cash assistance programs and food banks supported with state funds.

33. DSS will be required to increase its capacity to serve SNAP beneficiaries who will come to the agency in search of solutions to an unprecedented break in SNAP benefit delivery as well as other means of obtaining support for their basic needs, such as cash assistance. This in turn will pull away staff and resources necessary to implement significant other changes in federal laws, as well as negatively impact operations for other state-funded programs such as Medicaid. State-funded community partners who provide case management services and referrals will also experience a surge in demand and require additional funding to maintain service levels.

34. As described and detailed by the Centers on Budget and Policy Priorities, with citations to numerous relevant studies: "A substantial body of research links the Supplemental Nutrition Assistance Program (SNAP), the nation's most important anti-hunger program, with lower health care costs and improved health outcomes. . . . The available evidence consistently indicates that SNAP is associated with and likely promotes better health and lowers health care costs."[2] DSS is also the state's Medicaid agency, responsible for the health care costs of approximately 1 in 3 state residents, including most SNAP recipients. Medicaid is funded with both federal and state funds, and Connecticut contributes billions of dollars annually to the administration of the program in the state. With the loss of SNAP benefits, the state and DSS

---

[2] https://www.cbpp.org/research/food-assistance/snap-is-linked-with-improved-health-outcomes-and-lower-health-care-costs

will be required to spend more on Medicaid services for the households who lose access to nutritious food and have correspondingly higher health care costs.

35. DSS does not have the fiscal resources available to replace federally funded SNAP benefits with state-funded equivalent benefits.

*Administrative and Operational Burdens on the DSS*

36. If USDA continues to withhold SNAP funds, Connecticut and DSS would face irreparable harm to its ability to effectively administer the critical SNAP program. DSS would be forced to reduce or eliminate food and nutritional supports, including vital support programs such as employment training programs, and community outreach initiatives to assist SNAP recipients in achieving food security and economic stability. In addition, DSS would be required to allow SNAP services to deteriorate significantly or divert needed resources from other essential services such as healthcare, education, or public safety, thereby creating harmful collateral effects through the state and its infrastructure.

37. The actions to suspend the availability of SNAP benefits for November 2025 would significantly erode trust between the Connecticut and its residents built over many years and through the dedication of significant resources.

38. To properly effectuate its safety net programs, DSS has devoted years of work to overcome stigma, misinformation, and other barriers to access. DSS is the "face" of SNAP in Connecticut: if households experience delays in receiving crucial benefits, they are likely to feel that DSS has failed or engaged in wrongdoing. DSS has fostered trust with Connecticut residents and stakeholders by representing to them that SNAP eligibility and compliance with programmatic requirements will lead to timely benefits issuance. SNAP benefits directly fund

one of the most crucial basic human needs: access to food. Failure to deliver on that basic need as promised is a deep violation of residents' trust.

39. Furthermore, loss of trust among Connecticut residents will likely lead to decreased SNAP enrollments, which in turn will cause irreparable long-term harm and costs to the State in the form of increased healthcare and safety net costs, and expending of resources to rebuild trust in the public agency. USDA-FNS has acted in disregard of those reliance interests of the state of Connecticut.

40. The actions to suspend the availability of SNAP benefits for November 2025 also unduly burdens DSS's already limited administrative resources.

41. Once the current government shutdown began, USDA on or about October 1, 2025, sent DSS a letter regarding the lapse in regular appropriations, stating that "SNAP eligible households will receive monthly benefits for October" and that "funding is available for State administrative expenses (SAE) for October."  The letter directed state agencies to "continue to administer the program in accordance with Federal statute and regulations."

42.  DSS continued its normal operations, including processing new applications and preparing benefit issuance files for November benefits, through October, in part due to the representations in USDA's October 1 letter as well as guidance including questions and answers provided by the USDA during prior federal government shutdowns.

