# EXHIBIT 24

## DECLARATION OF MICHAEL COLE

I, Michael Cole, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a resident of the Commonwealth of Massachusetts. I am over the age of 18 and understand the obligations of an oath.

**Professional and Agency Background**

2. I am currently the Acting Commissioner of the Massachusetts Department of Transitional Assistance (DTA), a position I have held since September 2025. Immediately before assuming this role, I served as DTA's Chief Operating Officer of DTA. Between 2014 and 2024, I held several other titles within DTA, including Deputy Commissioner for Policy and Programs, and Assistant Commissioner for Organizational Effectiveness.

3. I make this declaration in my official capacity at DTA, based on personal knowledge and on my review of information and records gathered by agency staff.

4. DTA operates as the Commonwealth's primary agency for administering public assistance programs, with a statutory mission to assist and empower low-income individuals and families to meet their basic needs, improve their quality of life, and achieve long-term economic self-sufficiency. DTA administers a comprehensive portfolio of both state- and federally-funded programs, including but not limited to the Supplemental Nutrition Assistance Program (SNAP), which provides 100% federally-funded food assistance to, among others, families with children, older adults, and persons with disabilities; the Healthy Incentives Program (HIP), a state-funded initiative that incentivizes SNAP recipients to purchase local produce; Transitional Aid to Families with Dependent Children (TAFDC), a state- and federally-funded program operating

under the federal Temporary Assistance for Needy Families (TANF) block grant that provides financial assistance and employment programming with work requirements; Emergency Aid to the Elderly, Disabled, and Children (EAEDC), a state-funded program serving elderly and disabled adults and children; and state-funded State Supplemental Payments (SSP) to Supplemental Security Income (SSI). The agency operates employment services through its "Pathways to Work" programs, which connect TAFDC and SNAP clients to career pathways, education, and training opportunities designed to promote economic mobility and sustained employment. DTA maintains rigorous program integrity standards through advanced analytics and fraud detection practices.

5. As of October 2025, DTA operates through a workforce of approximately 1,900 employees, with over 80% deployed across 21 local transitional assistance offices throughout the Commonwealth, supported by specialized units including but not limited to program integrity investigators, administrative hearing officers, and policy specialists.

6. SNAP, one of the programs administered by DTA, involves the issuance of monthly electronic benefits, funded by the federal government, that can be used to purchase food at authorized retail stores.

**SNAP in Massachusetts**

7. SNAP is a key part of Massachusetts's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food—indeed, SNAP is, by far, the Commonwealth's largest anti-hunger program. Thus far in 2025, an average of 1.1 million people received SNAP benefits in Massachusetts each month, comprising approximately 665,000 families, and including 342,000 children, and 261,500 elderly individuals. Households in Massachusetts receive on average $323 per month in SNAP benefits to meet their basic

subsistence and nutritional needs. During the federal fiscal year between October 1, 2024, and September 30, 2025, DTA issued approximately $218.5 million per month in SNAP benefits in Massachusetts.

8.      DTA administers the SNAP program in Massachusetts. In that role, DTA is responsible for issuing and overseeing SNAP benefits and Electronic Benefit Transfer (EBT) cards; ensuring program integrity; and supervising local transitional assistance offices' day-to-day administration of SNAP, including processing applications for SNAP benefits and certifying eligible applicant households. 7 U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4; 7 C.F.R. § 274.2; *see* Mass. Gen. Laws ch. 18, §§ 1 *et seq*. The United States Department of Agriculture (USDA) funds the entirety of SNAP benefits in Massachusetts, though Massachusetts and the federal government split administrative costs. 7 U.S.C. § 2025(a).

9.      For Federal Fiscal Year 2025, DTA budgeted approximately $213 million in state funds to pay for SNAP administration. This spending was expected to generate approximately $106 million in SNAP federal financial participation, to cover half of anticipated administration costs.

10.     By the end of October 2025, DTA will have spent approximately $18 million in state funds to pay for SNAP administration during the month of October and in anticipation of issuing November benefits as per the typical issuance schedule. DTA did so with the expectation that SNAP would continue to provide benefits to low-income individuals in the Commonwealth.

