EXHIBIT 29

## DECLARATION OF DR. SHANEEN MOORE

I, **Dr. Shaneen Moore**, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am a resident of the State of Minnesota. I am over the age of 18 and understand the obligations of an oath.

## Professional and Agency Background

2.    I am the Assistant Commissioner of the Family Wellbeing administration of the Minnesota Department of Children, Youth, and Families. My educational background includes a Bachelor of Business degree, Master of Business Administration degree, and a Doctor of Philosophy in Public Service and Management. I have been employed as the Assistant Commissioner of the Family Wellbeing administration since July 11, 2024. Prior to my role as Assistant Commissioner, I served as Deputy Assistant Commissioner for the Children and Family Services Administration at the Minnesota Department of Human Services, and as Director and Deputy Director of the Child Support Division. My professional experience in this and similar capacities expands almost 12 years working for state government.

3.    I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

4.    The Minnesota Department of Children, Youth, and Families (DCYF) administers programs that keep children safe and provides families with supports to care for their children. Among the programs administered by DCYF is the Supplemental Nutrition Assistance Program (SNAP), which issues monthly electronic benefits that can be used to purchase food at authorized retail stores.

**SNAP in Minnesota**

5.      SNAP is a key part of Minnesota's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food. In Federal Fiscal Year 2024, an average of 440,000 people received SNAP benefits in Minnesota each month, including 181,980 children and 67,000 elderly individuals. More than $859,591,730.00 in SNAP benefits were issued through FFY 2024. This amount reflects those receiving federal SNAP benefits and state-funded food benefits as part of Minnesota's state-funded Minnesota Family Investment Program (MFIP) and solely state-funded SNAP benefits.

6.      DCYF administers the SNAP program in Minnesota pursuant to Minnesota Statutes § 142F.05 *et seq*. Pursuant to federal law, DCYF administers SNAP on behalf of the United States Department of Agriculture (USDA) and is responsible for the issuance, control, and accountability of SNAP benefits and Electronic Benefit Transaction (EBT) cards; ensuring program integrity; and supervising 87 counties and 3 Tribal Nations' day-to-day administration of SNAP, including processing applications for SNAP benefits and certifying eligible applicant households. 7 U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4; 7 C.F.R. § 274.2. USDA funds the entirety of SNAP benefits in Minnesota, though Minnesota and the federal government split administrative costs. 7 U.S.C. § 2025(a).

7.      For Federal Fiscal Year 2025, DCYF budgeted approximately $160 million in state funds to pay for SNAP administration. This spending is expected to generate approximately $80 million in SNAP federal financial reimbursement, to cover half of anticipated administration costs.

8.      Minnesota combines cash assistance (Temporary Assistance to Needy Families, or "TANF"), administered in Minnesota as the Minnesota Family Investment Program ("MFIP"),

and SNAP benefits into a single benefit, allocated to eligible recipients via an EBT card. The

EBT system issues benefits for MFIP, SNAP, and other state-funded cash assistance programs.

9.      DCYF spends an average of $2,606,327 per month in state funds to pay for SNAP

administration and expended similar funds during the month of October in anticipation of issuing

November benefits as per the typical issuance schedule.  DCYF did so with the expectation that

SNAP would continue to provide benefits to low-income individuals in Minnesota, consistent

with its obligations under state and federal law.

**USDA's Lapse of Appropriation Funding and Demand to Withhold Benefit Data**

10.      DCYF has a contract with a financial services vendor, Fidelity Information

Services ("FIS" or "Vendor"), to provide EBT processing services for SNAP, MFIP, and other

state-funded programs. FIS' services include processing benefit authorizations provided by

DCYF, managing the accounts through which those benefits are made available to recipients, and

processing the financial transactions that transmit payments to retailers that accept payments

from those accounts.

11.      Vendor invoices DCYF for services it provides under the DCYF contract and

invoices are paid by the State of Minnesota. Each month, DCYF's Vendor, on behalf of

Minnesota and USDA, loads the full value of each household's monthly SNAP benefit allotment

into the household's account. The household members access their account by using their EBT

card to purchase food in a similar manner to the way one uses a debit card.

12.      As part of the SNAP administration process, DCYF is required to regularly

transmit various types of electronic benefit issuance data files ("benefit files") to its Vendor.

These benefit files contain information related to individuals who have been determined eligible

for SNAP benefits, and the benefit level for that individual, alongside other information. DCYF

sends multiple benefit files to the Vendor, including monthly files for active SNAP recipients. Further, DCYF sends benefit files for SNAP recipients newly approved that month, a subset of which are individuals who have been approved for expedited SNAP benefits.

