# EXHIBIT 36

## DECLARATION OF HOA PHAM

I, Hoa Pham, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a resident of the Commonwealth of Pennsylvania. I am over the age of 18 and understand the obligations of an oath.

**Professional and Agency Background**

2. I am Deputy Secretary for the Pennsylvania Department of Human Services ("DHS"). As Deputy Secretary, I oversee DHS's Office of Income Maintenance ("OIM"), which serves low-income Pennsylvanians through numerous beneficial assistance programs. Before becoming Deputy Secretary of DHS's OIM, I served as OIM's Director for the Bureau of Employment Programs, where I oversaw education and job training programs designed to help reduce dependencies on DHS' various public assistance programs. Prior to joining the Commonwealth and OIM in 2021, I worked in various social impact-related positions with successive responsibility and leadership throughout the Greater Philadelphia region. These positions have included direct service delivery and management of various programs serving low income individuals; managing philanthropic investment portfolios; conducting local, state and federal advocacy; and providing technical assistance to community-based service providers. I have a Bachelor of Arts from Swarthmore College.

3. I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

4. DHS is Pennsylvania's comprehensive social services agency. Its mission is to assist Pennsylvanians in leading safe, healthy, and productive lives through equitable and outcome-focused services while being an accountable steward of Commonwealth and federal

resources. DHS carries out its mission through collaboration with individuals, families, community and advocacy organizations, and state and federal partners to facilitate the safety and economic security of individuals and families who qualify for DHS benefits and services in the Commonwealth of Pennsylvania.

5. SNAP, one of the programs administered by DHS, involves the issuance of monthly electronic benefits that can be used to purchase food at authorized retail stores. SNAP provides eligible households with funds each month on a debit card that can only be used for produce, meat, dairy, and other food at grocery stores, supermarkets, farmers markets, and other food retailers authorized by the United States Department of Agriculture (USDA). By helping families fight food insecurity and meet one of their fundamental needs, they can focus on overcoming barriers to self-sufficiency.

**SNAP in Pennsylvania**

6. SNAP is a key part of Pennsylvania's efforts to address hunger. SNAP supplements the food budget of low-income families so they can purchase healthy food. In federal fiscal year 2024, an average of 2,025,387 people received SNAP benefits in Pennsylvania each month, including 713,811 children and 697,001 elderly individuals. More than $4,374,348,030 in SNAP benefits were issued over the course of state fiscal year 2024.

7. Thus far in 2025, an average of 1,971,749 people received SNAP benefits in Pennsylvania each month, including approximately 1,081,862 families and 694,055 children. Households in Pennsylvania receive on average $329 per month in SNAP benefits to meet their basic subsistence and nutritional needs. During the federal fiscal year between October 1, 2024, and September 30, 2025, DHS issued approximately $358,217,114 per month in SNAP benefits in Pennsylvania.

8. DHS administers the SNAP program in Pennsylvania pursuant to 62 P.S. § 201. Pursuant to federal law, DHS administers SNAP on behalf of the USDA and is responsible for the issuance, control, and accountability of SNAP benefits and Electronic Benefit Transaction (EBT) cards; ensuring program integrity; and supervising local transitional assistance offices' day-to-day administration of SNAP, including processing applications for SNAP benefits and certifying eligible applicant households. USDA funds the entirety of SNAP benefits in Pennsylvania, though Pennsylvania and the federal government split administrative costs.

9. Pennsylvania expends approximately $435,470,235 on administrative costs to run its SNAP program each year, approximately $219,970,732 of which is reimbursed by the federal government. Pennsylvania currently covers approximately $215,499,503 in SNAP expenditures, and in-kind match contributions cover the remaining $4,977,803.

10. For Federal Fiscal Year 2025, DHS budgeted approximately $215,499,503 in state funds to pay for SNAP administration. This spending is expected to generate approximately $219,970,732 in SNAP federal financial participation, to cover half of anticipated administration costs.

11. By the end of October 2025, DHS will have spent approximately $17,464,310 in state funds to pay for SNAP administration during the month of October and in anticipation of issuing November benefits as per the typical issuance schedule. DHS did so with the expectation that SNAP would continue to provide benefits to low-income individuals in Pennsylvania.

