# DECLARATION OF JACK SMALLIGAN

### A. Qualifications

1. My name is Jack Smalligan. I served for four years as Deputy Associate Director (DAD) of the Office of Management and Budget (OMB) in the Executive Office of the President. In this capacity, I was the senior career civil servant responsible for OMB's Education, Income Maintenance, and Labor Division, which has responsibility for the Supplemental Nutrition Assistance Program (SNAP), child nutrition programs, the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC), and all other domestic food assistance programs of the United States Department of Agriculture (USDA). My curriculum vitae is attached. (Exhibit A.)

2. Prior to becoming DAD, I worked for nineteen years in the Income Maintenance Branch of the Education, Income Maintenance, and Labor Division of OMB, the final fifteen of which were as Branch Chief. The Income Maintenance Branch is the part of that division with responsibility for SNAP, child nutrition, and WIC. OMB conducts oversight of these programs for the Executive Office of the President, reviews draft regulations concerning these programs, prepares budget requests for their operation, apportions appropriated funds to USDA for these programs, and monitors budget implementation for them. Prior to joining the Income Maintenance Branch, I worked for four years in another branch of OMB.

3. My work for OMB has given me an in-depth understanding of the operations and financing of all major nutrition assistance programs and of the various means USDA has to support their operation, including Section 32 customs receipts and inter-departmental transfer authority.

4. My tenure in the Income Maintenance Branch and as DAD at OMB included several lapses in appropriations and several other occasions when lapses in appropriations seemed likely. On each of these occasions, I worked closely with my colleagues at OMB and at the affected departments to maintain continuity of program operation to the extent permitted by law.

### B. The Supplemental Food Assistance Program (SNAP)

5. The Supplemental Nutrition Assistance Program (SNAP) is this country's largest food assistance program. SNAP provides low-income households with monthly benefits designed to bridge the gap between each household's own funds available for food purchases and the cost of a minimally adequate nutritious diet. These benefits are provided through specialized debit cards via a system known as Electronic Benefit Transfer (EBT). SNAP benefits may only be spent on food at approved retailers. Federal law expressly prohibits providing SNAP benefits as cash.

6. SNAP is the successor to the Food Stamp Program, which traces its modern existence to some pilot programs in the early 1960s and the Food Stamp Acts of 1964 and 1977. In 2008, Congress renamed the Food Stamp Program as SNAP and the Food Stamp Act of 1977 as the Food and Nutrition Act of 2008. These laws specify the program's eligibility rules and the formula for determining how many benefits households should receive. State human services agencies administer SNAP under the oversight of the U.S. Department of Agriculture (USDA).

7. Although recent legislation makes changes for future years, through federal fiscal year 2026 the federal government pays all the costs of SNAP benefits and half of states' administrative costs attributable to the program. In federal fiscal year 2024, SNAP distributed $93.7 billion in benefits to an average of 41.7 million people each month. The federal share of states' primary administrative costs was $5.3 billion. Other program costs, including those for nutrition education and employment and training programs, totaled $1.3 billion.

**C. The Process of Certifying Households and Issuing SNAP Benefits**

8. Before a household may receive SNAP benefits, it must submit an application to a state agency. After verifying the information on the household's application and determining that the household meets federal eligibility requirements, the state agency certifies the household to receive benefits. The state agency determines the benefit amount the household should receive by following a formula specified in the Food and Nutrition Act. The length of each household's certification ranges from one month (in unusual cases) to twenty-four months (for some elderly and disabled households), with most households certified for six or twelve months at a time. If a household continues to need SNAP at the end of its certification period, it may reapply and be recertified by the state agency.

9. Each state agency contracts with a private vendor to issue SNAP benefits through EBT. States' contracts with these vendors include a range of specifications for the nature and timing of information the state agency must provide to the vendor as well as requirements for the vendors' performance. Although the details vary somewhat from state to state, in general state agencies transmit to the EBT vendor an electronic issuance file in the latter half of the month before the month in which issuance is to occur. This file lists all households certified to receive SNAP in that state for the following month and the amounts that each household should receive.

10. Upon receipt of the state agency's issuance file, the vendor loads the specified amount of benefits into each household's account. These amounts become accessible to the household on its specified issuance date. States commonly stagger these issuance dates through the first 3 to 20 days of the month in part to avoid having too many low-income households go to food stores all at once. States send issuance files for newly certified households on a daily basis during the month.

11. Once benefits have appeared in a household's EBT account, the household may go to an authorized food retailer of its choice, select the foods it wishes to purchase, and buy that food with its EBT card in the same way that other customers pay for food with credit or debit cards.

12. After the household spends its SNAP benefits at an authorized food store, that store seeks reimbursement from a financial institution that works with the state's EBT vendor. That financial institution, in turn, seeks reimbursement ultimately from the United States Treasury.

