IN THE UNITED STATES DISTRICT COURT
FOR THE  FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, <br><br> Defendants. | Civil Action No. 1:25-cv-13165 |

# DECLARATION OF PATRICK A. PENN

I, Patrick A. Penn, declare as follows:

1. I am the Deputy Under Secretary of the Food, Nutrition and Consumer Services (FNCS) at the United States Department of Agriculture (USDA).  As part of my responsibilities, I oversee the FNCS programs including the Supplemental Nutrition Assistance Program (SNAP), which is administered by the Food and Nutrition Service (FNS) within FNCS.  The statements made herein are based on my personal knowledge and information made available to me in the course of carrying out my official duties and responsibilities.

**SNAP Overview**

2. SNAP is a nutrition assistance program administered and funded by USDA at the federal level.  State SNAP agencies (also referred to as States) implement SNAP at the local level by processing applications, certifying eligible households and calculating the amount of benefits for each household in accordance with applicable laws and guidance.

3. SNAP benefits are distributed to households, generally once per month, on electronic benefit transfer (EBT) cards, which households may use at authorized retailers to purchase food. In Fiscal Year (FY) 2024, there were approximately 267,000 retailers authorized by USDA to accept SNAP benefits.

4. Federal law generally requires state SNAP agencies to issue benefits to a household on or about the same time each month. State SNAP agencies generally stagger benefit issuances to households throughout the month, so one group of households may receive their allotments on the 1st of each month, another group may receive their allotments on the 5th of each month, another group may receive their allotments on the 10th of each month, and so on.

5. SNAP benefits average approximately $8.2 billion per month, and State administrative expenses average about $450 million per month, for a total of about $8.65 billion per month for SNAP. In addition, the Nutrition Assistance Programs (NAP) in Puerto Rico and American Samoa cost roughly $300 million per month and are also funded from the SNAP appropriation, bringing the total cost average from the SNAP account to approximately $8.95 billion per month.

6. SNAP benefits (allotments) are based on the cost of the Thrifty Food Plan, a USDA calculated market basket that reflects the cost to feed a family of four adjusted for household size and income.

7. USDA pays the full cost of SNAP benefits, using the Federal Treasury's Automated Standard Application for Payments (ASAP) system to make funds available to States via Letters of Credit (LOCs). There is one funding stream used to update State LOCs on a daily basis that all States draw from as benefits are made available to participants on their EBT cards. As part of the administration of SNAP, States certify the eligibility of households, calculate benefit levels, and determine when benefits become available to each household. The States send this information,

referred to as an "issuance file", to their EBT processor. The EBT processor transfers the issuance file to their system, which holds household information such as card numbers, balances, and transaction histories. The EBT processor then loads the benefits "on the card" for existing households and creates new accounts for new households, specifying the date the benefits will become available. Next, the EBT processor sends a consolidated list of the amount of benefits made available in each State to USDA.

8. SNAP participants redeem benefits by purchasing food at an authorized SNAP retailer. As households redeem benefits, the EBT processor pays the retailers daily for all transactions. Thereafter, the EBT processor withdraws funds from the States' Letter of Credit to reimburse itself for the value of benefits redeemed.

9. The issuance and redemption of SNAP benefits described above is part of an integrated, automated process for all State SNAP agencies, SNAP participants, SNAP retailers and EBT processors which developed over time based in part on expectation of continued availability of sufficient SNAP appropriations.

**SNAP Funding**

10. Congress appropriates funds for SNAP benefits each fiscal year. The appropriation consists mostly of one-year base funds and sets aside a portion of that appropriation as three-year money for contingency funds. For example, in FY 2024, the total appropriation for SNAP was approximately $122 billion. *See* P.L. 118-42. From that amount, Congress directed that $3 billion "shall be placed in reserve for use only in such amounts and at such times as may become necessary to carry out program operations…" and available through the end of FY 2026. *See id*. Based on current apportionments and USDA's accounting system, there is approximately $5.25 billion in the contingency fund, an amount insufficient to cover a full month of benefits.

11. Over the years, FNS has repeatedly used the contingency fund for disaster assistance. For example, in 2017, after Hurricanes Maria, Rita and Harvey heavily impacted the southeastern United States and Puerto Rico, FNS spent approximately $4.3 billion on the affected States and roughly $1.7 billion in Puerto Rico for disaster assistance using contingency funds.

12. In addition, FNS has used the contingency funds to fund State administrative expenses and partial payments towards the Nutrition Assistance Programs (NAP) in Puerto Rico and American Samoa during a lapse in appropriations. For example, OMB apportioned $750 million on October 2, 2025 for State administrative expenses and NAP. NAP is a block grant nutrition assistance program specific to Puerto Rico and American Samoa authorized by 7 U.S.C. 2028, as opposed to SNAP which is established under 7 U.S.C. 2013(a). The NAP block grants are separate from SNAP and operate under different terms and processes.

13. However, FNS has not used the contingency fund for regular SNAP benefits during a lapse in appropriations.

14. USDA is required by 7 U.S.C. 2027(b) to limit SNAP benefits to an amount not in excess of the appropriation for such fiscal year and must reduce, suspend or cancel benefits to the extent necessary to comply with this requirement. That limitation applies only to SNAP, not to NAP block grants.

