UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS ET AL., | * * * |
| Plaintiffs, | * * |
| | * Civil Action No. 1:25-cv-13165-IT |
| v. | * * |
| UNITED STATES DEPARTMENT OF AGRICULTURE ET AL., | * * * |
| Defendants. | * * |

MEMORANDUM AND ORDER

October 31, 2025

TALWANI, D.J.

Pending before the court is Plaintiffs' Motion for a Temporary Restraining Order [Doc. No. 3] seeking to enjoin, on an emergency basis, Defendants' November 1, 2025 suspension of benefits under the Supplemental Nutrition Assistance Program ("SNAP"). For the reasons stated below, Plaintiffs have standing to bring this action and are likely to succeed on their claim that Defendants' suspension of SNAP benefits is unlawful. Where that suspension of benefits rested on an erroneous construction of the relevant statutory provisions, the court will allow Defendants to consider whether they will authorize at least reduced SNAP benefits for November, and report back to the court no later than Monday, November 3, 2025.

**I.  Background**

   *A. The Supplemental Nutrition Assistance Program*

In 1964, Congress established the Food Stamp Program, now known as the Supplemental Nutrition Assistance Program ("SNAP"), to serve as "a supplemental nutrition program…to permit low-income households to obtain a more nutritious diet through normal channels of trade

by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011. Participation in SNAP is generally limited to households whose income is at or below 130 % of the federally-defined poverty line. See id. § 2014(c)(1)–(2). Forty-one million people participated in SNAP in 2024.[1]

Congress appropriates funds for SNAP benefits each fiscal year. Decl. of Patrick A. Penn ¶ 10 [Doc. No. 17]. The annual appropriation "consists mostly of one-year base funds and sets aside a portion of the appropriation as three-year money for contingency funds." Id. The United States Department of Agriculture ("USDA") administers SNAP at the federal level but relies on state agencies to implement SNAP locally "by processing applications, certifying eligible households and calculating the amount of benefits for each household in accordance with applicable laws and guidance." Id. ¶ 2. SNAP requires approximately $8.6 billion of funding per month,[2] of which roughly $8.2 billion funds SNAP benefits directly and $450 million covers associated administrative expenses incurred by the states. Id. ¶ 5.

The underlying mechanics through which SNAP benefits are distributed involves parties at the federal, state, and individual vendor and retailer levels. Id. ¶¶ 2–3. As between USDA and the states, USDA makes funds available to the states via letters of credit that are updated daily. Id. ¶ 7. Each month, state agencies prepare benefit issuance files that contain SNAP recipients' benefit amounts. See, e.g., Decl. of Shaneen Moore ¶¶ 10–12 [Doc. No. 7-30]; Decl. of Wendy DeMarco ¶ 12 [Doc. No. 7-35]. The agencies then send these files to third-party vendors, who in

---

[1] Ctr. on Budget and Policy Priorities, Policy Basics: The Supplemental Nutrition Assistance Program (SNAP) (updated Nov. 25, 2024), https://www.cbpp.org/research/food-assistance/the-supplemental-nutrition-assistance-program-snap, accessed October 30, 2025.

[2] The $8.6 billion monthly cost does not include the costs associated with the Nutrition Assistance Programs in Puerto Rico and American Samoa, which are also funded through SNAP appropriations and cost approximately $300 million per month. Decl. of Patrick A. Penn ¶ 5 [Doc. No. 17].

turn, load the appropriate benefit amounts onto recipients' Electronic Benefit Transfer ("EBT") cards. See, e.g., Penn Decl. ¶ 7 [Doc. No. 17]; Moore Decl. ¶ 14 [Doc. No 7-30]; DeMarco Decl. ¶ 14 [Doc. No. 7-35]. Recipients are then able to use their EBT cards for food purchases at licensed SNAP retailers. Moore Decl. ¶ 14 [Doc. No 7-30]; DeMarco Decl. ¶ 14 [Doc. No. 7-35]. In turn, retailers are paid each day by the third-party vendors for all SNAP transactions. Penn Decl. ¶ 7 [Doc. No. 17]. Vendors then reimburse themselves by withdrawing funds from states' USDA-funded letters of credit. See id. ¶ 8; Moore Decl. ¶ 16 [Doc. No 7-30].

