# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, *et al.*,

        Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, *et al.*,

        Defendants.

No. 1:25-cv-13165

## DEFENDANTS' RESPONSE TO THE COURT'S ORDER DATED NOVEMBER 6; RESPONSE TO PLAINTIFFS' RENEWED MOTION FOR A TEMPORARY RESTRAINING ORDER

**TABLE OF CONTENTS**

INTRODUCTION..........................................................................................................................1

BACKGROUND ..........................................................................................................................2

I.      The SNAP Program and its Operation..........................................................................2

II.     Funding for SNAP and Other USDA Programs............................................................4

III.    This Litigation ...............................................................................................................6

LEGAL STANDARD ..................................................................................................................8

ARGUMENT................................................................................................................................8

I.      THE COURT SHOULD HOLD THE QUESTION OF FURTHER
        NOVEMBER BENEFITS PAYMENTS IN ABEYANCE PENDING
        GUIDANCE FROM THE HIGHER COURTS...............................................................8

II.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS...........................8

        A.      If the court reaches the November benefits issue, Defendants acted
                appropriately .......................................................................................................8

        B.      Plaintiffs' summary request for judicially fashioned indemnification cannot
                be countenanced................................................................................................16

III.    PLAINTIFFS FAIL THE REMAINING EQUITABLE CONSIDERATIONS
        FOR A NEW TEMPORARY RESTRAINING ORDER................................................19

IV.     PLAINTIFFS SHOULD BE ORDERED TO POST SECURITY IN
        CONNECTION WITH ANY INJUNCTIVE RELIEF AND THE COURT
        SHOULD STAY ANY RELIEF..................................................................................20

CONCLUSION ..........................................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos*,
  344 F. Supp. 3d 158 (D.D.C. 2018)...................................................................19

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ..........................................................................................13

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
  48 F.3d 618 (1st Cir. 1995).................................................................................19

*Dep't of Educ. v. California*,
  604 U.S. 650 (2025) ..........................................................................................20

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ..........................................................................................13

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ..........................................................................................13

*Harper v. Werfel*,
  118 F.4th 100 (1st Cir. 2024) ..............................................................................18

*Hercules Inc. v. United States*,
  516 U.S. 417 (1996) ..........................................................................................18

*Kosilek v. Misi*,
  630 F. Supp. 3d 328 (D. Mass. 2022)...................................................................17

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) .....................................................................................11, 12

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ............................................................................................8

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002).............................................................................12

*NIH v. Am. Pub. Health Ass'n*,
  606 U.S. __,145 S. Ct. 2658 (2025).....................................................................20

*Nken v. Holder*,
  556 U.S. 418 (2009) ..........................................................................................19

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
  810 F.3d 631 (9th Cir. 2015)...............................................................................17

*United States v. Wiley's Cove Ranch*,
   295 F.2d 436 (8th Cir. 1961) ................................................................................................12

*Wildearth Guardians v. Kempthorne*,
   592 F. Supp. 2d 18 (D.D.C. 2008) ........................................................................................12

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ....................................................................................................................8

**STATUTES**

5 U.S.C. § 701 .............................................................................................................................11

5 U.S.C. § 704 .............................................................................................................................18

7 U.S.C. § 612c *et seq.* ..............................................................................................................1, 5

7 U.S.C. § 612c-6 .....................................................................................................................1, 10

7 U.S.C. § 2011 .............................................................................................................................3

7 U.S.C. § 2013 ...........................................................................................................3, 4, 11, 12

7 U.S.C. § 2014 .......................................................................................................................3, 12

7 U.S.C. § 2020 ..........................................................................................................................3, 4

7 U.S.C. § 2025 ...................................................................................................................4, 17, 18

7 U.S.C. § 2027 ......................................................................................................................*passim*

7 U.S.C. § 2257 .................................................................................................................5, 10, 12

31 U.S.C. § 1341 .........................................................................................................................16

31 U.S.C. § 1512 ...........................................................................................................................4

51 U.S.C § 20148 ........................................................................................................................18

Consolidated Appropriations Act, 2024,
   Pub. L. No. 118-42, 138 Stat. 25 .......................................................................................4, 5

Full-Year Continuing Appropriations and Extensions Act, 2025,
   Pub. L. No. 119-4, 139 Stat. 9 ...............................................................................................4

**RULES**

Fed. R. Civ. P. 65 ........................................................................................................................20

## REGULATIONS

7 C.F.R. § 271.7 .............................................................................................................*passim*

7 C.F.R. § 273.10 ...........................................................................................................9

7 C.F.R. Part 275 .........................................................................................................18

7 C.F.R. § 277.4 .............................................................................................................4

7 C.F.R. § 280.1 .............................................................................................................5

## U.S. CONSTITUTION

U.S. Const. art I, § 7 .................................................................................................15, 16

## OTHER AUTHORITIES

Cong. Rsch. Serv., IF12193, Farm and Food Support Under USDA's Section 32 Account .................5

*Office of Legal Counsel*, Indemnification Agreements and the Anti-Deficiency Act (May 25, 1984) .......18

Off. of Mgmt. & Budget, Exec. Off. of the President, Circular No. A-11, Preparation, Submission, and Execution of the Budget, Fiscal Year 2026 (2024) .............................................4

USDA, Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025 (Oct. 10, 2025), https://perma.cc/LDG4- DQMC .......................................................6

USDA, Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025 (Oct. 24, 2025), https://perma.cc/4VPF-4ANN .......................................................6

## INTRODUCTION

The Supplemental Nutrition Assistance Program ("SNAP") is a critical program that, through regular allotments and extraordinary disaster disbursements ("D-SNAP"), helps to improve food security for millions of Americans. At its regular level, SNAP requires approximately $8.5 to $9 billion dollars each month to operate. But Congress's failure to make an annual appropriation for SNAP for this fiscal year has led to the current circumstance.

