# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS; et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE; et al.,<br><br>Defendants. | Case No. 1:25-cv-13165 |

**DECLARATION OF SCOTT MORISHIGE**

I, **Scott Morishige**, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a resident of the State of Hawaiʻi. I am over the age of 18 and understand the obligations of an oath.

2. I am currently the Division Administrator for the Benefit, Employment and Support Services Division (BESSD) of the Hawaiʻi Department of Human Services (HI DHS).

3. I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

4. The mission of HI DHS is to encourage self-sufficiency and support the well-being of individuals, families, and communities in Hawaiʻi. HI DHS is comprised of four divisions, including BESSD, Med-QUEST Division (MQD), Social Services Division (SSD), and Division of Vocational Rehabilitation (DVR). HI DHS also includes four administratively attached agencies that include the Hawaiʻi Public Housing Authority, Office of Youth Services, Office of Wellness and Resiliency, and Statewide Office on Homelessness and Housing Solutions.

5. SNAP, one of the programs administered by HI DHS, involves the issuance of monthly electronic benefits that can be used to purchase food at authorized retail stores.

6. SNAP is a key part of Hawai'i's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food. Thus far in 2025, an average of 161,400 people received SNAP benefits in Hawai'i each month, including approximately 27,910 families and 62,647 children. Households in Hawai'i receive on average $735.77 per month in SNAP benefits to meet their basic subsistence and nutritional needs. During the federal fiscal year between October 1, 2024 and September 30, 2025, HI DHS issued approximately $57,695,553 per month in SNAP benefits in Hawai'i.

7. HI DHS administers the SNAP program in Hawai'i pursuant to Hawai'i Revised Statutes § 346-14. Pursuant to federal law, HI DHS administers SNAP on behalf of the United States Department of Agriculture (USDA) and is responsible for the issuance, control, and accountability of SNAP benefits and Electronic Benefit Transaction (EBT) cards; ensuring program integrity; and supervising local transitional assistance offices' day-to-day administration of SNAP, including processing applications for SNAP benefits and certifying eligible applicant households. 7 U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4; 7 C.F.R. § 274.2. USDA funds the entirety of SNAP benefits in Hawai'i, though Hawai'i and the federal government split administrative costs. 7 U.S.C. § 2025(a).

8. For Federal Fiscal Year 2025, HI DHS budgeted approximately $32,310,980 in state funds to pay for SNAP administration. This spending is expected to generate approximately $32,310,980 in SNAP federal financial participation, to cover half of anticipated administration costs.

9. HI DHS has a contract with a financial services vendor, Fidelity National Information Services, Inc. ("FIS" or "Vendor"), to provide EBT processing services for SNAP, Temporary Assistance for Needy Families (TANF) cash benefits, and other state-funded HI DHS programs. These services include processing benefit authorizations provided by HI DHS; managing the accounts through which those benefits are made available to recipients; and processing the financial transactions that transmit payments to retailers that accept payments from those accounts.

10. The Vendor's invoices for its services rendered under its contract with HI DHS are paid by Hawaiʻi. Each month, HI DHS's Vendor, on behalf of Hawaiʻi and USDA, loads the full value of each household's monthly SNAP benefit allotment into the household's account. The household members access their account by using their EBT card to purchase food in a similar manner to the way one uses a debit card.

11. As part of the SNAP administration process, HI DHS is required to regularly transmit various types of electronic benefit issuance data files ("benefit files") to its Vendor. These benefit files contain information related to individuals who have been determined eligible for SNAP benefits, and the benefit level for that individual, alongside other information. HI DHS sends multiple benefit files to the Vendor, including monthly files for active SNAP recipients. Further, HI DHS sends benefit files for SNAP recipients newly approved that month, a subset of which are individuals who have been approved for expedited SNAP benefits.

12. HI DHS uses an in-house case management system called the Hawaiʻi Automated Welfare Information (HAWI) system to generate benefit files, among many other functions.

13. Once the Vendor receives the benefit files from HI DHS, the Vendor uses that information to authorize benefits for SNAP recipients and to subsequently load the approved

monthly SNAP benefit allotment on SNAP recipients' individual EBT cards. Recipients can then use their individual EBT cards to purchase food, as of the benefit availability date, at authorized SNAP retailers.

14.     U.S. Department of Agriculture's Food and Nutrition Service (USDA-FNS) manages the process of certifying retailers for participation in the SNAP program. SNAP recipients can only use their EBT card at approved retailers.