43. Further, because USDA indicated in the October 10, 2025, letter that DSS is to hold these benefit files "until further notice[,]" DSS must prepare for SNAP benefit interruptions for an indefinite period of time. A disruption of any length would burden DSS, with the extent of this burden increasing in relation to the duration of the disruption as the scale of resources required to manage the disruption mount over time. Moreover, the ambiguity of not knowing the

ultimate duration of a disruption itself exacerbates the burden on DSS, because DSS has to dedicate additional resources to planning for multiple contingencies.

44. DSS also anticipates that disruption to SNAP benefit issuance will result in additional administrative burden as a result of the need for additional customer support services and communications to recipients. DSS will still be required to continue processing applications and recertifications and maintain normal eligibility verification procedures during the shutdown. Whether due to confusion around recertification requirements amid the news around the shutdown or otherwise, many applicants who are otherwise eligible for SNAP benefits may fail to meet their certification procedures and have their application denied or case closed. This disruption, sometimes referred to as "applicant churn," will again require more DSS resources during a crucial period of reorganization in light of H.R.1 (the "One Big Beautiful Bill Act" enacted in July 2025).

45. DSS is already spending significant administrative resources managing communications and inquiries regarding the availability of SNAP benefits in November 2025. These communications are occurring, among other things, over call lines and in meetings with constituents and other stakeholders. Dozens of administrative staff members have already been required to absorb this administrative burden to handle shutdown-related concerns, in lieu of other important initiatives such as effectuating new requirements under H.R.1.

46. DSS also anticipates increased foot traffic and disruptions at Connecticut's local DSS Resource Centers (SNAP offices) as hungry individuals and families learn they cannot access their benefits, necessitating increased security personnel and law enforcement presence for public safety. DSS has already taken steps to expand state trooper and security presence at our offices in anticipation of increased foot traffic and dismayed clients seeking help. DSS

employs over 1,000 client-facing local office staff, many of whom will need to explain to recipients that they will not receive the SNAP benefits they anticipated receiving, including recipients who need those funds in order to feed their children and put food on the table. Many of these local office staff will face significant burdens on their time. Increased communication demands will likely require DSS to incur additional administrative burdens in the form of overtime pay to the limited staff available to handle this workload being added to all of their existing responsibilities.

*<u>Impacts on Connecticut's Provision of Other Public Benefits</u>*

47. Regardless of the length of the shutdown, any delay in benefit issuance file transmission will have cascading effects on DSS's provision of public benefits (of which SNAP is only one component) and the resources required to administer the SNAP program.

48. Changes to the benefit file schedule will require alterations in the case management system to include new data within established fields, subsequent testing of updated benefit files production with the Vendor, and negotiation of an updated file transfer schedule with the Vendor to send production files—all while numerous other states are trying to simultaneously transmit their own files to the Vendor (which serves as EBT vendor for multiple states).

49. DSS also must prepare for anticipated increases in high-volume demand events on our DSS website and mobile app, which is where clients go to check their EBT balances among many other features.  Information technology staff are required to be available to load and adjust new messaging across multiple online platforms and ensure that there is sufficient bandwidth for numerous users to interact with the same sections of our systems at the same time.

50. All of this will, in turn, require DSS to dedicate numerous information technology professionals, communications and operational resources, and administrative staff. This in turn will cause DSS to deprioritize numerous other pressing and important projects, including ongoing management of other DSS-issued benefits as well as preparation for upcoming systemic changes to SNAP administration following the effective date of H.R.1. Running these changes within DSS's production system will cause significant strain on DSS's already overworked infrastructure and interfere with department operations, introducing interruptions to DSS's ability to determine eligibility for SNAP and continue operating that system for benefits throughout the rest of fiscal year 2026.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 27th day of October 2025, in New Haven, Connecticut.

*Peter Hadler*
Digitally signed by Peter Hadler
DN: cn=Peter Hadler, o=DSS, ou=Deputy Commissioner, email=peter.hadler@ct.gov, c=US
Date: 2025.10.27 17:39:58 -04'00'

_____
Peter Hadler
Deputy Commissioner
Connecticut Department of Social Services