**USDA's Lapse of Appropriation Funding and Demand to Withhold Benefit Data**

11.     DTA has a contract with a financial services vendor, Fidelity Information Services (FIS, or "Vendor"), to provide EBT processing services for SNAP and other state-funded DTA programs. These services include but are not limited to processing benefit authorizations

3

provided by DTA; managing the accounts through which those benefits are made available to recipients; and processing the financial transactions that transmit payments to retailers that accept payments from those accounts.

12.     Each month, DTA's Vendor, on behalf of Massachusetts and USDA, loads the full value of each household's monthly SNAP benefit allotment into the household's EBT account. The household members can then use their EBT card like a debit card to purchase food.

13.     As part of the SNAP administration process, DTA is required to regularly transmit various types of electronic benefit issuance data files ("benefit files") to its Vendor. As relevant here, these benefit files contain the benefit level and other information for each individual who has been determined eligible for SNAP benefits. DTA sends multiple benefit files to the Vendor, including cyclical monthly and daily files for active SNAP recipients.

14.     DTA uses an in-house case management system called BEACON to generate benefit files, among many other functions.

15.     Once the Vendor receives the benefit files from DTA, the Vendor uses that information to authorize benefits for SNAP recipients and to subsequently load the approved monthly SNAP benefit allotment on SNAP recipients' individual EBT cards. Recipients can then use their individual EBT cards to purchase food, as of the benefit availability date, at authorized SNAP retailers.

16.     USDA's Food and Nutrition Service (USDA-FNS) certifies retailers for participation in the SNAP program. SNAP recipients can only use their EBT card at approved retailers.

17.     When SNAP recipients use their EBT card at a retailer's point of sale machine (such as a cash register), an electronic message goes from the retailer's cash register to FIS to

verify a variety of conditions including the availability of funds, and if sufficient funds are available, FIS approves the transaction. If the purchase is approved, the customer's EBT account is immediately debited. FIS then manages an overnight settlement process whereby it pays the retailer for the actual value of their SNAP transactions and draws down federal funds in the corresponding amount. Neither DTA nor any other state agency in the Commonwealth receives SNAP benefit funds as part of this process.

18. In accordance with this process, DTA transmits dozens of benefit files each month to its Vendor pursuant to a preset and mutually agreed upon transmission schedule.

19. DTA requires lead time to authorize cyclical SNAP benefits prior to the month in which the benefits will be issued. Cyclical benefit files contain issuances for active SNAP clients. DTA staggers the issuance of benefits over the first ten days of each month. For example, for SNAP benefits to be issued in November 2025, DTA is scheduled to start transmission of relevant benefits files to the Vendor on the evening of October 28, 2025, for individuals whose Social Security Number (SSN) ends in "0." DTA repeats this process for approximately nine subsequent business days, progressively submitting associated benefit files for recipients whose SSN ends in numbers zero through nine, until all the SNAP benefits for November 2025 have been issued.

20. In addition to the cyclical monthly benefit issuance process outlined above, DTA also follows a schedule for submitting other benefit files related to SNAP, including daily benefit files, which contain benefits issued for newly approved applications, a subset of which include expedited benefits. Daily benefit files also include ancillary benefits such as replacement benefits for household misfortune.

21.     When DTA approves an expedited or non-expedited SNAP application after the 15th of the month, BEACON automatically approves not only the prorated amount of benefits for that month, but also benefits for the following month. *See* 7 C.F.R. § 2723.2(g)(2). Together, both months' allotments are referred to as "combined allotments." At present, DTA's existing system is unable to separate combined allotments.

22.     If DTA fails to send benefit files to the Vendor by the agreed upon schedule, delivery of benefits to individual households may be delayed.

23.     On September 30, 2025, USDA released a "Lapse of Funding Plan[,]" as required by the Office of Management and Budget, to outline the approach to follow "for agency operations in the absence of appropriations." U.S. Dep't of Agric., Lapse of Funding Plan (2025), at 4. The plan stated that OMB's General Counsel previously had stated that "there is a bona fide need to obligate benefits for October . . . thereby guaranteeing that benefit funds are available for program operations even in the event of a government shutdown at the beginning of a fiscal year." *Id.* at 15. The plan further stated that "Congressional intent is evident that SNAP's operations should continue since the program has been provided with multi-year contingency funds" that "can be used for State Administrative Expenses" and also are "available to fund participant benefits in the event that a lapse occurs in the middle of the fiscal year." *Id.*