13.     DCYF uses an in-house case management system called MAXIS to generate benefit files, in addition to many other functions.

14.     Once the Vendor receives the benefit files from DCYF, the Vendor uses that information to authorize benefits for SNAP recipients and to subsequently load the approved monthly SNAP benefit allotment on SNAP recipients' individual EBT cards. Recipients can then use their individual EBT cards to purchase food, as of the benefit availability date, at authorized SNAP retailers.

15.     U.S. Department of Agriculture's Food and Nutrition Service (USDA-FNS) manages the process of certifying retailers for participation in the SNAP program. SNAP recipients can use their EBT card only at approved retailers.

16.     When SNAP recipients use their EBT card at a retailer's point of sale machine, an electronic message goes from the retailer's cash register to the Vendor to verify a variety of conditions including the availability of funds, and if sufficient funds are available. If the purchase is approved, the customer's EBT account is immediately debited and the retailer's account gets credited. Neither DCYF nor any other state agency in Minnesota ever receives SNAP benefit funds as part of this process.

17.     In accordance with this process, DCYF transmits 20 daily issuance files a month, 2 monthly issuance files, and 62 Rapid Electronic Issuance (REI) files containing – thousands of benefit records to its Vendor pursuant to a preset, contractual transmission schedule. The most recent daily file contained 730 records with an issuance amount of $156,109.18. REI runs twice-

4

a-day with, for example, one file containing 138 records for $32,574.24 and a second file containing 116 records for $24,829.73. The monthly food file for October contained 214,815 records totaling nearly $67 million.

18.     DCYF requires lead time to process SNAP benefits prior to the month in which the benefits will be issued. Likewise, DCYF's technology infrastructure historically requires at least 3.5 weeks prior to issuance to pause the mechanisms for benefit distribution. Benefit issuance occurs from the 4th through the 14th of every month. DCYF staggers the issuance of benefits over the first 14 days of a month.  For example, for SNAP benefits to be issued in November 2025, DCYF is scheduled to start transmission of relevant benefits files to the Vendor on the evening of October 27, 2025. Issuance date is determined by the last number of the case number. For example, for individuals whose case number ends in "9" benefits are issued the 9th of the month.

19.     In addition to the cyclical monthly benefit issuance process outlined above, DCYF also follows a schedule for submitting other benefit files related to SNAP, including daily benefit files, which contain benefits issued for expedited applications. In addition, when an agency approves a household for expedited SNAP benefits after the 15th of a month, the agency has discretion to approve not only the prorated amount of benefits for the month of eligibility, but also benefits for the following month. When processing benefit allotments at the end of a calendar month, DCYF thus issues, in part, benefits that are allotted for both the month in which the benefit files are submitted *and* the subsequent incoming month.

20.     If DCYF fails to send benefit files to the Vendor timely by the agreed upon schedule, delivery of benefits to individual households will be delayed.

21.     Furthermore, DCYF has received information through what appears to be a USDA memo, reported by public media, indicating that if the state proceeds with SNAP issuances using state funds, it is USDA's belief that states are liable for these funds without any guarantee of federal reimbursement.

22. On September 30, 2025, USDA released a "Lapse of Funding Plan[,]" stating that the Office of Management and Budget requires USDA to have a plan outlining the approach to follow "for agency operations in the absence of appropriations." U.S. Dep't of Agric., Lapse of Funding Plan (2025), at 4, previously available at https://www.usda.gov/sites/default/files/documents/fy2026-usda-lapse-plan.pdf. The plan stated that "there is a bona fide need to obligate benefits for October . . . thereby guaranteeing that benefit funds are available for program operations even in the event of a government shutdown at the beginning of a fiscal year." *Id.* at 15. The plan further stated that "Congressional intent is evident that SNAP's operations should continue since the program has been provided with multi-year contingency funds" that are "available to fund participant benefits in the event that a lapse occurs in the middle of the fiscal year." *Id.*

23.     On October 10, 2025, less than two weeks after the USDA Lapse of Funding Plan was released, the USDA-FNS Acting Associate Administrator Ronald Ward sent DCYF a letter addressed to all SNAP State Agency Directors of all State Agencies as well as Regional SNAP Directors of all regions. The October 10 letter stated that "if the current lapse in appropriations continues, there will be insufficient funds to pay full November SNAP benefits for approximately 42 million individuals across the Nation." The letter further stated that the USDA "has begun the process of fact finding and information gathering to be prepared in case a contingency plan must be implemented." USDA also indicated that it "[understood] that several

States would normally begin sending November benefit issuance files to their [EBT] vendors soon." Noting "the operational issues and constraints that exist in automated systems, and in the interest of preserving maximum flexibility," the letter indicated that USDA was "forced to direct States to hold their November issuance files and delay transmission to State EBT vendors until further notice." The letter further demanded that the States also hold "on-going SNAP benefits and daily files."