**USDA's Lapse of Appropriation Funding and Demand to Withhold Benefit Data**

12. DHS has a contract with a financial services vendor, Conduent State and Local Solutions (Conduent, or "Vendor"), to provide EBT processing services for SNAP and other state-funded DHS programs. These services include processing benefit authorizations provided

3

by DHS; managing the accounts through which those benefits are made available to recipients; and processing the financial transactions that transmit payments to retailers that accept payments from those accounts.

13. The Vendor's invoices for its services rendered under its contract with DHS are paid by Pennsylvania. Each month, DHS's Vendor, on behalf of Pennsylvania and USDA, loads the full value of each household's monthly SNAP benefit allotment into the household's account. The household members access their account by using their EBT card to purchase food in a similar manner to the way one uses a debit card.

14. As part of the SNAP administration process, DHS is required to regularly transmit various types of electronic benefit issuance data files ("benefit files") to its Vendor. These benefit files contain information related to individuals who have been determined eligible for SNAP benefits, and the benefit level for that individual, alongside other information. DHS sends multiple benefit files to the Vendor, including monthly files for active SNAP recipients. Further, DHS sends daily benefit files for SNAP recipients newly approved that month, a subset of which are individuals who have been approved for expedited SNAP benefits.

15. DHS uses an in-house case management system called the electronic Client Information System (eCIS) to generate benefit files, among many other functions.

16. Once the Vendor receives the benefit files from DHS, the Vendor uses that information to authorize benefits for SNAP recipients and to subsequently load the approved monthly SNAP benefit allotment on SNAP recipients' individual EBT cards. Recipients can then use their individual EBT cards to purchase food, as of the benefit availability date, at authorized SNAP retailers.

17. U.S. Department of Agriculture's Food and Nutrition Service (USDA-FNS) manages the process of certifying retailers for participation in the SNAP program. SNAP recipients can only use their EBT card at approved retailers.

18. When SNAP recipients use their EBT card at a retailer's point of sale machine, an electronic message goes from the retailer's cash register to the Vendor to verify a variety of conditions including the availability of funds, and if sufficient funds are available. If the purchase is approved, the customer's EBT account is immediately debited and the retailer's account gets credited. Neither DHS nor any other state agency in Pennsylvania ever receives SNAP benefit funds as part of this process.

19. In accordance with this process, DHS transmits hundreds of benefit files a month to its Vendor pursuant to a preset, contractual transmission schedule.

20. DHS requires lead time to process SNAP benefits prior to the month in which the benefits will be issued. DHS pre-stages EBT issuance files with the most up to date case actions by a defined deadline each month. Then, DHS begins transmitting regular SNAP monthly files to its Vendor five business days prior to the first payment day of the month. For example, for SNAP benefits to be issued in November 2025, DHS would have aggregated transmission files with all case actions taken up to the evening of October 23, and then began transmission of those files to the Vendor on October 27, for individuals whose SNAP Case Number ends in "1." DHS repeats this process across approximately 10 business days, progressively submitting associated benefit files for recipients whose SNAP Case Number ends in numbers zero through nine, until all SNAP benefits for November 2025 have been issued statewide. Because of USDA's directives, DHS missed these deadlines for November benefits.

21. In addition to the cyclical monthly benefit issuance process outlined above, DHS also follows a schedule for submitting other benefit files related to SNAP, including daily benefit files, which contain benefits issued for expedited applications, specific funds to support SNAP recipients' ability to participate in a SNAP work program, and other ancillary benefit types. In addition, DHS takes the state option to issue a prorated amount of benefits for households who are approved after the 15th of the month as well as benefits for the following month. When processing benefit allotments at the end of a calendar month, DHS thus issues, in part, benefits that are allotted for both the month in which the benefit files are submitted *and* the subsequent incoming month.

22. If DHS fails to send benefit files to the Vendor timely by the agreed upon schedule, delivery of benefits to individual households will be delayed.