13. State SNAP agencies keep track of their costs administering SNAP and submit claims for reimbursement to USDA at the end of each quarter for about half of those expenses. The federal government then pays the states.

D. **SNAP's Funding Structure**

14. Section 5(a) of the Food and Nutrition Act of 2008, like section 5(a) of the Food Stamp Act of 1977, makes SNAP an entitlement for eligible households who apply for benefits. Like many other entitlements (including Medicaid), SNAP receives funds through the annual appropriations process. Programs of this type are referred to as "appropriated entitlements". Because SNAP is administered by USDA, it is funded through the annual Agriculture Appropriations Act. Like most annual appropriations, most of these funds by law lapse at the end of the federal fiscal year for which they are provided, September 30.

15. SNAP is an entitlement and is so designated in federal budget process statutes. 2 U.S.C. §§ 622(9)(B), 900(c)(8)(C). Accordingly, funds appropriated for SNAP do not count against the annual caps or allocations of discretionary funds that Congress has set for itself and that constrain legislation that its appropriations committees may report out to the House and Senate in the annual appropriations process. Thus, appropriating more for SNAP does not require the committees to appropriate less for other programs. This is because spending on SNAP is determined by how many eligible people apply and how many benefits they are eligible to receive under the formula in the Food and Nutrition Act. Thus, Congress could quadruple SNAP's appropriation without increasing the program's actual spending because the program would still give benefits only to eligible households that apply and only in the amounts specified by the statutory formula.

16. As a result, Congress typically appropriates more than it expects to be needed to fund SNAP for the upcoming year to ensure that there is adequate funding for the benefits to which households are entitled. The number of people eligible for SNAP and the total amount of benefits the program provides vary considerably with the economic cycle. A sudden economic downturn can cause participation — and total benefit costs — to surge. To allow for this possibility, and to address the periodic problem of lapses in appropriations, Congress began several years ago to include multi-year contingency funds in each annual SNAP appropriation.

17. For the most recent several years, each annual Agriculture Appropriations Act has included $3 billion in contingency funds for SNAP "for use only in such amounts and at such times as may become necessary to carry out program operations" that remain available for multiple fiscal years. Thus, for example, the fiscal year 2024 Agriculture Appropriations Act provided $3 billion to remain available through all of fiscal years 2024, 2025, and 2026, expiring on September 30, 2026. Public Law No. 118-42, div. B, tit. IV, 138 Stat. 93 (March 9, 2024). These funds are in the same appropriations account as the remainder of the SNAP appropriation and therefore do not require any transfer for USDA to spend them. They receive the same designation at the U.S. Treasury apart from a different designation for their expiration dates. The full-year continuing resolution that Congress enacted in March 2025 in lieu of separate appropriations bills continued for fiscal year 2025 the policies in the fiscal year 2024 Agricultural Appropriations Act, with comparable periods of availability. Public Law No. 119-4, §§ 1103, 1109(a), 139 Stat. 12, 13 (March 15, 2025). It therefore provided another $3 billion in contingency funds to remain available through all of fiscal years 2025, 2026, and 2027, expiring on September 30, 2027.

18. Under federal budget process law, federal agencies may not spend appropriated funds until those funds are "apportioned" to them by the Office of Management and Budget (OMB). 31

U.S.C. § 1512(a).  These apportionments are designed to provide agencies authoritative interpretations of the requirements for those funds' use.

19.  On September 28 and October 2, 2025, OMB apportioned to USDA the $3 billion contingency appropriation in SNAP's fiscal year 2024 appropriation. (Exhibit B.) On September 28, 2025, OMB apportioned the $3 billion contingency appropriation in SNAP's fiscal year 2025 appropriation to USDA.  (Exhibit C)  These actions make $6 billion available for USDA to spend during fiscal year 2026.

**E.  The History of Contingency Funds and Lapses in SNAP Appropriations**

20.  Preventing interruptions in food stamp or SNAP benefits has been a high priority for administrations of both parties since the program's establishment.  For example, the recession of 1981-82 caused a sudden increase in food stamp participation that threatened the program's ability to provide benefits in September 1981.  President Reagan's administration worked diligently with the legal tools then available and avoided any interruption in benefits.

21.  When a lapse in appropriations occurred in October 2013, a separate law enacted in response to the Great Recession of 2007-09 appropriated funds for October benefits (but not state administrative costs).  USDA therefore did not immediately have to fund the program's benefits, and the lapse in appropriations ended before decisions were required concerning November benefits.  USDA did, however, inform states that the SNAP contingency reserve was available to fund state administration during October.  It wrote to states on October 1, 2013, that "[d]uring the lapse, there are limited funds available for State administrative expenses (SAE) through the SNAP contingency fund account.  The SNAP contingency funds are two-year funds, were provided in the fiscal year (FY) 2013 appropriations act and do not expire until the end of FY 2014."  (Exhibit D.)  The next two days it released sets of questions and answers that informed states that the contingency reserve was available to pay states' administrative costs for October.  (Exhibits E and F.)  It reiterated this message in another set of questions and answers on October 9.  (Exhibit G.)