15. Because Congress has not enacted FY 2026 SNAP appropriations, there are insufficient funds currently available to FNS to cover November 2025 SNAP benefits. In light of the insufficiency, USDA issued a notice on October 10, 2025 directing State agencies to hold on November issuance files. On October 24, given the continued lack of an FY 2026 appropriations act, USDA announced on October 24, 2025 that SNAP participants would not receive their November allotments.

**Full November Benefits Without Sufficient Funds**

16. As described, the system to issue benefits to SNAP households' accounts and redeem those benefits at SNAP retailers is highly automated and operates on the assumption that sufficient SNAP funds exist for benefit issuances and redemptions.

17. If States submit issuance files to EBT processors for the full amount of November benefits even in the absence of sufficient appropriations, then there will likely be additional consequences, as described below.

18. First, if States understand that SNAP funds are limited, States may rush to issue benefits (via the EBT processors) ahead of other States and thereby drain whatever funds are available, since all benefit issuances draw upon the same source of funds. This would leave households in certain States with November benefits and other State households without benefits.

19. Second, because EBT processors extend money through an automated process to SNAP retailers for benefit redemptions before reimbursing themselves from the State letters of credit, the lack of sufficient SNAP funding could mean that EBT processors overextend themselves. In other words, the EBT processors may not be able to fully reimburse themselves for the outlays made to SNAP retailers.

20. In such a situation, USDA would be liable to the EBT processors for the amount of unreimbursed redemptions plus interest, thereby incurring obligations in advance or in excess of appropriations.

21. Third, the only way to prevent such liability is to wholly withdraw all SNAP retailers' ability to redeem SNAP benefits. This would halt all SNAP transactions, even those attempting to use benefits from past months that were fully funded.

**Reducing November Benefits**

22. Were a Court to craft unprecedented relief (and contrary to the clear language in 7 U.S.C. 2027(b)) and direct USDA to provide reduced benefits, given insufficient funds to cover full allotments for November, USDA would direct States to reduce allotments, in accordance with 7 U.S.C. 2027(b) and 7 C.F.R. 271.7, by over 50 percent. Were the Court to force USDA to use the contingency fund, it would essentially deplete the contingency fund and USDA's ability to respond to disasters through D-SNAP and any other emergencies.

23. USDA has never implemented a reduction in SNAP benefits under 7 C.F.R. 271.7. Because no template, processes, or past experience exist to inform a reduction in benefits, there are multiple variables which could lead to significant problems in attempting to reduce benefits for every SNAP household in the country.

24. To implement a reduction in benefits, FNS would issue a new allotment table to replace the current FY 2026 version (https://www.fns.usda.gov/snap/allotment/cola). State agencies would then need to code their systems to issue revised allotments. The ability, time and resources to accomplish this system change would vary greatly among State agencies, with some State agencies working with systems that are decades old. It is unclear how many States would be able to complete the changes in an automated manner or with minimal disruption, versus requiring manual overrides or computations that could lead to payment errors.

25. Based on past informal conversations with State agencies, USDA's understanding is that for at least some States, system changes of this scope could take anywhere from a few weeks up to several months. Several factors contribute to the estimated time, including that many States operate eligibility systems integrating multiple assistance programs (SNAP, TANF, Medicaid, etc.) which create competing priorities for system adjustments. For SNAP itself, States are

working to implement major changes enacted by the One Big Beautiful Bill Act, such as revised alien eligibility, shelter cost calculations and expanded work requirements. *See* Title I, Subtitle A of Public Law 119-21, 139 Stat. 72, 80-85 (July 4, 2025).

26. After States manage to reduce benefits for November (the issuance of which may not actually occur in November), further necessary system changes could cause more delays and errors. For example, State agencies would have to revise their systems once again to return to regular allotments.

27. Any system change carries risk of payment errors and there are numerous examples of broad coding errors made by State agencies in implementing changes to benefit issuances. For example, in September of 2024, Texas Health and Human Services Commission (HHSC) informed FNS that they inadvertently provided an overpayment of Hurricane Beryl SNAP mass replacements totaling $10,025,089. HHSC determined the root cause of the overpayment resulted from an incorrect system rule that was coded. Also, in January 2024, the Pennsylvania Department of Human Services informed FNS that the State's system incorrectly aligned Medicaid and SNAP certification periods. The State created a workaround where eligibility workers had to manually unlink Medicaid and SNAP, but many workers failed to make the manual fix, and it resulted in an increased number of payment errors.

28. Such errors have significant implications for States and SNAP households, as well as the Federal government's responsibility for the public fisc. For example, errors may contribute to a State's fiscal year payment error rate, which could result in a State's liability to USDA for any overissuances. *See* 7 U.S.C. 2025(c) and 7 C.F.R. Part 275, Subpart C. In addition, Federal law generally requires State agencies to collect overissuances from households that had no responsibility for the mistake. *See* 7 U.S.C. 2022(b) and 7 C.F.R. 273.18.