States typically "stagger" the issuance of SNAP benefits to households throughout the month. Penn Decl. ¶ 4 [Doc. No. 17]; Decl. of Jack Smalligan ¶ 10 [Doc. No. 9] (noting that "States commonly stagger . . . issuance dates through the first 3 to 20 days of the month in part to avoid having too many low-income households go to food stores all at once.").

   B.  Present Dispute

Under the Food and Nutrition Act of 2008, "[a]ssistance under [SNAP] shall be furnished to all eligible households who make application for such participation." 7 U.S.C. § 2014(a). SNAP is "[s]ubject to the availability of funds appropriated under" section 2027 of the Act, id. § 2013(a)(1), which provides, in relevant part, that "[i]n any fiscal year, the Secretary shall limit the value of those allotments issued to an amount not in excess of the appropriation for such fiscal year." Id. § 2027(b). Through the 2024 Consolidated Appropriations Act, in addition to appropriating regular funds for SNAP for the fiscal year, Congress appropriated $6 billion to SNAP ("the Contingency Funds") through September 30, 2026, to "be placed in reserve for use only in such amounts and at such times as may become necessary to carry out program operations." Pub. L. No. 118-42, § 6, 138 Stat. 25, 93-94 (2024); Pub. L. No. 119-4, § 1101(a), 139 Stat. 9, 10 (2025).

3

Because Congress did not pass a regular appropriations bill for Fiscal Year 2026, SNAP's funding lapsed on October 1, 2025. Penn Decl. ¶ 15 [Doc. No. 17]; Ex. 1, at 1 [Doc. No. 7-2]. In anticipation of a potential lapse, USDA published a "Lapse in Funding Plan" on September 30, 2025, in which it affirmed that SNAP operation should continue in the event of a government shutdown and that "multi-year contingency funds" previously appropriated by Congress could be used to fund SNAP benefits if needed. Ex. L, USDA Lapse of Funding Plan (as of September 30, 2025), at ECF 16 [Doc. No. 9-12]. On October 1, USDA sent a letter to the states affirming that USDA would continue to fund benefits due in October 2025 and "continue to administer the program in accordance with Federal statutes and regulations." Ex. 1, Letter from Ronald Ward (Oct. 1, 2025), [Doc. No. 7-2].

On October 10, USDA sent a second letter to states' SNAP agencies, in which USDA warned that "if the current lapse in appropriations continues, there will be insufficient funds to pay full November SNAP benefits for approximately 42 million individuals across the Nation." Ex. 2, Letter from Sasha Gersten-Paal (Oct. 10, 2025), [Doc. No. 7-3]. USDA therefore "direct[ed] States to hold their November issuance files and delay transmission to State EBT vendors until further notice." Id. On October 24, USDA sent a third letter, in which the agency announced it was "suspending all November 2025 benefit allotments until such time as sufficient federal funding is provided, or until [Food and Nutrition Service, a component of USDA] directs State agencies otherwise." Ex. 3, Letter from Patrick A. Penn (Oct. 24, 2025) 1 [Doc. No. 7-4]. The letter directed states to "take immediate action to implement this suspension. Id. Also on October 24, USDA circulated a memorandum to the states asserting that the contingency fund could not be used to fund November 2025 benefits. Ex. 4, USDA Mem. (October 24, 2025)

[Doc. No. 7-5]. According to the agency, the "contingency fund is not available to support FY 2026 regular benefits, because the appropriation for regular benefits no longer exists." Id.

On October 28, 2025, Plaintiffs filed this action against Defendants under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C), alleging, inter alia, that USDA's suspension of SNAP funding for November 2025 is contrary to law, arbitrary and capricious, and an abuse of discretion. See Compl. [Doc. No. 1]. Also on October 28, Plaintiffs filed the pending Motion for a Temporary Restraining Order ("TRO") [Doc No. 3] seeking to enjoin the suspension of SNAP benefits on November 1. Defendants filed their Opposition [Doc. No. 18] on October 29, 2025, and the court held a hearing on the motion on October 30, 2025.