On October 31, this Court ordered the U.S. Department of Agriculture ("USDA") to consider "whether t[o] authorize at least reduced SNAP benefits for November and, if so, their timeline for determining whether to authorize only reduced SNAP benefits using the Contingency Funds or to authorize full SNAP benefits using both the Contingency Funds and additional available funds." October 31 Order, Doc. No. 26 at 15. Almost simultaneously, another district court ordered Defendants to deplete the entire SNAP contingency fund and consider using any other available funds. *See Rhode Island State Council of Churches et al v. Rollins et al.* ("*RISCC*"), 1:25-cv-569 (D. R.I.), Doc. No. 19. Restricted by the orders, USDA subsequently determined that it would make partial allotments and not divert billions of dollars from the Child Nutrition Programs. That decision was a reasonable one. In brief, if USDA were forced to transfer funds generated under Section 32 of the Agricultural Adjustment Act Amendment of 1935, which appropriates certain tariff revenue for various programs, but not SNAP, *see* 7 U.S.C. § 612c *et seq.*, it would blow a hole in the funds that are statutorily-dedicated to the Child Nutrition Programs. *See id.* § 612c-6(b)(1). That would raise calamitous concerns. The result would be a substantial shortfall in funding school meals, among other things, that would only speculatively be filled by future appropriation.

The *RISCC* Court disagreed, ordering full payment of the November SNAP benefits notwithstanding its effect on Child Nutrition Programs. *See RISCC*, Doc. No. 34. The orders are currently administratively stayed by Justice Jackson pending the First Circuit's ruling on the government's still-pending motion for a stay pending appeal. Considering the parallel appellate and Supreme Court proceedings of a nearly identical case, and to avoid conflicting rulings that could cause even more administrative complications for USDA and the States alike, this Court should hold in

1

abeyance questions on further November benefits disbursement pending further rulings.

Even if this Court does address the question of full November SNAP benefits at this time, it should deny Plaintiffs' motion. Given Congress's failure to appropriate sufficient funds and USDA's adherence to both the statute and its own regulations regarding partial benefits, it cannot be arbitrary and capricious for USDA to decline to raid an entirely different program, to the tune of billions of dollars, in the mere hope that Congress will fix the ensuing deficit through the general appropriations process. This is particularly true when the "hole" to be filled exists in a tariff-derived account—not in typical budget authority. And it would be unprecedented and unworkable for a court to mandate that USDA complete such a transfer using its discretionary interchange authority; it also raises the specter of innumerable conflicting injunctions demanding that every plaintiff's unfunded benefit program be supported by moving money from elsewhere. There is no basis in law for such an order. For these reasons, USDA is likely to succeed on the merits that it did not act arbitrarily and capriciously, or in violation of law, when it decided to move forward with partial allotments.

As a separate, new form of relief, Plaintiffs' "urge", in a single conclusory paragraph, for "the Court to order that USDA hold Plaintiffs harmless from any and all errors in November 2025, any other month with a partial SNAP payment, and any months immediately following a monthly issuance of partial benefits, and any resulting claims based on the implementation of reduced allotments in November 2025." Pls.' Renewed TRO Motion, Doc. No. 68 at 9. That includes "assum[ing] total financial liability associated with any errors that occur while the Plaintiffs attempt to provide partial benefits for November 2025 and any other month with a partial SNAP payment, including any demands and actions based upon or arising out of any activities performed by Plaintiffs." *Id.*

Plaintiffs cite no basis for this request: no statutory authority permitting it; no regulatory requirements to underpin it; and no practical or factual basis to clarify what claims or liabilities they reference. Indeed, asking for a "temporary" restraining order covering the capacious subject matter in Plaintiffs' motion makes a mockery of the very nature of such relief. A temporary restraining order is meant to maintain the status quo to provide immediate relief for imminent irreparable harm. But what

Plaintiffs ask for is nothing short of an ad hoc indefinite indemnification provision—fashioned out of whole cloth—without citation to a single authority. And to do so here—prospectively, based on a partial payment process explicitly contemplated by statute and regulation, and where States will have an opportunity to rebut any issues later on, is particularly unwarranted in this posture (or any posture).

The balance of the equities and irreparable harm factors also squarely favor Defendants. Plaintiffs do not even bother speculating why immediate irreparable harm will result without indemnification and why any resulting harm from partial allotments is not simply a direct result of the very relief they previously sought and a function of their own systems. Indeed, some Plaintiffs report that they can make *immediate* partial payments. Meanwhile, a court order to use the Child Nutrition Programs funds to pay SNAP benefits would inflict substantial harm on groups dependent on the Child Nutrition Programs.

All told, Defendants understand that Congress's failure to appropriate SNAP funds has created a difficult situation for millions of Americans. But Plaintiffs' sweeping plan to siphon funds from the Child Nutrition Programs is not a viable alternative, let alone one the Court can mandate. USDA reasonably rejected such a course. And Plaintiffs' extralegal appeal for an indemnification provision cannot be countenanced, at the very least in the context of a temporary restraining order.

## BACKGROUND

### I.    The SNAP Program and its Operation

SNAP is a federal nutrition assistance program administered by USDA at the federal level and implemented by state SNAP agencies at the local level. *See* 7 U.S.C. § 2020. Under the Food and Nutrition Act ("FNA"), SNAP benefits "shall be furnished to all eligible households" that apply, *id.* § 2014(a)—but, crucially, "[s]ubject to the availability of funds appropriated under section 2027 of this title," *id.* § 2013(a).

Since 1964, SNAP (or its predecessor) has provided monthly benefits to low-income households to purchase nutritious food. *Id.* § 2011. Eligible households receive their SNAP benefits on electronic benefit transfer (EBT) cards, *id.* § 2020, which may be used to purchase food from authorized retailers, *id.* § 2013(a). States are responsible for determining household eligibility and

benefit amounts, and loading benefits to EBT cards. *Id.* § 2020. States receive partial reimbursements for the costs of operating their SNAP programs (while the Federal Government pays for the entire cost of the benefits themselves). 50% of the cost of the administration of SNAP is borne by States while the federal government covers the other 50%. 7 U.S.C. § 2025(a); 7 C.F.R. § 277.4(b).