15.     When SNAP recipients use their EBT card at a retailer's point of sale machine, an electronic message goes from the retailer's cash register to the Vendor to verify a variety of conditions including the availability of funds, and if sufficient funds are available. If the purchase is approved, the customer's EBT account is immediately debited, and the retailer's account gets credited. Neither HI DHS nor any other state agency in Hawaiʻi ever receives SNAP benefit funds as part of this process.

16.     In accordance with this process, HI DHS transmits hundreds of benefit files a month to its Vendor pursuant to a preset, contractual transmission schedule.

17.     HI DHS normally requires lead time to process SNAP benefits prior to the month in which the benefits will be issued. The SNAP benefits file is transmitted to the Vendor four business days prior to the end of the month.  For example, for SNAP benefits to be issued in November 2025, HI DHS would normally be required to start transmission of relevant benefit files to the Vendor on October 28, 2025.

18.     HI DHS did not transmit benefits files for the month November 2025 pursuant to an October 24, 2025 memorandum from USDA Deputy Under Secretary Patrick A. Penn informing Regional SNAP Directors and SNAP State Agency Directors that FNS is suspending

all November 2025 SNAP benefits effective November 1, 2025, until such time as sufficient federal funding is provided or until FNS directs State agencies otherwise.

19. On Thursday, November 6, 2025, HI DHS became aware that the U.S. District Court for the District of Rhode Island issued a temporary restraining order, ordering the federal government, in pertinent part, "to make full payments of November SNAP benefits to the states by Friday, November 7, 2025," in the case of *Rhode Island State Council of Churches, et al. v. Rollins, et al.*, C.A. No. 25-cv-569-JJM-AEM.

20. On Friday, November 7, 2025, at approximately 7:41 a.m. in Hawaiʻi, HI DHS received a memorandum from USDA-FNS, signed by USDA-FNS Deputy Under Secretary Patrick A. Penn, addressed to all SNAP Agency Directors, with the subject line "Updated Supplemental Nutrition Assistance Program (SNAP) November Benefit Issuance." A true and correct copy of this memorandum is attached hereto as **Exhibit 1**.

21. The November 7, 2025 memorandum states, in pertinent part: "FNS is working towards implementing November 2025 full benefit issuances in compliance with the November 6, 2025, order from the District Court of Rhode Island. Later today, FNS will complete the processes necessary to make funds available to support your subsequent transmittal of full issuance files to your EBT processor."

22. In reliance upon the Rhode Island temporary restraining order and USDA-FNS' November 7, 2025 memorandum, HI DHS transmitted over 78,700 full benefit files to the Vendor for the month of November 2025.

23. For those whose full benefit files were transmitted to the vendor, benefits have been loaded onto those SNAP recipients' EBT cards, who have been able to access their benefits.

24.     HI DHS took these prompt actions in reliance upon the Rhode Island temporary restraining order and USDA-FNS' November 7, 2025 memorandum because of the urgent need for SNAP recipients to access benefits needed to purchase food for their households.

25.     Later on November 7, 2025, at approximately 5:01 p.m. in Hawaiʻi, HI DHS became aware of an administrative stay of the Rhode Island temporary restraining order issued by U.S. Supreme Court Associate Justice Ketanji Brown Jackson.  By that time, all of the aforementioned full benefit files for the month of November 2025 had already been transmitted to the Vendor.

26.     HI DHS did not receive any further communications from USDA-FNS on November 7, 2025.

27.     On Saturday, November 8, 2025, at approximately 4:54 p.m. in Hawaiʻi, HI DHS received a memorandum from USDA-FNS, signed by USDA-FNS Deputy Under Secretary Patrick A. Penn, addressed to all SNAP Agency Directors, with the subject line "Updated Supplemental Nutrition Assistance Program (SNAP) November Benefit Issuance."  A true and correct copy of this memorandum is attached hereto as **Exhibit 2**.

28.     The November 8, 2025 memorandum states in pertinent part:

> The U.S. Supreme Court granted the U.S. Department of Agriculture an administrative stay of the orders issued by the District Court of Rhode Island in *Rhode Island State Council of Churches, et al. v. Rollins,* 25-cv-569. Pending any explicit direction to the contrary from Food and Nutrition Service (FNS), States must not transmit full benefit issuance files to EBT processors. Instead, States must continue to process and load the partial issuance files that reflect the 35 percent reduction of maximum allotments detailed in the November 5 guidance.
>
> To the extent States sent full SNAP payment files for November 2025, this was unauthorized. Accordingly, States must immediately undo any steps taken to issue full SNAP benefits for November 2025. Please advise the appropriate FNS Regional Office representative of steps taken to correct any actions taken that do not comply with this memorandum.