24.     On October 10, 2025, less than two weeks after the USDA Lapse of Funding Plan was released, the USDA-FNS Acting Associate Administrator Ronald Ward sent DTA a letter addressed to all SNAP State Agency Directors of all State Agencies as well as Regional SNAP Directors of all regions. The October 10 letter stated that "if the current lapse in appropriations continues, there will be insufficient funds to pay full November SNAP benefits for approximately 42 million individuals across the Nation." *Id.* The letter further stated that the

USDA "has begun the process of fact finding and information gathering to be prepared in case a contingency plan must be implemented." *Id*. USDA also indicated that it "[understood] that several States would normally begin sending November benefit issuance files to their [EBT] vendors soon." *Id*. Noting "the operational issues and constraints that exist in automated systems, and in the interest of preserving maximum flexibility," the letter stated that USDA was "forced to direct States to hold their November issuance files and delay transmission to State EBT vendors until further notice." *Id*. The letter further demanded that the States also hold "on-going SNAP benefits and daily files." *Id*.

25. On October 15, 2025, SNAP Northeast Regional Director Matthew Henschel sent an email to DTA and other SNAP State Agency Directors of Northeast Regional State Agencies. In this email, Henschel thanked State Agencies "for their questions and issues [they had] brought forward following receipt of the memorandum released Friday [October 10, 2025] afternoon regarding holding issuance files." *Id*. Henschel further stated that "[a]s the agency [USDA] considers those questions, one data point we are seeking is whether your State agency exercises the combined allotment option at [7 C.F.R. §] 273.2(g)(2)." *Id*. Henschel requested a response as soon as possible to "help [USDA] turnaround some of the responses you all seek." *Id*. On October 16, 2025, DTA responded that the Commonwealth uses combined allotments in accordance with 7 C.F.R. § 273.2(g)(2).

26. On October 21, 2025, DTA requested clarification from SNAP Northeast Regional Director Matthew Henschel as to whether FNS planned to decertify SNAP retailers in November to prevent clients from transacting their SNAP benefits and, if so, the timeline for decertification. That same day, FNS acknowledged receipt of the question and indicated it would "let [DTA] know when we have additional information to share on this." When DTA followed

7

up with Henschel on October 23, 2025, requesting any updates, DTA received the same response.

27.  On October 24, 2025, the USDA-FNS Deputy Under Secretary Patrick A. Penn sent DTA a memo addressed to all SNAP State Agency Directors of all State Agencies as well as Regional SNAP Directors of all regions. The October 24 letter stated that "effective November 1, 2025[,]" "[i]n accordance with 7 CFR 271.7(b) [sic], FNS is suspending all November 2025 benefit allotments until such time as sufficient federal funding is provided, or until FNS directs State agencies otherwise." *Id.* The letter also directed state agencies like DTA to "notify households of the suspension in accordance with the mass change notice provisions at 7 CFR 273.12(e)(1) [sic]" and "encourage[d] State agencies to limit administrative expenses only to the activities necessary to support the eligibility and issuance processes, integrity/oversight, and system maintenance." *Id.* USDA further indicated that "[u]pon the availability of federal funding, FNS will notify State agencies of when the suspension is lifted to allow for immediate action to resume issuing November and subsequent monthly benefits to eligible households[,]" and that "[h]ouseholds shall receive retroactive benefits once the suspension is lifted upon the availability of federal funding." *Id.* For states like the Commonwealth "that adopted the optional statutory provision to allow for combined allotments for applicants that applied after the 15th day of the month, which provides for eligible households to receive their October and November allotment combined," USDA indicated that DTA "must issue benefits only for the prorated October portion of the household's allotment." *Id.*

**Fiscal Impacts on the State from the Unavailability of SNAP Benefits**

28.  Due to the Vendor's data submission schedule for Massachusetts, DTA faces the threat of benefit interruption as early as November 1, 2025. Each day in which DTA is delayed

from submitting benefit files results in continued benefit interruption and statewide food insecurity for some of the most vulnerable residents of the Commonwealth.

29. Failure to issue SNAP benefits to qualified recipients in Massachusetts will lead to immediate increases in food insecurity for approximately 1.1 million people in the Commonwealth and unprecedented reliance on already overwhelmed food banks that may struggle to meet the significant surge in demand.[1] SNAP is the largest anti-hunger program in Massachusetts. As a result, the sudden lack of benefits for otherwise eligible individuals and families on SNAP will have downstream effects on the safety net programs that currently fill needs that SNAP does not cover.