24.     On October 16, 2025, DCYF spoke with FNS' Jacob Hoot.  Hoot confirmed that under the USDA's October 10, 2025 letter, DCYF was not permitted to send issuance files for any SNAP funding beginning November 1, including expedited SNAP files that would draw both October and November funds.

25.     On October 24, 2024, USDA sent a memorandum to DCYF and other SNAP state agencies stating that "FNS is suspending all November 2025 benefit allotments until such time as sufficient federal funding is provided, or until FNS directs State agencies otherwise."

26.     Due to the Vendor's data submission schedule for Minnesota, DCYF faces the threat of benefit interruption as early as November 1, 2025. Each day in which DCYF is delayed from submitting benefit files results in continued benefit interruption and statewide food insecurity for some of the most vulnerable Minnesota residents.

27.     Failure to issue SNAP benefits to qualified recipients in Minnesota will lead to immediate food insecurity for approximately 440,000 people in Minnesota and unprecedented reliance on already overwhelmed food banks that will simply not be able to meet the significant surge in demand. SNAP is the largest anti-hunger program in Minnesota. As a result, the sudden lack of benefits for otherwise eligible individuals and families in SNAP will have devastating

consequences on the public health of Minnesota and downstream effects on the safety net programs that currently fill needs that SNAP does not cover.

28.    The uncertainty of whether SNAP benefits will continue during this shutdown creates food insecurity for SNAP beneficiaries by threatening their reliable access to food and forcing them to start rationing what are already subsistence-level benefits. Any disruption in SNAP benefits will force families to scramble for alternatives, including possibly going into debt or skipping meals entirely.

29.    SNAP is also an economic driver for Minnesota's local businesses. More than 3,600 merchants in Minnesota accept SNAP benefits for food purchases. Every $1 in SNAP benefits generates up to $1.50 in local economic activity, boosting grocery stores, farmers' markets and food retailers across the state. If hundreds of thousands of Minnesota residents are forced to cut back on food spending at once, this will immediately and drastically affect the economic well-being of vendors, farmers, and stores across Minnesota.

**Fiscal Impacts on the State from the Unavailability of SNAP Benefits**

30.    The loss of SNAP benefits funding would have a significant fiscal impact on Minnesota.

31.    The loss of SNAP benefits will result in greater need and requests for state-funded assistance programs, including, for example, state-funded nutrition access programs similar to SNAP.

32.    To respond to the impending crisis that loss of SNAP benefits will cause Minnesota families beginning November 1, 2025,  Minnesota committed an additional $4 million to provide additional funding for Minnesota's emergency food shelf network under Minnesota Statutes, section 142F.14.

33.     DCYF, as an agency, has spent hundreds of staff hours to ensure that DCYF is able to make system adjustments to comply with USDA directives, coordinate with county and Tribal Nation partners, provide proactive and responsive communications to recipients and community partners, and develop and implement responsive anti-hunger measures to ease the burden that will be experienced by hundreds of thousands of Minnesotans beginning November 1st if SNAP benefits remain paused by the USDA.

34.     DCYF does not have the fiscal resources available to replace federally funded SNAP benefits with state-funded equivalent benefits. I am informed and believe that Minnesota also does not have the fiscal resources available to replace federally funded SNAP benefits with state-funded equivalent benefits.

35.     A Minnesota study identified an association among food insecurity, poor health, and increased health care spending. The study suggests that allowing able-bodied adults without dependents to receive SNAP may be both critical to their health and cost-effective.

**Administrative and Operational Burdens on DCYF**

36.     The actions to suspend the availability of SNAP benefits for November 2025 would significantly erode trust between Minnesota and its residents built over many years and through the dedication of significant resources.

37.     To properly effectuate its safety net programs, DCYF has devoted years of work to overcome stigma, misinformation, and other barriers to access. DCYF is the representative of the broader SNAP framework to Minnesota residents: If households experience delays in receiving crucial benefits, they are likely to feel that DCYF has failed or engaged in wrongdoing. DCYF has fostered trust with Minnesota residents and stakeholders by representing to them that SNAP eligibility and compliance with programmatic requirements will lead to timely benefits

issuance. SNAP benefits directly fund one of the most crucial basic human needs: access to food. Failure to deliver on that basic need as promised is a deep violation of residents' trust.