23. On September 30, 2025, USDA released a "Lapse of Funding Plan[,]" stating that such a plan was required by the Office of Management and Budget to outline the approach to follow "for agency operations in the absence of appropriations." U.S. Dep't of Agric., Lapse of Funding Plan (2025), at 4, previously available at https://www.usda.gov/sites/default/files/documents/fy2026-usda-lapse-plan.pdf. The plan stated that "there is a bona fide need to obligate benefits for October . . . thereby guaranteeing that benefit funds are available for program operations even in the event of a government shutdown at the beginning of a fiscal year." *Id.* at 15. The plan further stated that "Congressional intent is evident that SNAP's operations should continue since the program has been provided with multi-year contingency funds" that are "available to fund participant benefits in the event that a lapse occurs in the middle of the fiscal year." *Id.*

24. On October 10, 2025, less than two weeks after the USDA Lapse of Funding Plan was released, the USDA-FNS Acting Associate Administrator Ronald Ward sent DHS a letter addressed to all SNAP State Agency Directors of all State Agencies as well as Regional SNAP Directors of all regions. The October 10 letter stated that "if the current lapse in appropriations continues, there will be insufficient funds to pay full November SNAP benefits for approximately 42 million individuals across the Nation." The letter further stated that the USDA "has begun the process of fact finding and information gathering to be prepared in case a contingency plan must be implemented." USDA also indicated that it "[understood] that several States would normally begin sending November benefit issuance files to their [EBT] vendors soon." Noting "the operational issues and constraints that exist in automated systems, and in the interest of preserving maximum flexibility," the letter indicated that USDA was "forced to direct States to hold their November issuance files and delay transmission to State EBT vendors until further notice." The letter further demanded that the States also hold "on-going SNAP benefits and daily files."

25. On October 6, 2025, and again on October 23, 2025, DHS requested guidance from USDA-FNS on how to treat combined payments under 7 CFR § 273.2(g)(2). USDA-FNS sought clarifying information from DHS on October 15, 2025, and October 20, 2025. USDA-FNS then confirmed on October 23, 2025, that DHS may not issue combined payments as described by 7 CFR § 273.2(g)(2).

26. On October 24, 2025, DHS received a letter from USDA purporting to formally suspend November SNAP benefits. Furthermore, USDA has informed Pennsylvania that if the state proceeds with SNAP issuances using state funds, it is USDA's belief that states are liable for these funds without any guarantee of federal reimbursement.

7

27.     Due to the Vendor's data submission schedule for Pennsylvania, DHS faces the threat of benefit interruption as early as November 1, 2025. Each day in which DHS is delayed from submitting benefit files results in continued benefit interruption and statewide food insecurity for some of the most vulnerable residents of Pennsylvania.

28.     SNAP is the largest anti-hunger program in Pennsylvania. Failure to issue SNAP benefits to qualified recipients in Pennsylvania will therefore lead to immediate food insecurity for nearly 1 in 6 Pennsylvanians, or approximately 2,000,000 people. Failure to issue SNAP benefits will also lead to unprecedented reliance on already overwhelmed food banks, which will simply not be able to fully meet the significant surge in demand. As a result, the sudden lack of benefits for otherwise eligible individuals and families in SNAP will have devastating consequences on the public health of Pennsylvania and downstream effects on the safety net programs that currently fill needs that SNAP does not cover.

29.     The uncertainty of whether SNAP benefits will continue during this federal government shutdown creates food insecurity for SNAP beneficiaries by threatening their reliable access to food and forcing them to start rationing what are already subsistence-level benefits. This is particularly true for SNAP beneficiaries who have diet-sensitive conditions such as Type II diabetes. Any disruption in SNAP benefits will force families to scramble for alternatives, including possibly going into debt, skipping meals entirely, and/or exacerbating health conditions.