22.  In September 2015, when a lapse in appropriations was possible, USDA issued a set of questions and answers to inform the public about the consequences for SNAP.  At that time, USDA had not yet adopted the practice of charging October benefits to the prior year's appropriation, so October benefits were in question.  USDA issued a set of questions and answers for SNAP recipients that confirmed that the contingency fund would be available to provide some substantial benefits in October: "USDA will have limited funding for SNAP benefits in October … If Congress does not act to provide funding, USDA can use its limited contingency funds to provide some October SNAP benefits."  (Exhibit H.)

23. In the lapse in appropriations that ran from December 2018 through February 2019, USDA interpreted a prior continuing resolution as providing funding for any benefits issued on or before January 20, 2019.  It therefore instructed states to issue February 2019 benefits early, in January, to meet that deadline.  The lapse in appropriations ended before decisions were required for March benefits.  USDA did, however, direct states to continue issuing SNAP benefits to new applicants after January 20 and into February. On January 10, 2019, it wrote to states:  "FNS is committed to minimizing the impact of the appropriations lapse on SNAP households and directing the limited funding available from the contingency that can be used toward normal

SNAP operations, including the issuance of benefits for new applicants in February, should the Federal government shutdown continue. … Limited funding within the SNAP contingency reserve is available for these cases … . States should handle new applications for February benefits according to normal procedures." (Exhibit I.)  On January 14, 2019, it reiterated this message in another message to states:  "FNS can confirm that limited funding is available from the contingency that can be used to provide benefits for February. This reserve is being used to fund recertifications and new applications through February. ... Limited funding within the SNAP contingency reserve is available for these cases... . States should handle new applications for February benefits according to normal procedures."  (Exhibit J.)  Again on January 18, 2019, it stated:  "FNS can confirm that limited funding is available from the contingency that can be used to provide benefits for February."  (Exhibit K.)

24.  On September 30, 2025, USDA posted a "Lapse of Funding Plan" on its website.  (Exhibit L.)  After explaining that October benefits would be issued as usual based on their obligation during fiscal year 2025, the plan went on to state "multi-year contingency funds are also available to fund participant benefits in the event that a lapse occurs in the middle of the fiscal year.".  Because SNAP benefits for the first month of the new fiscal year had been otherwise provided for, it appears that USDA referred to November or any later month as the middle of the fiscal year.  This document appears to have been removed from USDA's website.

**F.  Relationships Between Food Assistance Programs' Budgets**

25.  In addition to SNAP, USDA administers several other significant nutrition assistance programs.  These include the National School Lunch Program, the School Breakfast Program, the Child and Adult Care Food Program, the Summer Food Service Program for Children, the Summer Electronic Benefits Transfer Program, and other child nutrition programs as well as the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC).

26.  The major child nutrition programs other than WIC are also appropriated entitlements and funded together in a single appropriation item called "Child Nutrition Programs."  Thus, although they also receive funding through the annual Agriculture Appropriations Acts, those annual appropriations do not count against the appropriations committees' limits on the amounts of discretionary appropriations they may report out to their respective chambers.  As in the case of SNAP, their spending is controlled by eligibility rules and benefit formulas in the laws creating their entitlements and thus do not spend more even when they receive larger appropriations.  Also like SNAP, these programs have typically received annual appropriations in excess of their current needs.  Unlike SNAP, much of their funds are made available for two fiscal years.

27.  In addition to annual appropriations, a significant part of how Congress has chosen to fund child nutrition programs is a fund created by Section 32 of the Agricultural Adjustment Act amendments of 1935.  7 U.S.C. § 612c.  Section 32 is a permanent appropriation of thirty percent of gross customs revenues from the previous calendar year.  Because Section 32 is itself an appropriation, it thus does not require further action by Congress in annual appropriations bills.  Congress has set aside fixed amounts of Section 32 funds for various purposes relating to agricultural policy and to fund certain activities of the Department of Commerce.  All other Section 32 funds are provided to USDA to meet the costs of child nutrition programs.  7 U.S.C. § 612c-6(b)(1).  (The accounting for annual appropriations and Section 32 moneys in the child

nutrition programs is quite complex.) In recent years, customs receipts have been sufficiently large that child nutrition programs have received a substantial fraction of their funding needs through Section 32. This does not increase these programs' spending because they remain constrained by the eligibility rules and benefit limitations in their permanent authorizing statutes, the Richard B. Russell National School Lunch Act (42 U.S.C. 1751 *et seq.*) and the Child Nutrition Act of 1966 (42 U.S.C. 1771 *et seq.*). Section 32 funds do not lapse at the end of any particular fiscal year. USDA's "Lapse of Funding Plan" (Exhibit L), posted September 30, 2025 and since removed, indicated, "…the Child Nutrition Programs are largely funded by the Section 32 transfer from Treasury, which can be made available in advance of annual appropriations acts (7 USC 612c-6)."