**Diverting Section 32 Child Nutrition Funds to SNAP November Benefits**

29. Section 32 funds transferred to FNS are not normally available to pay SNAP benefits. USDA would have to undertake a series of steps under its Interchange authority (7 U.S.C. 2257) to make those funds available for November SNAP benefits, assuming the authority can be used in this manner.

30. Section 32 refers to a mandatory appropriation (7 U.S.C. 612c) that receives 30 percent of customs receipts on all imports from the prior calendar year. Among various purposes, Section 32 funds in large part funds the USDA FNS Child Nutrition Programs—namely the National School Lunch and Breakfast Programs authorized by the Richard B. Russell National School Lunch Act (42 U.S.C. 1751 et seq.) and the Child Nutrition Act of 1966 (42 U.S.C. 1771 et seq.). Of the $25.2 billion in Section 32 funds for FY26, approximately $23 billion was routed to USDA Child Nutrition Programs. *See* 7 U.S.C. 612c-6(b)(1).

31. Each year, the Congressional appropriations process relies significantly on Section 32 funding to fully fund the Child Nutrition Programs. *See, e.g.* Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 25, 92 (Mar. 9, 2024) ("For necessary expenses to carry out [Child Nutrition Programs]; $33,266,226,000, to remain available through September 30, 2025, of which such sums as are made available under section 14222(b)(1) of the Food, Conservation, and Energy Act of 2008 (Public Law 110–246), as amended by this Act, shall be merged with and available for the same time period and purposes as provided herein…". As Section 32 funds are appropriated by permanent law, in the absence of a FY26 appropriations act, USDA may use Section 32 funding for Child Nutrition programs.

32. The Office of Management and Budget (OMB) has apportioned Section 32 funds for FY26 Child Nutrition meal reimbursement and administrative costs only at this point, and USDA has

provided $6.2 billion of those funds to cover such expenses for October and November. To fund November SNAP benefits with some of the remaining $16.8 billion Section 32 funds, OMB would need to make an apportionment allowing USDA to employ its discretionary interchange authority under 7 U.S.C. 2257.

33. USDA has used the interchange authority to move funds to an account when the receiving account had some appropriations but not enough to fully cover expenses. For example, the Special Supplemental Nutrition Program for Women, Infants and Children (WIC) had some carryover balances available from the FY25 appropriation, but not enough to cover October 2025 costs. To ensure continuity of WIC in October 2025, USDA used the interchange authority to transfer $300 million into WIC from Child Nutrition Programs, which are currently funded with FY 25 carryover balances and FY 26 Section 32 funds.

34. Such a transfer from Section 32 funds for November SNAP benefits would involve several differences from the WIC transfer. Notably, the amount required to cover SNAP monthly costs—$8.95 billion—far exceeds the approximately $500 million needed for WIC on a monthly basis. Also, there are no carryover balances for SNAP benefits whereas WIC is funded with two-year appropriations.

35. The consequence of such action would mean a sizeable deficit in the Child Nutrition Program account that would likely need to be filled by new budget authority provided through FY 2026 Congressional appropriations. Each year, Congress appropriates resources in addition to Section 32 for the Child Nutrition Programs. For FY 2026, using $3.7 billion of the available Section 32 resources to fund SNAP benefits would require Congress to provide additional appropriations of that amount in the Child Nutrition account in order to ensure full funding for the Child Nutrition programs in FY 2026.

**SNAP Benefits in Prior Lapses**

36. While SNAP benefits continued to be issued in their full amounts during past lapses in funding, the current situation presents a unique, extreme situation not previously encountered.

37. For example, during the October 2013 lapse in appropriations, USDA was able to fully fund benefits because of funds made available under Section 101 of the American Recovery and Reinvestment Act (P.L. 111-5) which stated that benefits had to be provided at 113.6 percent of the June 2008 value of the thrifty food plan and that they could not be reduced for the level in effect for FFY 2009. This adjustment expired on October 31, 2013; therefore USDA was able to use those funds to cover October benefits during that lapse.

38. In January 2019, in the midst of a lapse in appropriations that began December 22, 2018 and ended January 5, 2019, FNS used budget authority in the Continuing Resolution (CR) (Pub. L. 115-245, div. C, §§ 101(1), 105(3), amended by Pub. L. No. 115-298, 132 Stat. 4382, 4382 (Dec. 7, 2018) to fully fund February 2019 benefits. Accordingly, FNS informed States on January 10, 2019 that States were permitted to issue February 2019 benefits in January. On January 25, 2019, the CR was extended through February 15, 2019. *See* Pub. L. No. 116-5, 133 Stat. 10, 10 (Jan. 25, 2019) and fiscal year 2019 appropriations were enacted on February 15, 2019. Pub. L. No. 116-6, 133 Stat. at 13.

I declare under penalty of perjury that the foregoing is true and correct.

PATRICK PENN
Digitally signed by PATRICK PENN
Date: 2025.10.29 22:39:47 -04'00'

Patrick A. Penn
Deputy Under Secretary
Food Nutrition and Consumer Services
UNITED STATES DEPARTMENT OF AGRICULTURE