## II.    Standing

Defendants contend that Plaintiffs do not have standing to bring suit. Defendants first argue that Plaintiffs do not satisfy Article III standing requirements because they have not asserted an injury-in-fact fairly traceable to Defendants' actions. Defendants' Opp'n 8–9 [Doc. No. 18]. Defendants subsequently suggest that were this court to find Plaintiffs have asserted an injury-in-fact, any injury would not be redressable by vacatur of the suspension. Id. at 10–11.

To satisfy Article III's standing requirements, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (quoting Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 149 (2010)). "At the preliminary injunction stage . . . the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." Murthy v. Missouri, 603 U.S. 43, 58 (2024) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 55, 560 (1992)).

5

To establish injury in fact, a plaintiff must demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560. "The particularization element of the injury-in-fact inquiry reflects the commonsense notion that the party asserting standing must not only allege injurious conduct attributable to the defendant but also must allege that he, himself, is among the persons injured by that conduct." Hochendoner v. Genzyme Corp., 823 F.3d 724, 731–32 (1st Cir. 2016).

Defendants note that States do not have standing as *parens patriae* to bring suits against the federal government on behalf of their citizens. Defs.' Opp'n 9 [Doc. No. 18]. This means that a State may not claim its citizens' injuries as its own when suing the federal government and instead must identify an injury-in-fact experienced by the State. Id. Defendants argue Plaintiffs fail to assert such an injury. Id. Plaintiffs disagree and point to a multitude of injuries they will experience as States. Pls.' Mem. ISO Mot. for a TRO 8–9 [Doc. No. 4]. Plaintiffs assert that a suspension of benefits would result in "major operational disruptions and administrative burdens across agencies" and "fiscal and operational harm to state programs that will be overwhelmed by residents lacking essential SNAP benefits." Id. at 9. These harms, though they may impact state residents, are ones that will be directly experienced by the Plaintiffs themselves.

Defendants then argue that, to the extent that Plaintiffs claim injuries to themselves, any "self-inflicted" injuries would not count as an injury-in-fact directly traceable to Defendants. Defs.' Opp'n 9 [Doc. No. 18]. Defendants specifically argue that any decision by Plaintiffs to provide benefits to state residents to mitigate the suspension of SNAP falls in this category. Id. But Defendants fail to distinguish between circumstances where Plaintiffs would be providing new benefits because of the suspension and those where existing benefits programs would be

6

overwhelmed by additional demand. The suspension creates a substantial risk that SNAP recipients will need to rely on, and potentially overwhelm, existing state resources and services. DeMarco Decl. ¶ 42 [Doc. No. 7-35] ("Regardless of the length of the shutdown, any delay in benefit issuance file transmission will have cascading effects on [the New York State Office of Temporary and Disability Assistance's] provision of public benefits (of which SNAP is only one component) and the resources required to administer the SNAP program."). Unlike any "self-inflicted injury," this injury would not be caused by the State as part of its response to the suspension. This risk of imminent fiscal injury to Plaintiffs is sufficient to assert standing. Massachusetts v. United States Dep't of Health & Hum. Servs., 923 F.3d 209, 222–225 (1st Cir. 2019) (noting that a change in coverage "established a substantial risk that a portion of the women who would lose contraceptive coverage would then obtain state-funded contraceptive care or state-funded prenatal care for unintended pregnancies and thus cause the Commonwealth to incur costs.").

As a final argument, Defendants contend that "indirect" economic harms may not constitute an injury-in-fact for standing purposes. Defendants' Opp'n 9–10 (citing United States v. Texas, 599 U.S. 670, 680 n.3 (2023)). United States v. Texas concerned States' standing to bring claims that the Executive Branch should make more arrests or bring more prosecutions. Texas, 599 U.S. at 677. In a footnote, the Court acknowledged that "States sometimes have standing to sue the United States or an executive agency or officer," but when a federal law has produced only indirect effects on state revenues or state spending, "the State's claim for standing can become more attenuated." Id. But while some indirect effects are too attenuated for standing, others are not. See e.g. Biden v. Nebraska, 600 U.S. 477, 489–91 (2023 (recognizing a state's standing to challenge a federal government action that harms an instrumentality of the state by

discharging federal student loans such that state instrumentality could no longer derive fee revenues from those accounts); New York v. Kennedy, -- F.4th --, 2025 WL 2658233 (1st Cir., Sept. 17, 2025) (rejecting government's argument on a stay motion that State lacked Article III standing to challenge Department of Health and Human Services' Reduction-in-Force, where plaintiffs alleged myriad injuries to the states themselves, leading to increased costs and burdens on the state agencies' operations).