The system of moving money from the Federal Government, to the States, to the processors, to the beneficiaries' cards, and to the retailers is complex and necessary to ensure continuous operation of SNAP. *See* Decl. Patrick A. Penn, Doc. No. 17 ¶¶ 1-9, 16-28.

## II.    Funding for SNAP and Other USDA Programs

**A.** Congress appropriates federal funds for SNAP benefits during the annual appropriations process. *See* 7 U.S.C. § 2013(a)(1) ("Subject to the availability of funds appropriated under section 2027 of this title, the Secretary is authorized to formulate and administer [SNAP]."). In the last regular appropriations bill, Congress fully funded the program through the end of the 2024 Fiscal Year ("FY"). *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, Div. B, Title IV, 138 Stat. 25, 93 (Mar. 9, 2024). Congress continued the program through the end of FY 25 through a full-year continuing appropriations act. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Div. A, Title I, Sec. 1101(a) and 1109(a), 139 Stat. 9, 10, 13 (Mar. 15, 2025). Congress has not provided an appropriation to fund SNAP benefits or administrative costs for the current fiscal year.

After SNAP funds are appropriated by Congress, OMB "apportions" them for USDA's administration of SNAP. *See* 31 U.S.C. § 1512; Off. of Mgmt. & Budget, Exec. Off. of the President, Circular No. A-11, Preparation, Submission, and Execution of the Budget, Fiscal Year 2026 § 10.5 (2024) ("OMB Circular A-11") (July 2024) § 10.5. The apportionment provides USDA the necessary authority to obligate and expend funds for SNAP.

**B.** Congress has provided, through a multi-year fund, emergency reserves for SNAP funding. *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, § 6, 138 Stat. 25, 93-94 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a), 139 Stat. 9, 10 (2025). Each bill includes funds to "be placed in reserve for use only in such amounts and at such times as may become necessary to carry out program operations." Consolidated Appropriations Act,

2024, 138 Stat. at 93.

The contingency fund has been used sparingly and has never before been used to fund benefits in a lapse caused by Congress' inability to enact appropriations for the fiscal year. Doc. No. 17 ¶¶ 11-13. Generally, those contingency funds are used in the event of a disaster, such as a hurricane, to provide critical relief. *Id.* 7 C.F.R. § 280.1. For example, in 2017, after Hurricanes Maria, Rita and Harvey heavily impacted the southeastern United States and Puerto Rico, FNS spent approximately $4.3 billion on the affected States and roughly $1.7 billion in Puerto Rico for disaster assistance using the contingency fund. Doc. No. 17 ¶ 11. In response to this Court's October 31 order, and the District of Rhode Island order issued that same day, USDA earlier this week took the steps necessary to use the fund as set out in 7 C.F.R. § 271.7 and statute. Supp. Decl. Patrick A. Penn, Doc. No. 48-1.

**C.** Under Section 32 of the Agricultural Adjustment Act Amendment of 1935, 7 U.S.C. § 612c *et seq.*, Congress has set forth a mandatory, and permanent, appropriation that stems from 30% of customs receipts on all imports from the prior calendar year. *See id.*; Cong. Rsch. Serv., IF12193, Farm and Food Support Under USDA's Section 32 Account (last updated Aug. 5, 2025). To clarify, Section 32 is funded by customs receipts, *not* by general appropriations. The breakdown of the *projected* amounts and transfers for FY 2026, is reflected in the chart in that Congressional Research Service report. As the diagram shows, the majority of the funding is transferred for the Child Nutrition Programs. Within limits, that money can sometimes be discretionarily transferred from the Child Nutrition Programs account. 7 U.S.C. § 2257 (permitting limited transfers from within the same "bureau, division, or office of the Department of Agriculture").

**D.** Recognizing that SNAP may suffer from insufficient appropriations, Congress through statute, and USDA through regulation, have set forth procedures and guidelines governing such an event. First, Congress directed that "[i]n any fiscal year, the Secretary shall limit the value of those allotments issued to an amount not in excess of *the appropriation for such fiscal year.*" 7 U.S.C. § 2027(b) (emphasis added). In the event of a potential shortfall of the appropriated funds, the Secretary may issue a reduction, and "[n]otwithstanding any other provision of this chapter," "the Secretary shall direct State agencies to reduce the value of such allotments to be issued to households certified as

eligible to participate in the supplemental nutrition assistance program to the extent necessary to comply with the provisions of this subsection." *Id.* The regulation detailing the calculation of a reduction is located at 7 C.F.R. § 271.7(a)-(h). This Court previously concluded that USDA must use the "highly detailed, step-by-step procedure with which to affect a reduction" set forth in 7 C.F.R. § 271.7. Doc. No. 26 at 11-13.

## III.   This Litigation

On September 30, 2025, the FY 2025 appropriation for the SNAP account lapsed. As the lapse in appropriation continued unabated, USDA informed States that SNAP benefits were at risk. On October 10, USDA explained that "if the current lapse in appropriations continues, there will be insufficient funds to pay full November SNAP benefits for approximately 42 million individuals across the Nation." USDA, Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025 (Oct. 10, 2025), https://perma.cc/LDG4- DQMC. ("Oct. 10 Letter"). Because of these difficulties, USDA "direct[ed] States to hold their November issuance files and delay transmission to State EBT vendors until further notice." *Id.*

Two weeks later, as the lapse in appropriations dragged on, USDA sent a second letter. At that time, USDA formally "suspend[ed] all November 2025 benefit allotments until such time as sufficient federal funding is provided, or until FNS directs State agencies otherwise." USDA, Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025 (Oct. 24, 2025), https://perma.cc/4VPF-4ANN. ("Oct. 24 Letter").

On October 28, 2025, Plaintiffs, a coalition of States, filed suit. Doc. No. 1. Plaintiffs brought two claims, both under the Administrative Procedure Act ("APA"). They seek to "hold unlawful and set aside" the "suspension of November SNAP benefits" as being "contrary to the SNAP Act and its implementing regulations" or "arbitrary and capricious." *Id.* ¶¶ 171-98. Plaintiffs seek, in sum, vacatur of the November suspension, including permitting Plaintiffs to begin sending SNAP benefit issuance files immediately, and otherwise requiring obligations under the SNAP program despite the lack of appropriated funds. *Id.* Prayer for Relief. Plaintiffs filed, that afternoon, a motion for temporary restraining order, memorandum in support, Pl.'s Mem., Doc. No. 4, declaration and exhibits, Doc.