    Per 7 CFR 271.7(h), failure to comply with this memorandum may result in USDA taking various actions, including cancellation of the Federal share of State administrative costs and holding States liable for any overissuances that result from the noncompliance.

  29. HI DHS is not aware of any method to "undo any steps taken to issue full SNAP benefits for November 2025."

  30. The HAWI eligibility system does not have the ability to correct the amount issued for monthly benefits once the benefits have been authorized and sent to the Vendor. The inability of HAWI to correct the amount issued would lead to incorrect financial information reflected in the eligibility system of record, which would impact HI DHS's ability to assess whether an overpayment has occurred.

  31. As HI DHS is not aware of any method to "undo . . . steps taken to issue full SNAP benefits for November 2025," HI DHS would theoretically need to pursue overpayment procedures for all SNAP recipients that were issued the full monthly benefit amount, and which is estimated at over 78,700 households. HI DHS would collect the overpayments through various means, including entering into repayment agreements with a SNAP recipient, reducing the amount of benefits a recipient receives for a future month, or through participation in the Treasury Offset Program (TOP). According to the November 8, 2025 memorandum from the USDA, failure to undo steps taken to issue full November SNAP benefits for the 78,700 households could result in cancellation of the Federal share of state administrative costs and potential financial penalties—upwards of $32 million.

  32. DHS anticipates that pursuit of overpayment claims against SNAP recipients would result in increased administrative burden due to the manual processes required to establish an overpayment claim for over 78,700 cases. Additionally, HI DHS anticipates that the level of

operational resources needed to actively pursue over 78,700 overpayment claims will adversely impact its ability to carryout daily eligibility functions and to effectively respond to corrective action plans to address timeliness and its payment error rate.

33. Taking actions to collect on purported overpayments of November 2025 benefits would significantly erode trust between Hawaiʻi and its residents built over many years and through the dedication of significant resources. In particular, actively pursuing overpayments through repayment plans or reduction of future months benefits will further strain the ability of already low-income households to purchase food for their families, including children, individuals with disabilities, people experiencing homelessness, veterans, and the elderly.

34. To properly effectuate its safety net programs, HI DHS has devoted years of work to overcome stigma, misinformation, and other barriers to access. HI DHS is the representative of the broader SNAP framework to Hawaiʻi residents. If HI DHS takes action to pursue overpayments that result in a reduction of benefits for recipients or delays in receiving benefits, recipients are likely to feel that HI DHS has failed or engaged in wrongdoing. HI DHS has fostered trust with Hawaiʻi residents and stakeholders by representing to them that SNAP eligibility and compliance with programmatic requirements will lead to timely and full benefits issuance. SNAP benefits directly fund one of the most crucial basic human needs: access to food. Failure to deliver on that basic need as promised is a deep violation of residents' trust.

35. Furthermore, loss of trust among Hawaiʻi residents will likely lead to decreased SNAP enrollments, which in turn will cause irreparable long-term harm and costs to the State in the form of increased healthcare and safety net costs, and expending of resources to rebuild trust in the public agency. USDA-FNS has acted in disregard of those reliance interests of Hawaiʻi.

36. The action to force the active pursuit of overpayments for over 78,700 households also unduly burdens HI DHS's already limited administrative resources. Additionally, if USDA were to cancel the Federal share of state administrative costs or impose financial penalties HI DHS would experience further administrative strain that would impact its ability to effectively serve low-income households in Hawaiʻi.

37. HI DHS is already spending significant administrative resources managing communications and inquiries regarding the availability of SNAP benefits in November 2025. These communications are occurring, among other things, over call lines and in meetings with constituents and other stakeholders. Approximately 11 administrative staff members have already been required to absorb this administrative burden to handle shutdown-related concerns, in lieu of other important initiatives such as new requirements under H.R.1.

38. HI DHS also anticipates increased foot traffic and disruptions at Hawaiʻi SNAP offices as hungry individuals and families are informed about reductions to future month's benefits and the impacts of overpayments on their limited budgets, potentially necessitating increased security personnel and law enforcement presence for public safety. HI DHS employs over 400 client-facing local office staff, many of whom will need to explain to recipients why they were issued a full month of SNAP benefit and then promptly informed they will need to repay a portion of that benefit back. Many of these local office staff will face significant burdens on their time. Increased communication demands will likely require HI DHS to incur additional administrative burdens in the form of overtime pay to the limited staff available to handle this workload.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  9th  day of November, 2025, in Honolulu, Hawaiʻi.

_____
Scott Morishige
Division Administrator
Hawaiʻi Department of Human Services