30. The uncertainty of whether SNAP benefits will continue during this shutdown creates food insecurity for SNAP beneficiaries by threatening their reliable access to food and forcing them to start rationing what are already subsistence-level benefits. Any disruption in SNAP benefits will force families to scramble for alternatives, including possibly going into debt or skipping meals entirely.

31. SNAP is an economic driver for Massachusetts local businesses. The program injects nearly $3 billion into more than 5,500 Massachusetts businesses each year. SNAP is a multiplier program for households and local food systems too—for every dollar in SNAP benefits received by a client in Massachusetts, $1.50 goes back into the local economy. Thus if 1.1 million Massachusetts residents are forced to cut back on food spending at once, this will immediately and drastically affect the economic well-being of vendors, farmers, and stores across the state. Indeed, if otherwise eligible individuals and families do not receive their

---

[1] *See, e.g.,* Katie Johnston & Mara Kardas-Nelson, *The crisis in food aid is being felt far and wide, from needy families to small grocers and local farms*, BOSTON GLOBE (Oct. 26, 2025), https://www.bostonglobe.com/2025/10/26/metro/food-stamps-snap-suspended-november-shutdown/.

9

authorized SNAP benefits, then local farmers, grocery stores, and vendors will lose business. SNAP sales alone average 20% of grocery store, supercenter, and retail store sales within the Commonwealth.

32. Massachusetts also operates HIP, a state-funded program that offers additional funds for Massachusetts SNAP clients purchasing local produce from farm vendors. Without access to SNAP, SNAP recipients cannot use SNAP benefit funds at HIP retailers. As a result, the lack of SNAP-funded purchases from otherwise eligible individuals and families will have a particularly large impact on local farms.

33. DTA does not have the fiscal resources available to replace federally funded SNAP benefits with state-funded equivalent benefits. Upon information and belief, the Commonwealth also does not have the fiscal resources available to replace federally funded SNAP benefits with state-funded equivalent benefits.

**Administrative and Operational Burdens on the Massachusetts Department of Transitional Assistance (DTA)**

34. Suspension of SNAP benefits for November 2025 would significantly erode trust between the Commonwealth and its residents built over many years and through the dedication of significant resources. To properly effectuate its safety net programs, DTA has devoted years of work to overcome stigma, misinformation, and other barriers to access. DTA is the representative of the broader SNAP framework to Massachusetts residents: if households experience delays in receiving crucial benefits, they are likely to feel that DTA has failed or engaged in wrongdoing. DTA has fostered trust with Commonwealth residents and stakeholders by representing to them that SNAP eligibility and compliance with programmatic requirements will lead to timely benefits issuance. SNAP benefits directly fund one of the most crucial basic human needs: access to food. Failure to deliver on that basic need as promised is a deep violation of residents' trust.

35. Furthermore, loss of trust among Massachusetts residents will likely lead to decreased SNAP enrollments among eligible residents, which in turn will cause irreparable long-term harm and costs to the State in the form of increased healthcare and safety net costs, and expending of resources to rebuild trust in the public agency. USDA-FNS has acted in disregard of those reliance interests of the Commonwealth.

36. The actions to suspend the availability of SNAP benefits for November 2025 also unduly burdens DTA's already limited administrative resources.

37. DTA continued its normal operations, including processing new applications and preparing benefit issuance files for November benefits, through mid-October, in part due to the representations made in the September 30, 2025, USDA Lapse of Funding Plan.

38. Further, because USDA indicated in the October 24, 2025, letter that "FNS is suspending all November 2025 benefit allotments until such time as sufficient federal funding is provided, or until FNS directs State agencies otherwise[,]" DTA must prepare for SNAP benefit interruptions for an indefinite period of time. A disruption of any length would burden DTA, with the burden increasing over time as the scale of resources required to manage the disruption mount. Moreover, the uncertainty around the duration of a disruption exacerbates the burden on DTA, because DTA must dedicate additional resources to planning for multiple contingencies.