38.    Furthermore, loss of trust among Minnesota residents will likely lead to decreased SNAP enrollments, which in turn will cause irreparable long-term harm and costs to the State in the form of increased healthcare and safety net costs, and expending of resources to rebuild trust in the public agency. USDA-FNS has acted in disregard of those reliance interests of Minnesota.

39.    The actions to suspend the availability of SNAP benefits for November 2025 also unduly burdens DCYF's already limited administrative resources.

40.    Once the current government shutdown began, USDA on October 10, 2025 sent DCYF a letter regarding the lapse in regular appropriations, stating that "SNAP eligible households will receive monthly benefits for October" and that "funding is available for State administrative expenses (SAE) for October." The letter directed state agencies to "continue to administer the program in accordance with Federal statute and regulations."

41.    DCYF continued its normal operations, including processing new applications and preparing benefit issuance files for November benefits, through October, in part due to the representations in USDA's October 1 letter.

42.    Further, because USDA indicated in the October 10, 2025 letter that Minnesota is to hold these benefit files "until further notice[,]" DCYF has had to prepare for SNAP benefit interruptions for an indefinite period of time. A disruption of any length would burden DCYF, with the extent of this burden increasing in relation to the duration of the disruption as the scale of resources required to manage the disruption mount over time. Moreover, the ambiguity of not knowing the ultimate duration of a disruption itself exacerbates the burden on DCYF, because DCYF continues to have to dedicate additional resources to planning for multiple contingencies.

43.     DCYF also anticipates that disruption to SNAP benefit issuance will result in additional administrative burden as a result of the need for additional customer support services and communications to recipients. DCYF will still be required to continue processing applications and recertifications and maintain normal eligibility verification procedures during the shutdown. Whether due to confusion around recertification requirements amid the news around the shutdown or otherwise, many applicants who are otherwise eligible for SNAP benefits may fail to meet their certification procedures and have their application denied or case closed. This disruption, sometimes referred to as "applicant churn," will again require more DCYF resources during a crucial period of reorganization in light of H.R.1 (the "One Big Beautiful Bill Act" enacted in July 2025).

44.     DCYF is already spending significant administrative resources managing communications and inquiries regarding the availability of SNAP benefits in November 2025. These communications are occurring, among other things, over call lines and in meetings with constituents and other stakeholders. Approximately 30 DCYF staff members have already been required to absorb this administrative burden to handle shutdown-related concerns, in lieu of other important initiatives such as new requirements under H.R.1.

45.     DCYF also anticipates increased foot traffic and disruptions at local county and tribal SNAP offices as hungry individuals and families learn they cannot access their benefit. DCYF relies on its local county and tribal agencies to administer SNAP, including thousands of public employees, many of whom will need to explain to recipients that they will not receive the SNAP benefits they anticipated receiving, including recipients who need those funds in order to feed their children and put food on the table. Many of these local agency staff will face significant burdens on their time. Increased communication demands will likely require DCYF to

11

incur additional administrative burdens in the form of overtime pay to the limited staff available to handle this workload.

**Impacts on Minnesota's Provision of Other Public Benefits**

46.     Regardless of the length of the shutdown, any delay in benefit issuance file transmission will have cascading effects on DCYF's provision of public benefits (of which SNAP is only one component) and the resources required to administer the SNAP program.

47.     Changes to the benefit file schedule will require alterations in the case management system to include new data within established fields, subsequent testing of updated benefit files production with the Vendor, and negotiation of an updated file transfer schedule with the Vendor to send production files—all while numerous other states are trying to simultaneously transmit their own files to the Vendor (which serves as EBT vendor for multiple states).

48.     DCYF also must prepare for anticipated increases in high-volume demand events on our DCYF website and contact centers for answers about benefit issuance; system help desks; ebtEDGE and mobile app where clients go to check their EBT balances among many other features.

49.     All of this will in turn require DCYF to dedicate numerous information technology professionals, communications and operational resources, and administrative staff. This in turn will cause DCYF to deprioritize numerous other pressing and important projects, including ongoing management of other DCYF-issued benefits as well as preparation for upcoming systemic changes to SNAP administration following the effective date of the H.R.1. Running these changes within DCYF's production system will cause significant strain on DCYF's already overburdened infrastructure and interfere with department operations,

introducing interruptions to DCYF's ability to determine eligibility for SNAP and continue operating that system for benefits throughout the rest of fiscal year 2026.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __27__ day of October, 2025, in Saint Paul, Minnesota.

_

_____
Dr. Shaneen Moore
Assistant Commissioner, Family Wellbeing Administration
Minnesota Department of Children, Youth, and Families