30.     SNAP is also an economic driver for Pennsylvania's local businesses. In Pennsylvania, over 10,600 retail entities, across 38,000 locations, accept SNAP benefits for food purchases. If millions of Pennsylvania residents are forced to cut back on food spending at once, this will immediately and drastically affect the economic well-being of vendors, farmers, and

stores across Pennsylvania. In September 2025 alone, DHS issued $354,038,245 in SNAP benefits throughout the Commonwealth. According to the United States Department of Agriculture's Economic Research Center, each $1 issued in SNAP benefits grew Pennsylvania's economy by $1.54 through job retention, creation and income for farms and other agricultural producers.

**Fiscal Impacts on the State from the Unavailability of SNAP Benefits**

31. The loss of SNAP benefits funding would have a significant fiscal impact on Pennsylvania.

32. The loss of SNAP benefits will result in greater need and requests for state-funded assistance programs, including, for example, state-funded nutrition access programs similar to SNAP.

33. Declining SNAP enrollment would have adverse and compounding effects. When participation in SNAP drops, food insecurity rises which then contributes to deteriorating public health. Chronic public health issues in turn require greater demand for other programs administered by DHS, including Medicaid and Temporary Assistance for Needy Families.

34. DHS does not have the fiscal resources available to replace federally funded SNAP benefits with state-funded equivalent benefits. Pennsylvania also does not have the fiscal resources available to replace federally funded SNAP benefits with state-funded equivalent benefits.

35. Given the ambiguity and lack of detailed guidance issued to States by USDA, DHS cannot be certain whether USDA will subsequently determine that eligibility and issuance actions DHS has taken during the funding lapse will result in a payment error. Penalties against

States with unacceptable payment error rates are outlined at 7 USC § 2025(c)(1)(c) and Pub. L. 119-21, § 10105, 139 Stat. 72, 83.

**Administrative and Operational Burdens on DHS**

36. The actions to suspend the availability of SNAP benefits for November 2025 would significantly erode trust between Pennsylvania and its residents built over many years and through the dedication of significant resources.

37. To properly effectuate its safety net programs, DHS has devoted years of work to overcome barriers to access those programs. DHS is the representative of the broader SNAP framework to Pennsylvania residents: if households experience delays in receiving crucial benefits, they are likely to feel that Pennsylvania has failed or engaged in wrongdoing. DHS has fostered trust with Pennsylvania residents and stakeholders by representing to them that SNAP eligibility and compliance with programmatic requirements will lead to timely benefits issuance. SNAP benefits directly fund one of the most crucial basic human needs: access to food. Failure to deliver on that basic need as promised is a deep violation of residents' trust.

38. Furthermore, in my experience, loss of trust among Pennsylvania residents will likely lead to decreased SNAP enrollments, which in turn will cause irreparable long-term harm and costs to the State in the form of increased healthcare and safety net costs, and expending of resources to rebuild trust in the public agency. USDA-FNS has acted in disregard of those reliance interests of Pennsylvania.

39. The actions to suspend the availability of SNAP benefits for November 2025 also unduly burdens DHS's already limited administrative resources.

40. On October 1, 2025, DHS received a letter from USDA confirming a funding lapse for USDA and informing States that USDA initiated the process of orderly shutdown of nonessential operations as outlined in USDA's Agency Contingency Plan. The letter further

indicates that "SNAP eligible households will receive monthly benefits for October" and that "funding is available for State administrative expenses (SAE) for October." The letter directed state agencies to "continue to administer the program in accordance with Federal state and regulations." However, the letter also goes on to "encourages States to delay further SNAP Ed and Employment and Training obligations until appropriations legislation is enacted."

41. DHS continued its normal operations, including processing new applications and preparing benefit issuance files for November benefits, through October, in part due to the representations in USDA's October 1 letter.

42. Further, because USDA indicated in the October 10, 2025, letter that DHS is to hold these benefit files "until further notice[,]" DHS must prepare for SNAP benefit interruptions for an indefinite period of time. A disruption of any length would burden DHS, with the extent of this burden increasing in relation to the duration of the disruption as the scale of resources required to manage the disruption mount over time. Moreover, the ambiguity of not knowing the ultimate duration of a disruption itself exacerbates the burden on DHS, because DHS must dedicate additional resources to planning for multiple contingencies.