28. Congress has given USDA significant authority to transfer funds among the programs it operates so long as any transfer occurs within the same agency within the Department . 7 U.S.C. § 2257. USDA has sometimes used this authority with respect to food assistance programs. For example, late in fiscal year 2023, USDA addressed an anticipated funding shortfall in WIC, which unlike most other nutrition programs is not an entitlement and is funded by annual discretionary appropriations, by transferring $503 million from SNAP to WIC. USDA determined that the prospect of eligible women, infants, or children going without WIC benefits was a sufficient emergency to justify invoking its transfer authority. This did not reduce SNAP spending, which remained subject to the eligibility rules and benefit formulas in the Food and Nutrition Act.

29. Earlier this month, USDA used this authority to transfer $300 million that had been provided to the child nutrition programs in Fiscal Year 2025 for use in Fiscal Years 2025 and 2026 to fund WIC during the lapse in appropriations. This transfer will not reduce benefits in the child nutrition programs because those programs retain sufficient funds to continue operating as specified in their permanent authorizing laws during the lapse in appropriations. OMB duly apportioned the transferred funds to WIC on October 9, 2025. (Exhibit M.) It then reduced its apportionment for child nutrition by the same amount. (Exhibit N.)

30. According to OMB's apportionment of September 30, 2025, Section 32 received a $25.2 billion mandatory appropriation for fiscal year 2026, reflecting 30 percent of customs duties collected during the period of January 1 to December 31, 2024, in addition to unobligated balances carried forward. Of this amount, more than $23 billion was transferred to FNS for child nutrition programs, as required. (Exhibit O.)

31. According to OMB's apportionment of October 8, 2025, the account for child nutrition programs has a balance in fiscal year 2026 of more than $23 billion, reflecting the anticipated transfer from Section 32's permanent appropriation. (Exhibit P.) This amount is in addition to more than $7 billion in carryover funds from fiscal year 2025. (Exhibit Q.) For comparison, child nutrition programs obligated $34.7 billion in fiscal year 2024. Over the first eight months of fiscal year 2025, child nutrition programs were spending an average of about $3 billion per month. Therefore, the available balances of funds in the child nutrition programs' accounts are sufficient to support substantial additional transfers without impairing benefits in those programs during a temporary lapse in appropriations. Thus, USDA could transfer funds from child nutrition programs to SNAP to help fund November benefits in SNAP without affecting child nutrition or WIC operations in November. Such a transfer would not reduce child nutrition and WIC benefits during a temporary lapse in appropriations that is resolved in the coming months.

32. In sum, while much of SNAP's funding is made available for one fiscal year and therefore is not available for obligation after the end of fiscal year 2025, the contingency funds in that account remain available in fiscal year 2026. In addition, these funds could be augmented with transfers from the child nutrition account, augmenting the contingency funds' ability to support SNAP benefits.

**G. Contingency Reserves Available for SNAP**

33. State SNAP agencies must irrevocably commit to issuing SNAP benefits at some point during the preceding month when they provide their electronic issuance file to their EBT vendors. This legal commitment of funds meets the definition of an "obligation" in federal budget process law. Accordingly, USDA correctly determined that October 2025 SNAP benefits were obligated in September and thus should be charged to the fiscal year 2025 SNAP appropriation. This conforms with USDA's interpretation when a similar lapse of appropriations seemed likely in 2023. Thus October 2025 benefits were issued on-time without difficulty.

34. Although USDA is not scheduled to pay states for their expenses administering SNAP until after the end of the first quarter of fiscal year 2026, some reports suggest that USDA may have charged the contingency fund for its estimate of the cost of state administration for October 2025. USDA's September 30, 2025 "Lapse of Funding Plan" indicated that the contingency reserves "…can be used for State Administrative Expenses to ensure that the State can also continue operations during a Federal Government shutdown." Although states have not yet reported their current administrative costs, during the first two quarters of fiscal year 2025 – the most recent for which data is available – the federal share of states administrative spending on SNAP was about $414 million per month. Thus, even if USDA were to charge its future liabilities for state administrative costs in October and November to the SNAP contingency fund, more than $5.1 billion would remain available to pay SNAP benefits in November.

35. In May 2025, the most recent month for which USDA has published data, SNAP issued $7.96 billion in benefits. In November 2024, SNAP issued $8.36 billion in benefits.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 27, 2025.

*[signature]*

_____

JACK SMALLIGAN