Plaintiffs have demonstrated that they are likely to experience an injury-in-fact directly traceable to Defendants if Defendants suspend SNAP benefits.

Defendants separately suggest that even if there is a cognizable and traceable injury, this injury would not be redressed by vacatur of the suspension. Defs.' Opp'n. 10 [Doc. No. 18]. They contend that the injury is not redressable because there is a lack of funding for November SNAP benefits. Id. This argument conflates the merits of the dispute with standing, however, and is not a basis for finding a lack of standing. Because, as set forth below, Defendants may (and indeed must) access the contingency funding, staying the suspension and granting related relief will at least partially redress plaintiffs' injury.

In sum, Plaintiffs have standing to bring this action challenging the suspension of SNAP benefits.

### III. Preliminary Relief

The issuance of a preliminary injunction before a trial on the merits can be held is an "extraordinary remedy" that shall enter only if a plaintiff makes a clear showing of entitlement to such relief. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). In evaluating a motion for a preliminary injunction, the court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e.,

> the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Esso Standard Oil Co. v. Monroig–Zayas, 445 F.3d 13, 17–18 (1st Cir.2006) (quoting Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004)); see also Bourgoin v. Sebelius, 928 F.Supp.2d 258, 267 (D. Me. 2013) (standard for issuing TRO is "the same as for a preliminary injunction"). When seeking preliminary relief, a harm must be likely, not just possible. Winter, 555 U.S. at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction.") (emphasis in original).

The first factor is the most important: if the moving party cannot demonstrate a likelihood of success on the merits, "the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (quoting Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)).

### A. *Likelihood of Success on the Merits*

Plaintiffs have demonstrated a strong likelihood of success on the merits of their claim under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), that Defendants' suspension of SNAP benefits is contrary to law. At core, Defendants' conclusion that USDA is statutorily prohibited from funding SNAP because Congress has not enacted new appropriations for the current fiscal year is erroneous. To the contrary, Defendants are statutorily mandated to use the previously appropriated SNAP contingency reserve when necessary and also have discretion to use other previously appropriated funds as detailed below.

9

When Congress established the program in 1964, it did so in part to utilize the nation's food supply "to the maximum extent practicable to safeguard the health and wellbeing of the Nation's population and raise levels of nutrition among low-income households." Food Stamp Act of 1964, Pub. L. No. 88-525, § 2, 78 Stat. 703, 703 (1964). Pursuant to the Food and Nutrition Act of 2008, "[a]ssistance under [SNAP] shall be furnished to all eligible households," 7 U.S.C. § 2014(a), subject to the availability of appropriated funds. Id. § 2013(a)(1) ("Subject to the availability of funds appropriated under section 2027 of this title, the Secretary is authorized to formulate and administer a supplemental nutrition assistance program . . . ."); id. § 2027(b) ("In any fiscal year, the Secretary shall limit the value of those allotments issued to an amount not in excess of the appropriation for such fiscal year"). Plaintiffs correctly assert, and Defendants do not dispute, that USDA's provision of SNAP benefits, which "shall be furnished to all eligible households," 7 U.S.C. § 2014(a), is mandatory under the Food and Nutrition Act. See Maine Community Health Options v. United States, 590 U.S. 296, 310 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.'").