Nos. 7, 9, and a proposed order, Doc. No. 3-1.

After a hearing, on October 31, this Court ordered the USDA to consider "whether t[o] authorize at least reduced SNAP benefits for November and, if so, their timeline for determining whether to authorize only reduced SNAP benefits using the Contingency Funds or to authorize full SNAP benefits using both the Contingency Funds and additional available funds." Doc. No. 26 at 15. The Court otherwise kept the motion for a temporary restraining order pending. At the same time, another district court ordered Defendants to deplete the entire SNAP contingency fund and consider using any other available funds. *See RISCC*, Doc. No. 19. Restricted by the orders, USDA subsequently determined that it would make partial allotments.

On November 3, Defendants filed a status report and declaration laying out USDA's compliance and reasoning. Doc. No. 48. USDA explained, in its declaration, why it had declined to transfer billions of dollars from other food security programs. *Id.* at 48-1. USDA then filed an initial memorandum and tables implementing use of the contingency fund for partial benefits. Doc. No. 55. And, after further calculations, on November 5, USDA was able to increase available benefits— reducing the maximum allotment by 35% rather than 50%—and updated its memorandum and tables to reflect that recalculation. Doc. No. 65.

The next day, Plaintiffs filed a reply in support of their motion for a temporary restraining order, or alternatively a renewed motion for a temporary restraining order. Doc. No. 68. That motion raises three issues. First, it alleges that Defendants did not properly set minimum benefit for one or two member households. Second, it argues that USDA acted in violation of the APA by not taking billions of dollars from the Child Nutrition Programs to provide a full SNAP allotment for November. And third, Plaintiffs seek some manner of court-ordered indemnification.

In the meantime, the *RISCC* Court ordered USDA to provide full benefits to States by Friday, November 7, through a multi-billion-dollar depletion of the Child Nutrition Programs funds. *RISCC*, Doc. No. 34. Defendants sought an emergency stay from the First Circuit, and while that request was denied, Justice Jackson granted an administrative stay later that day. These Plaintiff States were and remain nonparties to that suit. At no point did USDA direct Plaintiffs to release issuance files for full

benefits. Indeed, the most recent pre-stay guidance stated that USDA was "*working towards implementing November 2025 full benefit issuances* in compliance with the November 6, 2025, order . . . [and] will *complete the processes necessary* to make funds available t*o support your subsequent transmittal of full issuance file*s to your EBT processor." Doc No. 75-1 at 2 (emphasis added). Meanwhile, at least some Plaintiffs represent that they released full issuance files. Doc No. 75.

## **LEGAL STANDARD**

Injunctive relief "is an extraordinary and drastic remedy." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (quotation omitted). To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## **ARGUMENT**

**I.  THE COURT SHOULD HOLD THE QUESTION OF FURTHER NOVEMBER BENEFITS PAYMENTS IN ABEYANCE PENDING GUIDANCE FROM THE HIGHER COURTS**

Given the ongoing proceedings in the *RISCC* case and the substantial similarity of the claims and arguments, this Court should hold the question of further November benefits payments in abeyance pending further guidance. To do otherwise would risk another change in obligations for USDA, which would once again have to formulate guidance for States. Meanwhile, given the appellate proceedings, it is possible that a judgment from this Court would soon conflict with rulings by the First Circuit, or Supreme Court, further complicating the next steps to be formulated by USDA. All told, it is in the best interests of all Parties for a short abeyance period pending appellate proceedings.

**II.  PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS**

**A.  If the court reaches the November benefits issue, Defendants acted appropriately**

*Defendants properly set the minimum benefit in conformity with regulation.*

USDA properly calculated the minimum benefit for one and two person households. USDA agrees that its initial tables, sent on November 4, needed correction for the maximum allotment calculations. It sincerely regrets the error and, upon realizing the mistake, immediately set to work on

revised calculations to increase available benefits. Doc. No. 65-1 at 5-6. On November 5, USDA issued revised tables that properly formulated maximum allotments (reducing them by only 35% rather than 50%) depleting the contingency fund to a minimal amount, less than $1 per recipient. *Id.* at 5-10.

Plaintiffs claim that the revised tables err by setting the minimum benefits for one and two person households too low. Doc. No. 68 at 7-9. They do so by a simple misreading of the regulation. As an initial matter, the regulation states that, in situations where there is going to be reduced benefits, "allotments shall be reduced by reducing maximum SNAP allotments amounts for each household size by the same percentage." 7 C.F.R. § 271.7(b). That is why USDA's tables set maximum allotment amounts based on each household's size. Doc. No. 65-1 at 8-10. "All one- and two-person households affected by a reduction action shall be guaranteed the minimum benefit" except in inapplicable circumstances. 7 C.F.R. § 271.7(b). The "minimum benefit" is 8% of the maximum allotment. *Id.* § 273.10(c)(2)(iii)(C). Plaintiffs agree that this is the relevant regulatory text. Doc. No. 68 at 7.

USDA followed this calculation, using the *reduced* maximum allotment dictated by statute and regulations in light of insufficient appropriations. In November, USDA set the maximum allotment for a one person household in accordance with the regulatory formula for a reduction based on the contingency funds available. That led to a 35% reduction and a maximum allotment for a one person household of 193 dollars for 48 States and D.C. and 329 for Hawaii (a Plaintiff in this suit). Doc. No. 65-1 at 8-9. Applying the formula of eight percent (rounded to the nearest whole dollar), the revised tables calculate the minimum benefit as $16 for 48 States and D.C and $26 for Hawaii. *Id.* at 10.