39. DTA also anticipates that disruption to SNAP benefit issuance will result in additional administrative burden as a result of the need for additional customer support services and communications to recipients. DTA will still be required to continue processing applications and recertifications and maintain normal eligibility verification procedures during the shutdown. Whether due to confusion around recertification requirements amid the news around the shutdown or otherwise, many applicants who are otherwise eligible for SNAP benefits may fail

to meet their certification procedures and have their application denied or case closed. This disruption, sometimes referred to as "applicant churn," will again require more DTA resources during a crucial period of reorganization required by H.R.1 (the "One Big Beautiful Bill Act" enacted in July 2025).

40. DTA is already spending significant administrative resources managing communications and inquiries regarding the availability of SNAP benefits in November 2025. These communications are occurring, among other things, over call lines and in meetings with constituents and other stakeholders. Approximately a dozen administrative staff members have already been required to absorb this administrative burden to handle shutdown-related concerns, in lieu of other important initiatives such as new requirements under H.R.1.

41. DTA also anticipates increased foot traffic and disruptions at Massachusetts Transitional Assistance Offices (TAOs) as hungry individuals and families learn that USDA-FNS has suspended SNAP benefits after October 31, 2025. DTA employs over 1,000 client-facing local office staff at TAOs who will need to explain to recipients that they will not receive the SNAP benefits they anticipated receiving, including recipients who need those funds in order to feed their children and put food on the table. Many of these local office staff will face significant burdens on their time—in addition to the emotional toll that having such difficult conversations with constituents will likely entail. Increased communication demands will require DTA to potentially incur additional administrative burden in the form of overtime pay to the limited staff available to handle this workload. To further support staff and the public and to ensure that TAOs do not experience disruption, DTA is assigning additional security personnel to area offices beginning Monday, October 27, 2025.

42. Equally troubling, DTA is presently unable to separate combined allotments under its processing system within the short timeframe expected by USDA. Any partial allowance of benefits from the combined allotments will create chaos and uncertainty in the complex data management involved in DTA's administration of SNAP benefits. The technical work to make this change in DTA's benefits issuance workflow is monumental, requiring up to ten information technology staff devoted entirely to this effort. Even with those additional resources, the change could not be implemented until after October 31, 2025. This reassigning of information technology staff would also disrupt the timeline for implementing changes to SNAP required by H.R.1.

**Impacts on Massachusetts's Provision of Other Public Benefits**

43. Regardless of the length of the shutdown, any delay in benefit issuance file transmission will have cascading effects on DTA's provision of public benefits (of which SNAP is only one component) and the resources required to administer the SNAP program.

44. Changes to the benefit file schedule will require alterations in the case management system to include new data within established fields, subsequent testing of updated benefit files production internally and with the Vendor, and negotiation of an updated file transfer schedule with the Vendor to send production files—all while numerous other states are trying to simultaneously transmit their own files to the Vendor (who serves as EBT vendor for multiple states). Thus, if and when the federal government decides to fund SNAP again, there will likely be a delay between that announcement and when benefits appear on recipients' EBT cards for use at retailers.

45. DTA also must prepare for anticipated increases in high-volume demand events on its DTA Connect web portal and mobile app, which is where SNAP recipients go to check

their EBT balances among many other features. To appropriately communicate this departure from normal SNAP issuance dates with clients, DTA must utilize many forms of communications—including direct-to-client text messages, emails, and a direct-to-client robocall campaign—to contact its entire SNAP caseload in a short time period. The cost of all these communications is approximately $11,000.

46.     In addition, DTA's communications systems rarely handle full caseload outbound efforts of this magnitude, but it is necessary to inform every SNAP household that they may experience a significant delay in benefits. These efforts will drive traffic to DTA's benefit management portal, DTA Connect, which is supported through the same infrastructure that houses DTA's eligibility determination system, BEACON. Therefore, these significant outbound efforts place substantial demands on DTA's information technology infrastructure and may destabilize all DTA applications.

47.     All of this will in turn require DTA to dedicate numerous information technology professionals, communications and operational resources, and administrative staff to managing through the funding lapse. This will have an adverse effect on DTA's many other pressing and important projects, including ongoing management of other DTA-issued benefits as well as preparation for upcoming systemic changes to SNAP administration following the effective date of the H.R.1. Running these changes within DTA's production system will likely strain DTA's already overworked infrastructure and interfere with department operations.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 28th day of October 2025, in Boston, Massachusetts.

*Michael A. Cole*

Michael Cole
Acting Commissioner
Massachusetts Department of Transition Assistance

15