43. It would cost DHS approximately $1,000,000 to send mailed notices to all currently eligible SNAP recipients in Pennsylvania of a delay in payment, and an additional $1,000,000 for any subsequent mailed notices to inform SNAP recipients of subsequent changes to expected payments.

44. DHS also anticipates that disruption to SNAP benefit issuance will result in additional administrative burden as a result of the need for additional customer support services and communications to recipients. DHS will still be required to continue processing applications and recertifications and maintain normal eligibility verification procedures during the shutdown.

Whether due to confusion around recertification requirements amid the news around the shutdown or otherwise, many applicants who are otherwise eligible for SNAP benefits may fail to meet their certification procedures and have their application denied or case closed. This disruption, sometimes referred to as "applicant churn," will again require more DHS resources during a crucial period of reorganization in light of H.R.1.

45.     DHS is already spending significant administrative resources managing communications and inquiries regarding the availability of SNAP benefits in November 2025. These communications are occurring, among other things, over call lines and in meetings with constituents and other stakeholders. Administrative staff members have already been required to absorb this administrative burden to handle shutdown-related concerns, in lieu of other important initiatives such as new requirements under H.R.1.

46.     DHS also anticipates increased foot traffic and disruptions at Pennsylvania's County Assistance Offices as hungry individuals and families learn they cannot access their benefits, necessitating increased security personnel and law enforcement presence for public safety. DHS has over 90 facilities across the Commonwealth where it administers public assistance programs. DHS employs over 6,100 client-facing staff in those local offices, many of whom will need to explain to recipients that they will not receive the SNAP benefits they anticipated receiving, including recipients who need those funds in order to feed their children and put food on the table. Many of these local office staff will face significant burdens on their time. Increased communication demands will likely require DHS to incur additional administrative burdens in the form of overtime pay to the limited staff available to handle this workload.

47.     DHS takes the state option to issue combined allotments as described at 7 CFR § 273.2(g)(2). As such, DHS' eligibility files that drive benefit issuance payments are designed to issue combined allotments only. Since USDA's October 1 letter announcing the funding lapse, DHS has expended considerable resources to determine whether its eligibility files and payment issuance processes could disaggregate pro-rated October benefit payments from full November benefit payments. Despite these efforts to redesign the process, at this time, we are unable to isolate October only payments.

**Impacts on Pennsylvania's Provision of Other Public Benefits**

48.     Regardless of the length of the shutdown, any delay in benefit issuance file transmission will have cascading effects on DHS's provision of public benefits (of which SNAP is only one component) and the resources required to administer the SNAP program.

49.     Changes to the benefit file schedule will require alterations in the case management system to include new data within established fields, subsequent testing of updated benefit files production with the Vendor, and negotiation of an updated file transfer schedule with the Vendor to send production files—all while numerous other states are trying to simultaneously transmit their own files to the Vendor (which serves as EBT vendor for multiple states).

50.     DHS also must prepare for anticipated increases in high-volume demand events on our DHS website and DHS' call centers, which is where clients go to check their EBT balances, and get information about their benefits. High volume demand on DHS' website may slow down or even crash web pages. Further, high volume demand on DHS' call centers may overwhelm DHS staff capacity, which will likely erode public trust in DHS resources, drive traffic to in-person DHS facilities and prevent DHS customers who are seeking information about programs other than SNAP from connecting with DHS staff.

51.     All of this will in turn require DHS to dedicate numerous information technology professionals, communications and operational resources, and administrative staff. This in turn will cause DHS to deprioritize numerous other pressing and important projects, including ongoing management of other DHS-issued benefits as well as preparation for upcoming systemic changes to SNAP administration following the effective date of the H.R.1. Running these changes within DHS's production system will cause significant strain on DHS's already overworked infrastructure and interfere with department operations, introducing interruptions to DHS's ability to determine eligibility for SNAP and continue operating that system for benefits throughout the rest of fiscal year 2026.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 27th day of October, 2025, in Philadelphia, Pennsylvania.

_____
Hoa Pham
Deputy Secretary, Office of Income Maintenance
Pennsylvania Department of Human Services