As both parties acknowledge, Congress has not yet appropriated any new funds for SNAP benefits for Fiscal Year 2026, which began on October 1, 2025. Pls.' Mem. 6 [Doc. No. 4]; Defs.' Opp'n 7 [Doc. No. 18]. But Congress took steps to protect against the deprivation of SNAP assistance. In the 2024 Consolidated Appropriations Act, Pub. L. No. 118-42, § 6, 138 Stat. 25, 93-94, Congress separately appropriated $6 billion to the SNAP program "to remain available through September 30, 2026" and "be placed in reserve for use only in such amounts and at such times as may become necessary to carry out program operations." See also Pub. L. No. 119-4, § 1101(a), 139 Stat. 9, 10 (2025). As Plaintiffs point out, given the mandatory nature of SNAP benefits under 7 U.S.C. § 2014(a) and the appropriation of these funds to be available

through this current fiscal year, the government is obligated to use this contingent reserve account to fund SNAP "as may become necessary to carry out program operations." 138 Stat. at 93-94; Pls.' Mem. 11 [Doc. No. 4].

Defendants argue that because "there is no available money in the annual program account," there is "therefore no annual program allotments to support using the emergency funds." Defs.' Opp'n 11 [Doc. No. 18]. Stated differently, under Defendants' statutory construction, the use of the separately appropriated contingent reserve to fund SNAP benefits is somehow predicated on Congress's annual appropriation of funds to the SNAP program. Congress placed no such restrictions in the 2024 Consolidated Appropriations Act.

Defendants contend further that these reserve funds are not sufficient to fully fund the SNAP program for the month of November. Id. Even if that is so, the statutory scheme does not contemplate an outright suspension of the program while some funds are available. Instead, Congress directed that if appropriations are deficient, "the Secretary shall direct State agencies to <u>reduce</u> the amount of such coupons to be issued to participating households to the extent necessary" so as not to exceed the available appropriated funds. Food Stamp Act of 1964, Pub. L. No. 88-525, § 16(b), 78 Stat. 703, 709 (1964) (emphasis added); 7 U.S.C. §§ 2014(a), 2027. And the current statutory scheme contemplates a "reduction" in benefits, as opposed to a suspension or cancellation, in response to deficient appropriations. See 7 U.S.C. § 2027(b) ("[I]f in any fiscal year the Secretary finds that the requirements of participating States will exceed the appropriation, the Secretary shall direct State agencies to reduce the value of such allotments to be issued to households certified as eligible . . . to the extent necessary to comply with the provisions of this subsection").

Defendants argue out that a "suspension" is permitted under USDA's regulations, and that USDA "has consistently interpreted its authority to allow for the suspension or cancellation of benefits when necessary." Defs.' Opp'n 6 [Doc. No. 18]. The regulation at issue, 7 C.F.R. § 271.7(a), sets forth procedures to be followed if monthly SNAP allowances "<u>must</u> be reduced, suspended, or cancelled to comply with section 18 of the Food and Nutrition Act of 2008" (emphasis added). But that the regulation allows for a suspension when there are no funds does not mean that Defendants may choose a suspension over a reduction while funds do remain. If the regulation did authorize such discretion, it would be inconsistent with the statutory mandate that benefits "shall" be paid unless funding is no longer available.

Moreover, Defendants fail to address the import of § 271.7's highly detailed, step-by-step procedure with which to affect a reduction. See, e.g., 7 C.F.R. § 271.7(c) (reduction method and calculation percentages); id. § 271.7(d)(1)(i)-(ii) (notification process, computer program and card system adjustments, proper rounding of benefits, and distribution of issuance tables). Nor do Defendants address USDA's view at the time of rulemaking in 1981 that, when funding is insufficient to provide "full benefits to all certified households," the agency is "required to <u>reduce</u> the value of the benefits issued to those households." Procedures for Reducing, Suspending or Cancelling Food Stamp Benefits, 46 Fed. Reg. 1421, 1422 (Jan. 6, 1981) (to be codified at 7 C.F.R. pts. 271, 272, 273, 274) (emphasis added). Finally, the court notes that any reliance on the regulation to support the suspension of benefits while appropriated funds remain available has not previously been tested, as there has never previously been a suspension of benefits during the program's sixty-year history.