Plaintiffs, without explanation, reference the maximum allotment amounts when a reduction is not in effect as the baseline for an eight percent calculation when a reduction *is* in effect. Doc. No. 68 at 8-9. That does not make sense. There is nothing in the regulations suggesting that the minimum benefit is tied to the maximum allotment absent a reduction. It refers to a simple formula with the reference point being "*the* maximum allotment for a household of one." 7 C.F.R. § 273.10(e)(2)(ii)(c) (emphasis added). This month, the maximum allotment had been reduced in response to the *RISCC* November 1 order and led to the minimum benefit in USDA's revised tables. Doc. No. 65-1 at 7-10. Because USDA followed the regulatory formula, it did not act contrary to law.

### *The SNAP statutory scheme does not require draining all non-SNAP sources of funds.*

Plaintiffs also argue that USDA *must* "make Section 32 funds available," by law so that full allotments can be made. Doc. No. 68 at 6. That is wrong. First and foremost, the only funds available under the cited authority, Section 2257, are those "amounts appropriated for any fiscal year for the miscellaneous expenses of the work of any bureau, division, or office of the Department of Agriculture" to be transferred "within . . . such bureau division, or office." 7 U.S.C. § 2257. So it is not "Section 32 funds" that are at issue, but rather those funds in the account for the Child Nutrition Programs which, USDA agrees, are in the same bureau, division, or office. Though derived from the Section 32 appropriation, those funds were transferred to the programs' account. *See id.* § 612c-6(b)(1).

Second, reducing benefits—when funds appropriated for the SNAP program specifically are lacking—is contemplated in both statute and regulation. Recognizing that SNAP may suffer from insufficient appropriations during the fiscal year, Congress and USDA have set forth procedures and guidelines governing such an event. Congress directed that "[i]n any fiscal year, the Secretary *shall limit the value of those allotments* issued to an amount not in excess of *the appropriation for such fiscal year*." 7 U.S.C. § 2027(b) (emphasis added); *see id.* § 2013(a)(1) ("Subject to the availability of funds appropriated under section 2027 of this title, the Secretary is authorized to formulate and administer [SNAP]."). So the SNAP scheme itself recognizes that SNAP allotments are limited by the SNAP appropriations.

Third, Congress has directed the process for how USDA must act upon deficient funds for SNAP. If the Secretary finds that the benefit amounts needed by State agencies will exceed the appropriation, "[n]otwithstanding any other provision of this chapter," the Secretary must "direct State agencies to reduce the value of such allotments to be issued to households certified as eligible to participate in the supplemental nutrition assistance program to the extent necessary to comply with the provisions of this subsection." *Id.* § 2027(b). USDA has followed the requirements in its regulation for calculating and implementing such a reduction. 7 C.F.R. § 271.7.

Consistent with Congress's direction, the Court's order contemplates partial payments as an option. Doc. No. 26 at 15. After this Court's order and the *RISCC* November 1 order, USDA chose partial allotments given the multi-billion-dollar shortfall that would result from using the Child

Nutrition Programs funds. As the regulation requires, "State agencies shall act immediately to implement the reduction," including by making the necessary changes to their "computerized issuance systems." 7 C.F.R. § 271.7(d)(1)(ii). To help resolve the States' own difficulties, USDA has pledged that "[t]o assist State agencies with the massive changes, USDA will have staff available for technical assistance." Doc. No. 48-1 ¶ 26. USDA has further expended nearly half a billion dollars to compensate States for the resulting administrative costs. *Id.* ¶ 2. All that was in compliance with law.

### *The decision not to drain the Child Nutrition Programs' funds is not reviewable.*

Plaintiffs argue that USDA violated the APA by declining to transfer billions of dollars from other food-security programs to permit full SNAP benefits for November. Doc. No. 68 at 4-6. But the decision to deplete the funds for one congressionally mandated program to pay for another program without sufficient appropriations falls squarely within the APA exception for decisions committed to agency discretion by law. 5 U.S.C. § 701(a)(2). In constituting the SNAP program, Congress directed that "[i]n any fiscal year, the Secretary shall limit the value of those [SNAP] allotments issued to an amount not in excess of *the appropriation for such fiscal year.*" 7 U.S.C. § 2027(b) (emphasis added). The context refers to the appropriation for the SNAP program, not any appropriation made to USDA for other programs. *See id.* § 2013(a)(1). Nothing else in the SNAP framework says otherwise; no portion of the scheme contains mandatory language directing the raiding (and ultimately destruction by fiscal shortfall) of every other USDA program to fund SNAP.

The Supreme Court has long recognized that an agency's determination of how to allocate funds among competing priorities and recipients is the classic action committed to agency discretion by law. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). In *Lincoln*, the Court explained that a funding decision is committed to agency discretion where it requires "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including whether "resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id.* (cleaned up). An "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.*

The APA "gives the courts no leave to intrude." *Id.* Thus, "the decision about how the moneys" for programs "could best be distributed" is classically committed to agency discretion. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751-52 (D.C. Cir. 2002).

The decision to transfer funds from one program to another program is in the heartland of this exception. Section 2257 authorizes (but nowhere requires) that an amount "[n]ot to exceed 7 per centum of the amounts appropriated for any fiscal year for the miscellaneous expenses of the work of any bureau, division, or office of the Department of Agriculture" can be transferred to another appropriation "within ... such bureau division, or office, but no more than 7 per centum shall be added to any one item of appropriation." 7 U.S.C. § 2257. The statute provides for cap exceptions "in cases of extraordinary emergency," *id.*, but at no point does it make a transfer mandatory. The choice to deplete one program to try and shore up another ticks every box discussed in *Lincoln*: (1) complicated balancing of factors within the agency's purview; (2) consideration of best use of resources "on one program or another"; (3) whether USDA "is likely to succeed in fulfilling its statutory mandate"; and (4) "whether the agency has enough resources to fund a program at all." *See Lincoln*, 508 U.S. at 193; *see* Doc. No. 17 ¶¶ 16-35 (laying out the challenges); Doc. No. 48-1 ¶¶ 7-23 (laying out USDA's decisionmaking with respect to partial payment). Simply put, if depleting one program to bolster one without sufficient funds is not committed to agency discretion under the *Lincoln* principles, it is hard to see how any funding decision would be. And the extraordinary emergency portion of that authority only reinforces this conclusion. *See, e.g.*, *Wildearth Guardians v. Kempthorne*, 592 F. Supp. 2d 18, 25 (D.D.C. 2008) (explaining that language "giv[ing] the Secretary the authority—but not the duty—to [take an action on an] emergency basis" is committed to agency discretion); *accord United States v. Wiley's Cove Ranch*, 295 F.2d 436, 446 (8th Cir. 1961) (holding "certificate of [individual's] eligibility to receive benefits under the Emergency Feed Program" was committed to agency discretion).