With this statutory and regulatory context, Plaintiffs are likely to succeed on their claim that Congress intended the funding of SNAP benefits, at a reduced rate if necessary, when

appropriated funds prove insufficient. Here, Congress appropriated $6 billion to SNAP in 2024 as a contingency reserve through 2026, "to be used in such amounts and at such times as may become necessary to carry out program operations." Pub. L. No. 118-42, § 6, 138 Stat. 25, 93-94 (2024); Pub. L. No. 119-4, § 1101(a), 139 Stat. 9, 10 (2025). Where there are at present no new appropriations for fiscal year 2026, this contingency reserve, which Congress specifically appropriated for use when funding is "necessary to carry out program operations," is available to USDA and must be deployed to fund SNAP benefits.[3]

As a matter of law, then, Defendants erred in concluding that USDA is statutorily prohibited from using the contingency reserve to fund SNAP benefits during the pendency of the lapse in appropriations. Plaintiffs are therefore likely to succeed on the merits of their claim under 5 U.S.C. § 706(2)(A), (C), that Defendants' suspension of SNAP benefits is contrary to law.

Moreover, as Plaintiffs note, in addition to the contingency funds, there are additional funds that Defendants would have discretion to access. Under Section 32 of the Agricultural Adjustment Act of 1935, "Congress has set forth a mandatory, and permanent, appropriation that stems from 30% of customs receipts on all imports from the prior calendar year." Defendant's Opp'n 5 [Doc. No. 18]. Much of this funding is appropriated for the Child Nutrition Program,

---

[3] At least through September 30, 2025, USDA concurred with this interpretation:

> Congressional intent is evident that SNAP's operations should continue since the program has been provided with multi-year contingency funds that can be used for State Administrative Expenses to ensure that the State can also continue operations during a Federal Government shutdown. These multi-year contingency funds are also available to fund participant benefits in the event that a lapse occurs in the middle of the fiscal year. To fulfill this Congressional intent, it is necessary that a limited number of FNS employees be excepted from furlough to support program operations."

Ex. L, USDA Lapse of Funding Plan (as of September 30, 2025), at ECF 16 [Doc. No. 9-12].

13

but USDA has the authority pursuant to 7 U.S.C. § 2257 to authorize transfers of such funds discretionarily. Id. Indeed, USDA has done so recently to transfer funds to the WIC program. Accordingly, Defendants may <u>also</u> consider relying on these discretionary funds to fund the remaining SNAP shortfall.

      B. *Irreparable Harms*

At present, SNAP funding will not be available starting on November 1. This suspension will not immediately impact all recipients as SNAP disbursements may be staggered throughout the month. Penn Decl. ¶ 4 [Doc. No. 17]; Smalligan Decl. ¶ 10 [Doc. No. 9]. And USDA's October 24, 2025, letter does indicate that it would be possible for benefits to be issued retroactively. Ex. 3, Letter from Patrick A. Penn (Oct. 24, 2025) 1 [Doc. No. 7-4] ("Households shall receive retroactive benefits once the suspension is lifted upon the availability of federal funding."). Nonetheless, at least some recipients will not receive SNAP payments at the beginning of the month and this absence of SNAP payments will undoubtedly result in substantial harm to them.

But as to the Plaintiffs, irreparable harm may still be avoided. Defendants' suspension of SNAP payments was based on the erroneous conclusion that the Contingency Funds could not be used to ensure continuation of SNAP payments. This court has now clarified that Defendants are <u>required</u> to use those Contingency Funds as necessary for the SNAP program. And while these contingency funds reportedly are insufficient to cover the entire cost of SNAP for November, Defendants also may supplement the Contingency Funds by authorizing a transfer of additional funds pursuant to 7 U.S.C. § 2257 to avoid any reductions.

Whether Defendants choose to use only the appropriated Contingency Funds and reduce benefits or use the additional discretionary funds to cover the shortfall, Defendants now have

14

different options before them based on the court's findings. And where Defendants may now opt to provide full funding of SNAP benefits from previously appropriated funds, Plaintiffs have not yet demonstrated a risk of irreparable harm.

IV. **Conclusion**

The Motion for a Temporary Restraining Order remains under advisement. No later than Monday, November 3, 2025, Defendants shall advise the court whether they will authorize at least reduced SNAP benefits for November and, if so, their timeline for determining whether to authorize only reduced SNAP benefits using the Contingency Funds or to authorize full SNAP benefits using both the Contingency Funds and additional available funds.

October 31, 2025 /s/ Indira Talwani
United States District Judge