Section 2014's statement that benefits, "shall be furnished to all eligible households who make application for such participation," is not to the contrary. 7 U.S.C. § 2014(a). That provision is subject to the availability of appropriations for the SNAP program. *Id..* § 2027(b); *id.* § 2013(a)(1). So benefits are explicitly limited by the appropriations for the SNAP program. Meanwhile, the language

12

authorizing transfer of separate funds for separate programs falls under Section 2257—which has no mandatory language and is not an appropriation referenced in the governing SNAP statutes. That is the classic open funding authorization that lies within agency discretion. Taking from one program to fund another involves the precise balancing that places the decision outside the APA.

### *If USDA's decision is reviewable, it is well reasoned and should be upheld.*

Even if the APA permits review, Plaintiffs cannot prevail. Under the arbitrary and capricious standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quotation marks omitted).

USDA reasonably decided against depleting "at least $4 billion from th[e] Child Nutrition funds to provide full SNAP benefits instead of reduced benefits for the month of November." Doc. No. 48-1 ¶ 7. USDA "contemplated various factors" including (1) that Congress appropriated funds for the Child Nutrition Programs specifically (not generally for any program needing funds); (2) "the impact a transfer of the magnitude necessary to support SNAP would have on Child Nutrition Programs"; (3) "the likelihood (or lack thereof) of Congress's ability to appropriate additional billions of dollars for Child Nutrition Programs for FY26 to make up the funding shortfall"; and (4) the Court orders at issue. *Id.* ¶ 8. Ultimately, USDA decided "to protect full operation of Child Nutrition Programs throughout the fiscal year." *Id.* ¶ 9. Those Programs "provide critical, nutritionally-balanced meals and food assistance benefits to millions of children every day" serving "[t]hrough the National School Lunch Program alone, approximately 29 million children per day." *Id.* ¶ 10.

USDA balanced the importance of the Child Nutrition Programs against the dangers of a shortfall in funds. *Id.* ¶¶ 8-20. "[T]he $4 billion removed from Child Nutrition Programs for one month of SNAP benefits would be a permanent loss to Child Nutrition Programs for the entirety of

their annual operations in FY26." *Id.* ¶ 17. "To make Child Nutrition Programs whole for FY26, Congress would need to appropriate an additional $4 billion in new budget authority." *Id.* ¶ 19. Such a shortfall would be "unprecedented and significant." *Id.* ¶ 16. "In other words, instead of Congress appropriating the estimated $13.2 billion for Child Nutrition Programs in FY26, Congress would need to appropriate more than *$17.2 billion* for Child Nutrition Programs to continue funding the Child Nutrition Programs." *Id.* ¶ 19. The difference of $4 billion stems from the diversion of Child Nutrition Program funds, which derive from tariff receipts and not general appropriations, to SNAP. If Congress passes a continuing resolution, maintaining earlier levels of funding, or if Congress simply chooses to appropriate the sum originally anticipated, the Child Nutrition Programs will face a large shortfall. *See id.* ¶¶ 8-20. In sum, "creating a shortfall in Child Nutrition Program funds to fund one month of SNAP benefits is an unacceptable risk, even considering the procedural difficulties with delivering a partial November SNAP payment, because shifting $4 billion dollars to America's SNAP population merely shifts the problem to millions of America's low income children that receive their meals at school." *Id.* ¶ 22.

In exercising its statutory discretion, USDA also considered congressional intent. *Id.* ¶ 21. Congress provides the SNAP program a contingency fund. *Id.* Congress also provides the Child Nutrition Programs with sufficient funds to carry out their operations. *Id.* "USDA would ignore those provisions while also threatening its ability to administer Child Nutrition Programs if it were to repurpose funds Congress explicitly intended be used only for Child Nutrition Programs." *Id.* That issue does not arise with the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC") because the relatively small quantity of funds does not threaten to impair Child Nutrition Programs operations. *Id.* ¶¶ 20-21. Finally, "[t]here are no other large blocks of funding— that is, funding not tied to yearly appropriations—within [the relevant bureau, division, or office] that could be used to supplement SNAP." *Id.* ¶ 23.

Ultimately, USDA has reasonably chosen to protect funding for the critical Child Nutrition Programs rather than speculate that Congress will, in the future, appropriate billions of additional dollars reallocated by USDA to comply with the Court's order. *Id.* ¶¶ 7-23. It simply cannot be arbitrary

and capricious to determine that maintaining appropriate funds for their intended purpose (as prescribed by Congress, no less), when there is no suggestion that a deficit will be restored, is the proper course of action here. Indeed, to deplete the Child Nutrition Programs on the speculative hope that Congress will bail out the resulting shortfall, would itself risk failing arbitrary and capricious review. And to the extent that Plaintiffs or the Court assume that Congress will necessarily appropriate such funds in the future (or that it will have no choice but to be compelled to do so), and therefore it is appropriate to disburse funds now, such a premise risks violating the Appropriations Clause's requirement that "[n]o money shall be drawn from the Treasury, but in consequence of Appropriations made by Law." U.S. Const. Art I, § 7, cl. 7.

Plaintiffs' counterarguments do not detract from this well-reasoned conclusion.

Most prominently, Plaintiffs allege that USDA did not consider the drawbacks of a partial allotment. Doc. No. 68 at 4-5. But of course, USDA provided paragraphs of consideration and detail regarding this point, Doc. No. 48-1 ¶¶ 24-30, and explicitly "determined that creating a shortfall in Child Nutrition Program funds to fund one month of SNAP benefits is an unacceptable risk, even considering the procedural difficulties with delivering a partial November SNAP payment, because shifting $4 billion dollars to America's SNAP population merely shifts the problem to millions of America's low income children that receive their meals at school." *Id.* ¶ 22. As this Court is well aware, USDA has been warning about the procedural difficulties since the beginning of this litigation and originally suspended payments to avoid these logistical hurdles. But having been offered only two choices—partial allotments with the full contingency fund or full allotments at the expense of the Child Nutrition Programs' operational longevity—USDA decided the resulting shortfall would be too devastating. Plaintiffs may disagree with USDA's weighing of the considerations, but USDA did in fact consider and reasonably resolve the dilemma.

Otherwise, Plaintiffs contend that there will be no shortfall for Child Nutrition Programs because they have funds now, even if without Congressional action there would be "a future budgeting crisis." Doc. No. 68 at 6. But USDA has reasonably focused on the entire fiscal year, not specifically the lapse in appropriations. And Plaintiffs' speculation about hypothetical congressional action cannot

overcome the agency's reasoned choice. Plaintiffs' contention is ultimately that USDA *must* assume in this unprecedented situation that Congress will simply ratify the use of funding not appropriated for the SNAP program and allocate billions more for the Child Nutrition Programs. That kind of speculation about the actions of Congress, which ultimately let funding lapse for various critical programs – and the entirety of the federal government, cannot overcome the agency's reasonable choice to protect the Child Nutrition Programs from a deficit that would impair its operations.

Even setting all that aside, it risks violating both the Appropriations Clause and the Antideficiency Act to generate a deficit in the Child Nutrition Programs in anticipation of *future* congressional appropriations. U.S. Const. Art I, § 7, cl. 7; 31 U.S.C. § 1341 (forbidding "involv[ing] [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law"). Indeed, the Antideficiency Act appears designed to avoid agencies generating precisely the kind of liability that Plaintiffs ask for—a multi-billion dollar gap in funds that Congress must choose to repair. So at the very least USDA did not abuse its discretion by generating such an obligation "before an appropriation" in anticipation of such an appropriation.

At base, USDA is not required to defund one program to support another, and it certainly did not abuse its discretion by refusing to do so. To hold otherwise would also open a Pandora's box. SNAP is far from the only program that includes mandatory language but is dependent on congressional appropriations. And Section 2257 is not the only statute that provides discretionary authorization for agencies to transfer funds from one purpose to another. If Plaintiffs can secure a court order requiring USDA to exercise that authority to ensure that their program remains funded despite a lapse, there is nothing to stop the beneficiaries of every benefit program from seeking analogous relief, imposing conflicting and unworkable obligations on agencies as the federal courts usurp the role of fiscal management and direct movement of funds across the government. Plaintiffs conceive of this Court as playing the role of a bankruptcy judge, giving priority to certain claims over others, but that is entirely improper and an offense against the separation of powers.

**B. Plaintiffs' summary request for judicially fashioned indemnification cannot be countenanced.**

Plaintiffs also summarily "urge" that this Court fashion some kind of ad hoc judicial indemnification including "from any and all errors in November 2025" (and future months); "any resulting claims based on the implementation of reduced allotments"; "any errors must be excluded from the yearly performance error measure or rate"; and "USDA must assume total financial liability associated with any errors that occur while the Plaintiffs attempt to provide partial benefits" "including any demands and actions based upon or arising out of any activities performed by Plaintiffs pertaining to the issuing of these partial issuances." Doc. No. 68 at 9. And all of this is meant to come in the form of a *temporary* restraining order. And Plaintiffs cite not a single legal authority for this order.

This incredible request must be rejected. To start, the claims in Plaintiffs' complaint contain no basis for the indemnification request. Doc. No. 1 ¶¶ 171-98. Plaintiffs sought to "set aside" the "suspension of November SNAP benefits" as being "contrary to the SNAP Act and its implementing regulations" or "arbitrary and capricious." *Id.* That result of overturning that suspension was the reduction required by statute and regulation, neither of which speaks to some kind of immunity for States' errors. Absent such claims, no emergency relief can flow. *Kosilek v. Misi*, 630 F. Supp. 3d 328, 334 (D. Mass. 2022) (citing *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015)); *Pac. Radiation Oncology*, 810 F.3d at 633 ("When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction.").

Even if the claims could support indemnification, there is no basis in law to do so. Congress did not provide for any of the indemnification that Plaintiffs seek. It instead commanded the Secretary to "direct State agencies to reduce the value of such allotments to be issued to households certified as eligible to participate" and chose the manner by which the Secretary would handle calculations to then be used by the States. 7 U.S.C. § 2027(b), (c). Congress did create a complicated quality control system, including tracking of payment error rates. *Id.* § 2025(c). But Congress implemented no carveout or exception to this system for implementation of reductions. *See id.*

The regulatory scheme also does not mention or contemplate indemnification. The regulation instead directs that States *must* follow the instructions of USDA. 7 C.F.R. § 271.7. And it sets forth the process for any penalties, stating that USDA "may" take "actions against a State agency that fails

17

to comply with a directive to reduce, suspend or cancel allotments in a particular month." *Id.* § 271.7(h). No mandatory language is used for such penalties. More generally, nothing in 7 C.F.R. § 271.7 affects the quality control process and liability scheme established in 7 U.S.C. § 2025(c) and 7 C.F.R. Part 275. If any consequences result under those regulations, that would take place as a future administrative action which any State would then participate in.

In fact, the Supreme Court has long held that open-ended indemnification agreements by the Federal government are nearly impossible absent explicit statutory authorization. *See, e.g., Hercules Inc. v. United States*, 516 U.S. 417, 427 & n.10 (1996) (explaining that open-ended indemnification agreements, without statutory authorization, are understood to be barred by the Antideficiency Act); *Office of Legal Counsel*, Indemnification Agreements and the Anti-Deficiency Act (May 25, 1984) (same); *see, e.g.*, 51 U.S.C § 20148 (setting out an example of statutory indemnification). Such agreements are an affront to the Antideficiency Act to the extent the United States is subjected to an indefinite, indeterminate, or potentially unlimited liability. The reason is simple. There could never be certainty that sufficient funds have been appropriated. Even if the Court read into Plaintiffs' request something entirely absent—a limiting upper bound of such indemnification as a State's full allotment—the request is still unlawful. Defendants have established a level of partial benefits designed to effectively drain the contingency fund. Doc. No. 65-1 at 5-10. Any indemnification in excess of the maximum allotments prescribed, by definition, would obligate the United States to cover liability that exceeds the appropriation.

Even setting all that aside, there is no "final agency action" to challenge under the APA (the only basis for Plaintiffs' claims). *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting 5 U.S.C. § 704). Plaintiffs have provided no evidence that this request has been made to USDA, or that USDA has taken action on such a request. Nor have Plaintiffs pointed to any penalization action, or even an investigation of States on this issue. Without a final agency action, no APA relief can flow.

Lastly, the Court must not grant Plaintiffs' request in the posture of a temporary restraining order. Nothing about their request is temporary. Indeed, it is not even clear that what they are seeking is a restraint on Defendants. Plaintiffs use such broad language as "USDA must assume total financial

liability" and "any resulting claims." Doc. No. 68 at 9. Plaintiffs cite nothing to narrow their requests and, read broadly, they appear to be asking for this Court to abrogate the United States's sovereign immunity to allow claims to be transferred from States to the Federal Government—or to otherwise appropriate federal funds to indemnify States. At the very least, the Court must require Plaintiffs to explain precisely what they are seeking and a basis in legal authority to grant that request.[1] And because Plaintiffs have not done so their motion must be denied.

## III. PLAINTIFFS FAIL THE REMAINING EQUITABLE CONSIDERATIONS FOR A NEW TEMPORARY RESTRAINING ORDER

"A prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury." *Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018). And irreparable harms must be harms to the Plaintiffs; not third parties. *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir. 1995). Meanwhile, when the Federal Government is a party, the balance of the equities and public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). All considerations support USDA.

For irreparable harm, Plaintiffs argued that the Court should require use of the entire contingency fund to at least pay partial benefits. Fortunately, some States have systems that permit *immediate* partial payment. Doc. No. 68 at 2 n.3. That other States must now contend with the result of their own requested relief, made more difficult by their own systems, is not a basis for irreparable harm. Defendants precisely warned of this dilemma previously and Plaintiffs sought partial benefits anyway.[2] Moreover, Plaintiffs have provided no evidence of immediate and irreparable harm from

---

[1] Plaintiffs' belated notice, filed this morning, also asks that "their hold harmless request extend to any issuances of benefits — whether *full* or partial — in November 2025 or *any other months affected by or immediately following* the government shutdown." Doc. No. 75 at 3 (emphasis added). Plaintiffs again cite nothing in law authorizing, permitting, or even suggesting their ever-expanding demand.

[2] Indeed, as counsel for Plaintiffs stated: "Your Honor, I understand that a reduction in benefits would be a procedural obstacle for many states. But in this situation, I do not think the perfect should be the enemy of the good. As you have observed, there are procedures in both the regulation and the statute for reduction. And these set forth, as it says in the regulation, you must do what is necessary. . . . States can begin the process of ensuring that they can do a reduction in benefits, which admittedly will take time and will put some delays in the process." Hrg. Trans. 33:19-34:11.

their request for indemnification. Presumably, they are speculating that resulting errors from this process could lead to some kind of future liability, or future administrative action. But that is not only entirely speculative, it is precisely the kind of harm that can be resolved later through administrative or court proceedings. There is no basis to grant such relief today.

As for the equities—the damage to nonparties, including beneficiaries of the Child Nutrition Programs, strongly counsels in favor of rejecting Plaintiffs' motion. If this Court ultimately were to order the depletion of billions of dollars from the Child Nutrition Programs on the speculative hope of a congressional fix on the backend, it would substantially damage the interests of those beneficiaries who rely on those other programs. And ordering the kind of indemnification these States seek would be to the detriment of the nonparty States who would receive no such shield and would suffer as "shielded States" drain funds from the pot remaining for benefits in all States.

## IV.   PLAINTIFFS SHOULD BE ORDERED TO POST SECURITY IN CONNECTION WITH ANY INJUNCTIVE RELIEF AND THE COURT SHOULD STAY ANY RELIEF.

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiffs' motion in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiffs to post an appropriate bond commensurate with the scope of any such order. *See* Fed. R. Civ. P. 65(c); *cf. Dep't of Educ. v. California*, No. 24A910, 604 U.S. 650, 652 (2025).

Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of forty-eight hours to allow the United States to seek an emergency, expedited stay if an appeal is authorized. That is especially true because any distributed moneys may be forever lost. *See NIH v. Am. Pub. Health Ass'n*, 606 U.S. __,145 S. Ct. 2658 (2025) (Mem.). Plaintiffs have asserted that no bond should be required here, even though they have failed to commit to repay the billions of dollars expended (and indeed seek judicially created immunity to do so). And the deficit that would be created for the Child Nutrition Programs cannot be undone except through Act of Congress.

## <u>CONCLUSION</u>

The Court should deny Plaintiffs' motion.

Dated: November 8, 2025

Respectfully submitted,

STANLEY WOODWARD, Jr.
Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

TYLER BECKER
Counsel to the Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

*/s/ Jason Altabet*
JASON ALTABET (Md. Bar No. 2211280012)
Trial Attorney, U.S. Department of Justice
Tel.: (202) 305-0727
Email: jason.k.altabet2@usdoj.gov
1100 L Street, N.W. 20005
Washington, D.C. 20005

*Attorneys for the United States*

## CERTIFICATE OF SERVICE

On November 8 2025, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court for the District of Massachusetts, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

/ s/ Jason Altabet

Trial Attorney